132

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - - -
BRENDA K. HURSTON                    :

                Plaintiff,           :

    vs.                              :     Case No. C-1-01-313
                                     :     (Judge H. J. Weber)
BUTLER COUNTY DEPT. OF               :
JOB AND FAMILY SERVICES,             :
ET AL.                               :
                                     :
                Defendants.          :
- - - - - - - - - - - - - - - - -

VOLUME II

        Continued deposition of BRENDA K. HURSTON,

plaintiff herein, called by the defendants for

cross-examination, pursuant to the Federal Rules of

Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the offices

of City of Middletown Law Department, One Donham

Plaza, Middletown, Ohio, Cincinnati, Ohio, on

Tuesday, September 9, 2003, at 10:07 AM.

# ORIGINAL



133

1                                                    Pages:   132 - 252

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

134

1  APPEARANCES:

2

       On behalf of the Defendants:
3
           Jack C. McGowan, Esq.
4          Jack C. McGowan & Associates
           246 High Street
5          Hamilton, Ohio  45011
           Phone:  (513) 844-2000
6
   Also present:
7
   Linda F. Hagans
8

9
                              -  -  -
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

135

1                    <u>I N D E X</u>

2         Examination by:              Page

3            Mr. McGowan . . . . . . . .136

4                       -   -   -

5

6                    <u>E X H I B I T S</u>

7                                          Page

8

9  Deposition Exhibit A ................... 139
   Deposition Exhibits B, C, D, E & F ..... 140
10 Deposition Exhibit G ................... 224
   Deposition Exhibit H ................... 226
11 Deposition Exhibit I ................... 226
   Deposition Exhibit J ................... 227
12 Deposition Exhibit K ................... 228
   Deposition Exhibit L ................... 228
13 Deposition Exhibit M ................... 229
   Deposition Exhibit N ................... 231
14 Deposition Exhibit O ................... 231
   Deposition Exhibit P ................... 235
15 Deposition Exhibit Q ................... 236
   Deposition Exhibit R ................... 239
16 Deposition Exhibit S ................... 239
   Deposition Exhibit T ................... 241
17 Deposition Exhibit U ................... 243
   Deposition Exhibit V ................... 246
18 Deposition Exhibit W ................... 247

19

20                       -   -   -

21

22

23

24

136

1                    BRENDA K. HURSTON

2     being by me first duly cautioned and sworn, deposes

3     and says as follows:

4              THE WITNESS:  May I ask a question?  I

5          want to make sure that the deposition -- I want

6          a copy of it and I want it certified, because

7          last time I did not receive the deposition and

8          you said or they stated, whoever you had

9          before, claimed that they sent me the

10         deposition and they didn't.  And I want it on

11         record that I am requesting it to be certified.

12         I want to be notified certified.

13              CROSS-EXAMINATION (Continued)

14     BY MR. MCGOWAN:

15         Q.   What address do you wish to be notified at

16     as certified?

17         A.   The same address.  You already had 1812

18     Grant Avenue, Middletown, Ohio, 45044, to my

19     attention, Brenda Hurston.

20         Q.   So if the court reporter today, who is not

21     the same court reporter as we had last time,

22     communicates with you at that address with the

23     deposition, that would be the appropriate way to

24     handle this, as far as you're concerned?

137

10:08:52   1        A.    Yes.    And it should have been handled that

10:08:54   2   way before.

10:08:55   3        Q.    Well, whether it was or whether it wasn't,

10:08:57   4   I'm not here to argue with you.    I am simply asking

10:08:58   5   you to --

10:08:59   6        A.    I was not notified, sir.    I was not

10:09:00   7   notified.

10:09:04   8        Q.    Ma'am, we give instructions before

10:09:06   9   depositions.    We typically say, try not to talk at

10:09:09  10   the same time because it makes it difficult for the

10:09:13  11   court reporter.    I'll try not to interrupt you.    And

10:09:16  12   if I do, I apologize ahead of time.    You indicate to

10:09:19  13   me that I'm interrupting you, and I'll try to stop,

10:09:22  14   let you finish whatever you're trying to say.    If

10:09:25  15   you would do me the same courtesy.    That way the

10:09:27  16   court reporter will be sure to type down exactly

10:09:28  17   what we both say today.

10:09:31  18        A.    Okay.

10:09:35  19        Q.    Now, would you, again, state your full

10:09:37  20   name for us.

10:09:38  21        A.    Brenda K. Hurston.

10:09:41  22        Q.    Thank you.    Ms. Hurston, we are here after

10:09:46  23   the Court ruled that I was entitled to continue your

10:09:49  24   deposition.    Do you understand that?

138

10:09:52   1      A.    Yes.

10:09:53   2      Q.    Okay.  The last time you and I met under

10:09:56   3   these circumstances and I asked you questions you

10:10:00   4   had indicated that you had certain tapes of

10:10:04   5   conversations that you had had with people with the

10:10:08   6   Butler County Department of Human Services.  Do you

10:10:11   7   remember that testimony?

10:10:11   8      A.    Yes.

10:10:11   9      Q.    I had asked you to produce those tapes,

10:10:17  10   and the Court had ruled that I was entitled to

10:10:24  11   follow up today with regard to the tapes.  Have you

10:10:26  12   brought them with you today?

10:10:27  13      A.    Yes.

10:10:30  14      Q.    How many have you brought with you, ma'am?

10:10:32  15      A.    I brought five.

10:10:34  16      Q.    These were microcassette tapes; is that

10:10:37  17   correct?

10:10:39  18      A.    Yeah.

10:10:49  19      Q.    May I see those tapes?

10:10:52  20      A.    (Witness complies.)

10:11:08  21            MR. MCGOWAN:  We'd like the court reporter

10:11:11  22      to mark these.

10:11:13  23      Q.    We have already furnished the court

10:11:15  24   reporter a copy of the amended notice for your

10:11:17  1    deposition, Ms. Hurston.  Do you agree that the

10:11:21  2    document that I am showing to you now is, in fact,

10:11:24  3    an amended notice for your deposition?

10:11:27  4        A.   It says amended notice of deposition of

10:11:31  5    Brenda K. Hurston.  Can I turn it and see what

10:11:35  6    page -- what the date is?

10:11:39  7        Q.   Yes, ma'am.

10:11:40  8        A.   Okay.  You did this on August 29th, 2003.

10:11:42  9    You amended the notice from prior notice.

10:11:47  10       Q.   Did you receive a copy of this, ma'am?

10:11:49  11       A.   No.  Wait a minute.  Yes, I did.

10:11:56  12       Q.   All right.  And you called me and said

10:11:57  13   that would work out fine for you today, to have the

10:12:00  14   deposition taken today, correct?

10:12:01  15       A.   Yes.

10:12:02  16       Q.   All right.

10:12:02  17            MR. MCGOWAN:  Let's have that marked as

10:12:04  18       Exhibit A.

10:12:24  19                              (Deposition Exhibit A
10:12:24                                  was marked for identi-
10:12:24  20                              fication.)

10:12:25  21            MR. MCGOWAN:  I would ask the court

10:12:26  22       reporter to mark, beginning with Tag B through

10:12:31  23       C, D, E and F, the cassette tapes that Ms.

10:12:35  24       Hurston has brought with her today.

140

| | |
|---|---|
| 10:12:45 | 1 |

THE WITNESS:  Now, I'm not giving you my
tapes.  You're not keeping these tapes.  You
told me to bring them, right, so you can hear
them.

MR. MCGOWAN:  Please go ahead and mark the
deposition -- the tapes.

(Discussion off the record.)

(Deposition Exhibits B,
C, D, E & F were marked
for identification.)

MS. HAGANS:  I'm going to stop this for a
minute just to make sure it's recording
properly, because I don't know if the volume is
all the way up.

It is.

BY MR. MCGOWAN:

Q.   Ma'am, handing you what's been marked as
Deposition Exhibit B, is that one of the
microcassettes that you brought with you here today?

A.   Yeah.

Q.   It has some handwriting on the cassette
label.  Can you tell us if that's your handwriting?

A.   Yes.

Q.   Okay.  And what does that say, ma'am?

A.   "Haley's party."

141

10:15:19  1       Q.    There's no handwriting on the B side of

10:15:20  2    the tape; is that correct?

10:15:22  3       A.    Correct.

10:15:23  4       Q.    What does this tape deal with, ma'am?

10:15:25  5       A.    Haley's party.

10:15:26  6       Q.    What -- explain that for me, please.

10:15:30  7       A.    A party at Butler County.

10:15:34  8       Q.    And how does that have anything to do with

10:15:35  9    this case?

10:15:36  10      A.    It proved that they allowed people to come

10:15:39  11   into the building and have parties.

10:15:45  12      Q.    When was this party conducted?

10:15:52  13      A.    I believe around, I'm going to say 1999.

10:16:00  14      Q.    Do you remember a season of the year?

10:16:04  15      A.    To the best of my knowledge, no.

10:16:09  16      Q.    Who was in attendance at the party that

10:16:11  17   you recognized?

10:16:12  18      A.    Everybody that worked for Butler County,

10:16:17  19   as well as Linda Day.

10:16:19  20      Q.    Please give me the names of each person

10:16:22  21   that you can remember that was there that you

10:16:24  22   recognized in addition to Linda Day.

10:16:42  23      A.    Robbie Robertson, Gigi Eliff (phonetic) --

10:17:05  24   can I just say the whole unit or could I just say

142

10:17:10  1   the employees of Butler County, because it's

10:17:20  2   everybody basically that worked for Butler County.

10:17:20  3        Q.   To the extent that you remember, could you

10:17:20  4   give me the names of each person that you remember.

10:17:21  5        A.   Right now that's two -- them two as well

10:17:26  6   as Haley, the little girl, Steve DePew, and that's

10:17:46  7   to the best of my knowledge right now.

10:17:49  8        Q.   Who is Haley?

10:17:50  9        A.   She's Robbie Robertson's adopted daughter.

10:18:06  10       Q.   How long did the party last?

10:18:09  11       A.   To the best of my knowledge, I cannot tell

10:18:11  12  you how long.

10:18:13  13       Q.   Can you give me an estimate of whether it

10:18:15  14  was more than an hour or not?

10:18:21  15       A.   I cannot tell you how long.

10:18:24  16       Q.   Do you know what time of day it started?

10:18:26  17       A.   No.

10:18:29  18       Q.   You said it was in the building.  Could

10:18:30  19  you identify the building?

10:18:32  20       A.   Butler County, Department of Jobs and

10:18:34  21  Family Services.

10:18:37  22       Q.   In Middletown?

10:18:38  23       A.   Yes.

10:18:40  24       Q.   Was it on a workday?

143

| | | | |
|---|---|---|---|
| 10:18:41 | 1 | A. | Yes. |
| 10:18:41 | 2 | Q. | Was it during working hours? |
| 10:18:45 | 3 | A. | Yes. |
| 10:18:46 | 4 | Q. | You attended the party? |
| 10:18:54 | 5 | A. | No. |
| 10:18:55 | 6 | Q. | Was there a specific location within the |

10:18:57  7  department where the party was held?

| 10:19:02 | 8 | A. | The break room. |
| 10:19:03 | 9 | Q. | Break room? |
| 10:19:03 | 10 | A. | Yes. |
| 10:19:08 | 11 | Q. | Do you know approximately how old Haley |

10:19:10  12  was at the time of the party?

10:19:14  13        A.    To the best of my knowledge, I would have

10:19:17  14  to say maybe four or five.

10:19:20  15        Q.    Was it a birthday party for her?

10:19:22  16        A.    Yes, I believe.

10:19:23  17        Q.    All right.  Is Robbie Robertson a superior

10:19:31  18  or was he a superior of yours at the Butler County

10:19:35  19  Department of Job and Family Services?

10:19:39  20        A.    She's an employee.

10:19:43  21        Q.    Was she a boss or supervisor for you?

10:19:47  22        A.    No.

10:19:47  23        Q.    You said there was a person by the name of

10:19:50  24  Gigi?

144

| 10:19:51 | 1 | A. | Yes. |

A.    Yes.

Q.    What was the last name?

A.    Eliff.

Q.    Is that a female or a male?

A.    Female.

Q.    Did she work in the same unit as you did?

A.    No.

Q.    Was Julie there?  Did you say Julie was there also?

A.    Excuse me?

Q.    Julie?  Did you say there was a Julie there?

A.    No.

Q.    Okay.  Who else was there?  Steve DePew I think you said, right?

A.    Yes.

Q.    Did Steve work in the same unit as you did?

A.    No.

Q.    Linda Day I think you said was there, correct?

A.    Yeah.

Q.    All right.  Was Linda Day at that time the supervisor of any of the people that you've told me

10:20:39  1  about here?

10:20:40  2       A.    No.

10:20:40  3       Q.    And you think the party was sometime in

10:20:51  4  1999, to your best remembrance?

10:20:53  5       A.    Yes.

10:20:54  6       Q.    Do you know whether this tape is full of

10:21:00  7  recording or whether there's some portion of it?

10:21:05  8       A.    To the best of my knowledge, I believe

10:21:07  9  that's all I have on there.

10:21:09  10       Q.    And do you think the tape is fully

10:21:12  11  recorded on both sides?

10:21:13  12       A.    No.

10:21:15  13       Q.    Do you think it's about half recorded or

10:21:18  14  do you have any estimate for me?

10:21:23  15       A.    No.  The way I have it is basically it

10:21:26  16  will -- it's right where the party is at.  I might

10:21:30  17  have to rewind it so you can go to the beginning.

10:21:36  18       Q.    All right.  Does it have anything on the

10:21:39  19  tape other than Haley's party?

10:21:41  20       A.    To the best of my knowledge, I do not

10:21:43  21  know.

10:21:44  22       Q.    All right.  Is this the actual tape that

10:21:47  23  you made at the time that the party was going on?

10:21:51  24       A.    Yes.

146

| | | |
|---|---|---|
| 10:21:52 | 1 | Q. Okay. So this isn't a duplicate, this is |
| 10:21:53 | 2 | the actual tape; is that correct? |
| 10:21:55 | 3 | A. Yes. |
| 10:21:56 | 4 | Q. All right. Can you tell me if what has |
| 10:22:06 | 5 | been marked as Deposition Exhibit C is another of |
| 10:22:09 | 6 | the five microcassettes that you brought with you |
| 10:22:12 | 7 | today? |
| 10:22:13 | 8 | A. Yes. |
| 10:22:14 | 9 | Q. All right. And does it have handwriting |
| 10:22:16 | 10 | on the cassette label for that tape? |
| 10:22:21 | 11 | A. Yes. |
| 10:22:21 | 12 | Q. Does it have writing on both the A side |
| 10:22:23 | 13 | and the B side? |
| 10:22:25 | 14 | A. Yes. |
| 10:22:25 | 15 | Q. Could you read what you have written on |
| 10:22:28 | 16 | the A side for me, please. |
| 10:22:29 | 17 | A. The A side has "MJB" and "8/21/2000." |
| 10:22:39 | 18 | Q. All right. And what does this tape |
| 10:22:42 | 19 | contain that you think would be relevant to the |
| 10:22:44 | 20 | issues in this lawsuit? |
| 10:22:50 | 21 | A. A conversation with Mary Jane Benoit. |
| 10:22:56 | 22 | Q. When did that conversation take place? |
| 10:23:03 | 23 | A. August 21st, 2000. |
| 10:23:04 | 24 | Q. What was the subject matter of the |

147

| | | |
|---|---|---|
| 10:23:06 | 1 | conversation? |
| 10:23:06 | 2 | A. Probably Melissa Gully. |
| 10:23:16 | 3 | Q. What was discussed about Melissa Gully? |
| 10:23:18 | 4 | A. How she stays in the back area with Linda |
| 10:23:22 | 5 | Day. |
| 10:23:23 | 6 | Q. Why were you having that discussion with |
| 10:23:26 | 7 | Mary Benoit on August 21, 2000? |
| 10:23:30 | 8 | A. Because Melissa sits at Linda Day's desk |
| 10:23:35 | 9 | and watch me the majority of the time. |
| 10:23:41 | 10 | Q. Is Melissa Gully supervised by Linda Day? |
| 10:23:45 | 11 | A. Yes. |
| 10:23:46 | 12 | Q. What was Melissa Gully's position, if you |
| 10:23:49 | 13 | know, with the -- with Butler County at that time? |
| 10:23:51 | 14 | A. Income maintenance. |
| 10:23:54 | 15 | Q. Income maintenance? |
| 10:23:58 | 16 | A. Yes. |
| 10:23:58 | 17 | Q. Do you know generally what she did in that |
| 10:24:02 | 18 | position? |
| 10:24:02 | 19 | A. She should have been at the front desk |
| 10:24:06 | 20 | helping customers. |
| 10:24:17 | 21 | Q. Who else was present when you were |
| 10:24:19 | 22 | speaking to Mary Jane Benoit and taping the |
| 10:24:25 | 23 | conversation? |
| 10:24:26 | 24 | A. Just her and myself. |

148

10:24:28  1      Q.   Jeff Herr?

10:24:29  2      A.   Just Mary Jane Benoit and myself.

10:24:36  3      Q.   I apologize.  Just?

10:24:38  4      A.   Yes.

10:24:39  5      Q.   Okay.  And is Mary Jane Benoit supervised

10:24:42  6   by Linda Day?

10:24:43  7      A.   Yes.

10:24:44  8      Q.   What is her position, if you know, or was

10:24:47  9   at that time?

10:24:47 10      A.   To the best of my knowledge, the same as

10:24:51 11   Melissa.

10:24:59 12      Q.   Do you recall how long a conversation you

10:25:03 13   had with Ms. Benoit?

10:25:10 14      A.   I don't recall.

10:25:11 15      Q.   Is all of the conversation recorded on

10:25:15 16   Exhibit C?

10:25:16 17      A.   Yes.

10:25:19 18      Q.   How did you accomplish taping the

10:25:24 19   conversation?  Could you tell me what equipment you

10:25:25 20   used and where it was when you were talking to

10:25:30 21   Ms. Benoit?

10:25:31 22      A.   A tape-recorder.

10:25:32 23      Q.   What kind of a tape-recorder?

10:25:34 24      A.   It was bigger than this (indicating).

149

| | | |
|---|---|---|
| 10:25:35 | 1 | Q. You brought one with you today that's |
| 10:25:37 | 2 | about the size of -- what would you say the size of |
| 10:25:43 | 3 | that one that you brought today is? It's not as big |
| 10:25:47 | 4 | as a pack of cigarettes, is it? |
| 10:25:49 | 5 | A. No. |
| 10:25:50 | 6 | Q. But the one that you were using when you |
| 10:25:52 | 7 | taped the conversation with Mary Jane Benoit was |
| 10:25:56 | 8 | somewhat larger than this? |
| 10:25:57 | 9 | A. Yes. |
| 10:25:58 | 10 | Q. Do you think it was as large as a pack of |
| 10:26:02 | 11 | cigarettes? |
| 10:26:02 | 12 | A. No. |
| 10:26:02 | 13 | Q. Where did you have it? Did you have it in |
| 10:26:04 | 14 | a purse, in a pocket? |
| 10:26:06 | 15 | A. Purse -- well, no, not my purse, my |
| 10:26:09 | 16 | pocket. |
| 10:26:09 | 17 | Q. Your pocket? |
| 10:26:10 | 18 | A. Uh-huh. |
| 10:26:11 | 19 | Q. Okay. And did you tell Mary Benoit that |
| 10:26:13 | 20 | you would like to tape your conversation with her? |
| 10:26:16 | 21 | A. No. |
| 10:26:16 | 22 | Q. Do you think Mary Benoit knew that you |
| 10:26:18 | 23 | were taping the conversation? |
| 10:26:19 | 24 | A. No. |

150

| | | |
|---|---|---|
| 10:26:20 | 1 | Q.    Who initiated the conversation? |
| 10:26:22 | 2 | A.    I did. |
| 10:26:28 | 3 | Q.    And where, as close as you can tell me, |
| 10:26:31 | 4 | within the department or within the building there, |
| 10:26:32 | 5 | did this conversation take place? |
| 10:26:36 | 6 | A.    Front desk. |
| 10:26:40 | 7 | Q.    And when you say the front desk, is that, |
| 10:26:42 | 8 | when you come into the department, is that a desk |
| 10:26:46 | 9 | that you would first come to? |
| 10:26:49 | 10 | A.    It means the, I guess, customer area |
| 10:26:54 | 11 | maybe, the front desk.  It's surrounded by glass.  I |
| 10:27:00 | 12 | was inside the area where the glass was. |
| 10:27:06 | 13 | Q.    What were you doing just before you |
| 10:27:08 | 14 | initiated the conversation with Ms. Benoit? |
| 10:27:12 | 15 | A.    To the best of my knowledge, I can't -- I |
| 10:27:17 | 16 | don't know. |
| 10:27:18 | 17 | Q.    What was Ms. Benoit doing as you |
| 10:27:26 | 18 | approached her to have a conversation? |
| 10:27:31 | 19 | A.    I guess, to the best of my knowledge, just |
| 10:27:34 | 20 | sitting there. |
| 10:27:34 | 21 | Q.    Is the front desk where Mary Benoit |
| 10:27:42 | 22 | typically sits? |
| 10:27:43 | 23 | A.    Yes. |
| 10:27:44 | 24 | Q.    Okay.  Now, there's a label on the B side |

151

10:27:51  1  of the microcassette which is written on; is that

10:27:54  2  correct?

10:27:54  3      A.    Yes.

10:27:54  4      Q.    Is that your handwriting?

10:27:56  5      A.    Yeah.

10:27:56  6      Q.    Can you tell me what it says?

10:27:58  7      A.    It says "Linda, Dawn, utility cart."

10:28:04  8      Q.    Is this a different time or different

10:28:07  9  subject matter than what is on the A side of this

10:28:10  10  cassette?

10:28:10  11      A.    Yes.

10:28:12  12      Q.    Okay.  What does this have to do with the

10:28:14  13  issues in the lawsuit?

10:28:17  14      A.    Utility cart.

10:28:22  15      Q.    Please explain that for me.

10:28:24  16      A.    I had a conversation with Dawn and I had a

10:28:26  17  conversation with Linda Day.

10:28:32  18      Q.    Dawn is D-A-W-N?

10:28:34  19      A.    Yes.

10:28:34  20      Q.    And her last name?

10:28:35  21      A.    Sullivan.

10:28:44  22      Q.    Is your conversation with Dawn Sullivan

10:28:47  23  recorded on this tape?

10:28:48  24      A.    Yes.

152

| | | |
|---|---|---|
| 10:28:48 | 1 | Q.   And is your conversation with Linda Day |
| 10:28:50 | 2 | recorded on this tape? |
| 10:28:52 | 3 | A.   Yes. |
| 10:28:53 | 4 | Q.   What is the date that you had the |
| 10:28:56 | 5 | conversation with Dawn Sullivan? |
| 10:28:58 | 6 | A.   August 21st, 2000. |
| 10:29:04 | 7 | Q.   What was the subject matter of the |
| 10:29:06 | 8 | conversation with Dawn Sullivan? |
| 10:29:08 | 9 | A.   Utility cart. |
| 10:29:12 | 10 | Q.   Why were you and Dawn Sullivan discussing |
| 10:29:14 | 11 | the utility cart? |
| 10:29:16 | 12 | A.   She had -- she had one and I didn't. |
| 10:29:21 | 13 | Q.   All right.  Have you provided a transcript |
| 10:29:24 | 14 | of this tape? |
| 10:29:26 | 15 | A.   Yes. |
| 10:29:26 | 16 | Q.   And you've marked it as an exhibit? |
| 10:29:28 | 17 | A.   Yes. |
| 10:29:29 | 18 | Q.   Who did the transcript? |
| 10:29:30 | 19 | A.   I did. |
| 10:29:31 | 20 | Q.   How did you do the transcript? |
| 10:29:35 | 21 | A.   Listened to the tape and wrote it down and |
| 10:29:39 | 22 | then typed it up. |
| 10:29:40 | 23 | Q.   So you listened to a portion of the tape, |
| 10:29:43 | 24 | would write down what was said and then listen to |

10:29:46  1    some more and write down what was said, is that the

10:29:49  2    way you did it?

10:29:49  3        A.    Yes.

10:29:50  4        Q.    Okay.  Then once you had finished writing

10:29:52  5    all that down you typed it up?

10:29:53  6        A.    Yes.

10:29:54  7        Q.    All right.  Did anybody help you in doing

10:29:55  8    that?

10:29:56  9        A.    No.

10:30:02  10       Q.    Okay.  Let me go back to the tape which

10:30:06  11   we've marked as Exhibit B.  Have you done a

10:30:08  12   transcript of that tape?

10:30:09  13       A.    No.

10:30:10  14       Q.    All right.  Was anyone else present when

10:30:22  15   you were speaking with Dawn Sullivan?

10:30:24  16       A.    No.

10:30:26  17       Q.    Where did the conversation actually take

10:30:28  18   place within the workplace?

10:30:31  19       A.    My desk and her desk, somewhere in that

10:30:35  20   area.  We -- we were sitting close together.

10:30:40  21       Q.    Were your two desks close to each other?

10:30:43  22       A.    Yes.  We have a desk in between, but I

10:30:46  23   can't tell you exactly where we were positioned or

10:30:52  24   standing.

154

10:30:54    1        Q.    What was Dawn Sullivan doing as you

10:30:56    2    approached her to have the conversation?

10:30:59    3        A.    To the best of my knowledge, I do not

10:31:01    4    know.

10:31:03    5        Q.    Okay.    What were you doing as you

10:31:04    6    approached her?    Were you going to her desk as part

10:31:08    7    of some work duty that you had?

10:31:10    8        A.    To the best of my knowledge, I do not

10:31:12    9    know.

10:31:13    10        Q.    All right.    Is Dawn Sullivan supervised by

10:31:18    11    Linda Day?

10:31:18    12        A.    Yes.

10:31:19    13        Q.    Do you know her position?

10:31:31    14        A.    She was just promoted to another position,

10:31:35    15    but she was the active file clerk.

10:31:45    16        Q.    What kind of cart did she have?

10:31:49    17        A.    A plastic utility cart with handles and

10:31:55    18    wheel.

10:31:55    19        Q.    What kind of handle are we speaking of,

10:31:58    20    ma'am?

10:31:59    21        A.    Plastic big handles on each side of the

10:32:03    22    cart.

10:32:04    23        Q.    Do they stick up, straight up, the

10:32:06    24    handles?

155

10:32:07  1      A.    No.   They are positioned on the side of

10:32:17  2   the top.

10:32:17  3      Q.    All right.   Does the cart have wheels on

10:32:17  4   it?

10:32:17  5      A.    Yes.

10:32:17  6      Q.    Okay.   Now, at that time did you have a

10:32:20  7   metal cart?

10:32:22  8      A.    On that same day I received a metal cart.

10:32:26  9      Q.    All right.   Why did you and Dawn Sullivan

10:32:32 10   have a conversation about her cart on August 21,

10:32:35 11   2000?

10:32:39 12      A.    Because I had spoke to Dawn when she first

10:32:41 13   received the cart and I want to verify how she got

10:32:46 14   the cart.

10:32:47 15      Q.    Why was that?

10:32:49 16      A.    Because they just asked her did she need

10:32:52 17   one.

10:32:53 18      Q.    Did you know that before you asked Dawn?

10:32:55 19      A.    Yes.

10:32:55 20      Q.    How did you know that?

10:32:57 21      A.    Because I was the one that typed the order

10:32:59 22   up.

10:32:59 23      Q.    Okay.   Do you know if that plastic cart

10:33:06 24   had been used elsewhere within the department?

156

10:33:09  1      A.   Yes.

10:33:10  2      Q.   Had it been used in Hamilton?

10:33:12  3      A.   No.

10:33:13  4      Q.   Where else had it been used?

10:33:16  5      A.   At the -- it had been used by me before.

10:33:22  6      Q.   And when was that?

10:33:23  7      A.   To the best of my knowledge, I can't tell

10:33:24  8  you.

10:33:30  9      Q.   What did Dawn Sullivan tell you about how

10:33:33  10  she got the cart?

10:33:35  11      A.   Linda Day asked her did she want a cart.

10:33:40  12  She said yes.

10:33:41  13      Q.   Did she, did Dawn Sullivan say whether

10:33:46  14  Linda Day mentioned if the cart was coming from some

10:33:49  15  other location?

10:33:49  16      A.   No.  I typed that order up when she

10:33:52  17  received the cart.

10:33:53  18      Q.   Explain that for me if you could.

10:33:56  19      A.   Well, Linda made a request that I purchase

10:33:59  20  the cart for Dawn Sullivan.

10:34:04  21      Q.   Okay.  So you typed up an order to a

10:34:08  22  private company?

10:34:09  23      A.   Yes.

10:34:09  24      Q.   Is that Office Depot?

157

| | | |
|---|---|---|
| 10:34:10 | 1 | A.    Yes. |
| 10:34:16 | 2 | Q.    And you're not sure when that was? |
| 10:34:18 | 3 | A.    It was, to the best of my knowledge, it |
| 10:34:24 | 4 | was approximately December, around Christmastime, or |
| 10:34:34 | 5 | the first of January, I want to say 1998. |
| 10:34:57 | 6 | Q.    Do you know when the cart arrived in the |
| 10:34:58 | 7 | area where you worked? |
| 10:35:00 | 8 | A.    Approximately January. |
| 10:35:02 | 9 | Q.    Of '99? |
| 10:35:03 | 10 | A.    Yes.  I -- to the best of my knowledge, I |
| 10:35:07 | 11 | believe, uh-huh. |
| 10:35:08 | 12 | Q.    And was the cart used by anybody other |
| 10:35:11 | 13 | than yourself and Dawn Sullivan, to the best of your |
| 10:35:16 | 14 | knowledge? |
| 10:35:16 | 15 | A.    No. |
| 10:35:22 | 16 | Q.    How long did you use the cart? |
| 10:35:25 | 17 | A.    To the best of my knowledge, I can't tell |
| 10:35:27 | 18 | you that. |
| 10:35:33 | 19 | Q.    Did you use it for more than a day? |
| 10:35:38 | 20 | A.    No.  It -- it was just when I had an order |
| 10:35:42 | 21 | that I could not carry, I had put the order on the |
| 10:35:50 | 22 | utility cart. |
| 10:35:53 | 23 | Q.    Did Dawn Sullivan begin using the cart |
| 10:35:57 | 24 | when it arrived in the workplace in January of 1999? |

158

| | | |
|---|---|---|
| 10:36:04 | 1 | A.    To the best of my knowledge, yes. |
| 10:36:08 | 2 | Q.    Did you ever ask Dawn Sullivan if you |
| 10:36:09 | 3 | could use the cart also? |
| 10:36:11 | 4 | A.    Yes. |
| 10:36:12 | 5 | Q.    What did she say? |
| 10:36:14 | 6 | A.    Sure.  Nobody wasn't using it. |
| 10:36:19 | 7 | Q.    Was the cart kept in a certain location |
| 10:36:22 | 8 | when it wasn't being used by anybody? |
| 10:36:24 | 9 | A.    Yes. |
| 10:36:24 | 10 | Q.    Where was that? |
| 10:36:25 | 11 | A.    In between -- I have, like, I'm going to |
| 10:36:31 | 12 | say three locations where I had to work.  This was |
| 10:36:35 | 13 | in -- this was stationed in between the back of her |
| 10:36:43 | 14 | desk, the active file, and in front of the printing |
| 10:36:47 | 15 | area -- in front of the printing area as I walked |
| 10:36:57 | 16 | out of the door. |
| 10:36:58 | 17 | Q.    Did you ever get a plastic cart? |
| 10:37:00 | 18 | A.    Yes. |
| 10:37:00 | 19 | Q.    Do you know when? |
| 10:37:01 | 20 | A.    Approximately, I'm going to say October, |
| 10:37:06 | 21 | November. |
| 10:37:09 | 22 | Q.    Does October 23 of 2000 sound right? |
| 10:37:13 | 23 | A.    To the best of my knowledge, I cannot say. |
| 10:37:17 | 24 | Q.    But you wouldn't be surprised if it was in |

159

| | | |
|---|---|---|
| 10:37:20 | 1 | October of 2000? |
| 10:37:21 | 2 | A.    2000.   It was in 2000. |
| 10:37:23 | 3 | Q.    And you said it was either October or |
| 10:37:25 | 4 | November? |
| 10:37:25 | 5 | A.    Yes. |
| 10:37:27 | 6 | Q.    How did you get that cart? |
| 10:37:31 | 7 | A.    It was delivered. |
| 10:37:39 | 8 | Q.    By whom? |
| 10:37:41 | 9 | A.    To the best of my knowledge, I do not |
| 10:37:42 | 10 | know. |
| 10:37:44 | 11 | Q.    But you had requested that you be provided |
| 10:37:45 | 12 | such a cart? |
| 10:37:46 | 13 | A.    Yes. |
| 10:37:46 | 14 | Q.    And you had selected a page from an Office |
| 10:37:49 | 15 | Depot catalog illustrating a cart like you would |
| 10:37:52 | 16 | prefer? |
| 10:37:52 | 17 | A.    Yes. |
| 10:37:54 | 18 | Q.    That the kind of cart that was delivered? |
| 10:37:57 | 19 | A.    Yes. |
| 10:37:57 | 20 | Q.    Did you begin using that in your work? |
| 10:37:59 | 21 | A.    Yes. |
| 10:38:02 | 22 | Q.    Did you continue using that as long as you |
| 10:38:04 | 23 | worked for Butler County? |
| 10:38:07 | 24 | A.    Yes. |

160

| | | |
|---|---|---|
| 10:38:08 | 1 | Q. Was it ever taken away from you? |
| 10:38:10 | 2 | A. No. |
| 10:38:18 | 3 | Q. When did you get the metal cart? Did you |
| 10:38:20 | 4 | say that was on August the 21st? |
| 10:38:23 | 5 | A. Yes, 2000. |
| 10:38:24 | 6 | Q. Did you use the metal cart? |
| 10:38:31 | 7 | A. Well, I tried to. |
| 10:38:33 | 8 | Q. Tell me what you mean by "tried to." |
| 10:38:37 | 9 | A. The metal cart was an old cart by Dawn |
| 10:38:40 | 10 | Sullivan. She had it years before. It -- it has |
| 10:38:43 | 11 | been in the basement. The wheels would not hardly |
| 10:38:48 | 12 | move the cart. It had edges, sharp edges around the |
| 10:38:52 | 13 | cart. When I tried to use it the sharp edges could |
| 10:38:56 | 14 | have easily cut my hand. |
| 10:39:01 | 15 | Q. Did you receive any cuts from the sharp |
| 10:39:04 | 16 | edges when you tried to use it? |
| 10:39:06 | 17 | A. No, but my hand hurt from trying to pull |
| 10:39:10 | 18 | it. |
| 10:39:10 | 19 | Q. Which hand? |
| 10:39:11 | 20 | A. Both. |
| 10:39:13 | 21 | Q. What was on the cart when you were trying |
| 10:39:15 | 22 | to pull it? |
| 10:39:16 | 23 | A. Just like booklets or in binders. |
| 10:39:20 | 24 | Q. Is this a cart that you could put things |

161

| 10:39:23 | 1 | on top of the cart as well as on a section closer to |
| 10:39:27 | 2 | the wheels of the cart? |
| 10:39:29 | 3 | A.   It had a second shelf. |
| 10:39:32 | 4 | Q.   There's a top shelf? |
| 10:39:48 | 5 | A.   Yes. |
| 10:39:48 | 6 | Q.   And then the second shelf would be down |
| 10:39:48 | 7 | close to the wheels, or not? |
| 10:39:48 | 8 | A.   To the best of my knowledge, I cannot tell |
| 10:39:48 | 9 | you that. |
| 10:39:48 | 10 | Q.   Is it a rectangular metal cart? |
| 10:39:50 | 11 | A.   Yeah.  Square.  Uh-huh. |
| 10:39:51 | 12 | Q.   And gray in color, I assume, or is it some |
| 10:39:55 | 13 | special color? |
| 10:39:56 | 14 | A.   To the best of my knowledge, I couldn't |
| 10:39:59 | 15 | tell you if it was gray. |
| 10:40:01 | 16 | Q.   All right.  If you have equipment that's |
| 10:40:03 | 17 | not working properly is there a maintenance |
| 10:40:06 | 18 | department or somebody you can take a piece of |
| 10:40:07 | 19 | equipment to like a cart to see why the wheels |
| 10:40:11 | 20 | aren't working? |
| 10:40:12 | 21 | A.   No. |
| 10:40:13 | 22 | Q.   Nobody fixes carts that don't work? |
| 10:40:16 | 23 | A.   To the best of my knowledge, it was in the |
| 10:40:19 | 24 | basement.  That's why it was down there.  It was for |

162

| | | |
|---|---|---|
| 10:40:23 | 1 | auction. |
| 10:40:41 | 2 | (Discussion off the record.) |
| 10:41:25 | 3 | Q.  Did you ask Dr. Schriber to write a letter |
| 10:41:29 | 4 | to Butler County saying that you needed a cart? |
| 10:41:32 | 5 | A.  Yes. |
| 10:41:33 | 6 | Q.  Did Dr. Schriber do that? |
| 10:41:35 | 7 | A.  Yes. |
| 10:41:38 | 8 | Q.  Did he give that letter to you or did he |
| 10:41:40 | 9 | just send it directly to Butler County? |
| 10:41:42 | 10 | A.  He sent it -- to the best of my knowledge, |
| 10:41:44 | 11 | I believe he faxed it to Butler County. |
| 10:41:51 | 12 | Q.  Can you tell me about how long your |
| 10:42:00 | 13 | conversation with Dawn Sullivan was? |
| 10:42:04 | 14 | A.  To the best of my knowledge, maybe five |
| 10:42:09 | 15 | minutes. |
| 10:42:10 | 16 | Q.  And it's all on the tape, you told me, |
| 10:42:12 | 17 | right? |
| 10:42:12 | 18 | A.  Yeah. |
| 10:42:14 | 19 | Q.  Okay.  Now, there's a second conversation |
| 10:42:15 | 20 | recorded on this side of the tape, that is B? |
| 10:42:18 | 21 | A.  Yes. |
| 10:42:18 | 22 | Q.  And that is with Linda Day? |
| 10:42:20 | 23 | A.  Yes. |
| 10:42:21 | 24 | Q.  And, again, is that August 21st of 2000? |

163

10:42:26  1      A.    Yes.

10:42:27  2      Q.    Was that a conversation that you had with

10:42:29  3  Linda Day after you talked to Dawn Sullivan?

10:42:42  4      A.    To the best of my knowledge, I don't know.

10:42:45  5      Q.    As you think back today, can you remember

10:42:49  6  whether you talked to Dawn Sullivan before you

10:42:51  7  talked to Linda Day on August 21st?

10:42:58  8      A.    To the best of my knowledge, I believe I

10:43:01  9  talked to Linda Day first.

10:43:08  10      Q.    Okay.  Which conversation is recorded

10:43:09  11  first on side B of Exhibit C?

10:43:12  12      A.    I believe it's Linda.

10:43:13  13      Q.    All right.

10:43:14  14      A.    Linda.  Uh-huh.

10:43:20  15      Q.    Did either Linda Day or Dawn Sullivan

10:43:23  16  know, to the best of your knowledge, that they were

10:43:25  17  being taped when you were talking to them?

10:43:27  18      A.    No.

10:43:27  19      Q.    Did you tape the conversations with them

10:43:32  20  using the same equipment that you used for Haley's

10:43:36  21  party?

10:43:38  22      A.    Yes.  To the best of my knowledge, yes.

10:43:41  23  Uh-huh.

10:43:43  24      Q.    And where was the tape equipment located

164

10:43:45  1    when you were talking to Dawn Sullivan?

10:43:47  2        A.    In my pocket.

10:43:49  3        Q.    Okay.  Where was it located when you

10:43:50  4    talked to Linda Day?

10:43:52  5        A.    I believe in my pocket.  The same.

10:43:55  6        Q.    Where was your pocket located?

10:43:58  7        A.    To the best of my knowledge, I can't tell

10:43:59  8    you what I had on, but it was in my pocket.

10:44:02  9        Q.    Did you have any microphone plugged into

10:44:10  10   the equipment that you had or did you simply use the

10:44:13  11   self-contained microphone that's inside the tape

10:44:16  12   equipment?

10:44:19  13       A.    Just the tape-recorder.

10:44:23  14       Q.    Okay.  So you didn't have a wire going

10:44:26  15   from the tape-recorder to a microphone that was put

10:44:30  16   somewhere else on your body?

10:44:34  17       A.    No.

10:44:35  18       Q.    Do you know who was present when you were

10:44:40  19   speaking to Linda Day, that we have the tape of?

10:44:44  20       A.    Just Linda Day and myself.

10:44:47  21       Q.    Where did that conversation take place,

10:44:50  22   ma'am?

10:44:50  23       A.    To the best of my knowledge, by my desk.

10:45:00  24       Q.    What is the subject matter of the

165

10:45:01  1    conversation?

10:45:03  2        A.    Utility cart.

10:45:06  3        Q.    How did the subject of utility cart come

10:45:08  4    up between you and Linda Day?  Was that something

10:45:10  5    you brought up or something she brought up to you?

10:45:12  6        A.    To the best of my knowledge, I brought it

10:45:15  7    up.

10:45:18  8        Q.    What was your purpose in bringing it up

10:45:20  9    with Linda Day?

10:45:21  10        A.    To let her know I had used both of the

10:45:24  11    cart.  They were right there together.

10:45:27  12        Q.    Do you mean the utility cart that was made

10:45:30  13    of plastic and the utility cart made of metal?

10:45:33  14        A.    Yes.

10:45:34  15        Q.    Have you done a transcript of your

10:45:39  16    conversation with Linda Day?

10:45:40  17        A.    Yes.

10:45:41  18        Q.    And you've marked that as an exhibit?

10:45:44  19        A.    Yes.

10:45:45  20        Q.    Okay.  Did you do the transcript the same

10:45:47  21    way you did for the other one I asked you about?

10:45:49  22        A.    Yes.

10:45:55  23        Q.    Can you remember about how long you

10:45:57  24    discussed the utility cart with Linda Day on

10:45:59   1   August 21, 2000?

10:46:03   2        A.    To the best of my knowledge, maybe five

10:46:07   3   minutes.

10:46:07   4        Q.    And all of that conversation is on the

10:46:09   5   tape?

10:46:09   6        A.    Yes.

10:46:12   7        Q.    To the best of your knowledge, are there

10:46:14   8   any other conversations or other events that are

10:46:17   9   recorded on side B of Exhibit C?

10:46:22  10        A.    To the best of my knowledge, I really

10:46:24  11   don't know, because the way -- it's a lot of space

10:46:33  12   in the tape.  I made a conversation and that was it,

10:46:37  13   to the best of my knowledge.

10:46:42  14        Q.    Am I correct that these tapes are 30

10:46:44  15   minutes on a side or is it less than that?  Can we

10:46:53  16   tell?

10:46:54  17        A.    60 -- well, it's got 60 minutes, so it

10:46:58  18   probably is 30 minutes on each side.

10:47:00  19        Q.    On each side.  Okay.  Ma'am, to the best

10:47:07  20   of your knowledge, are there any duplicates of these

10:47:13  21   tapes that exist?

10:47:14  22        A.    No.

10:47:17  23        Q.    Let me move on to Exhibit D if I could.

10:47:20  24   Is that also one of the five microcassette tapes

167

| 10:47:23 | 1 | that you brought with you here today? |
| 10:47:25 | 2 | A.    Yes. |
| 10:47:32 | 3 | Q.    On the A side of this tape there is no |
| 10:47:45 | 4 | writing. |
| 10:47:45 | 5 | A.    No. |
| 10:47:45 | 6 | Q.    Do you believe there's any recording on |
| 10:47:45 | 7 | side A? |
| 10:47:45 | 8 | A.    No. |
| 10:47:45 | 9 | Q.    With regard to side B there does appear to |
| 10:47:45 | 10 | be some handwriting.   Is that yours? |
| 10:47:46 | 11 | A.    Yes. |
| 10:47:46 | 12 | Q.    Can you tell me what you wrote? |
| 10:47:49 | 13 | A.    Bruce Jewett. |
| 10:47:57 | 14 | Q.    Who is Bruce Jewett? |
| 10:47:58 | 15 | A.    The director.   The tape also has "fear" on |
| 10:48:02 | 16 | it. |
| 10:48:02 | 17 | Q.    Fear? |
| 10:48:02 | 18 | A.    Fear. |
| 10:48:03 | 19 | Q.    F-E-A-R? |
| 10:48:04 | 20 | A.    Yes. |
| 10:48:05 | 21 | Q.    When was this tape made? |
| 10:48:12 | 22 | A.    In 1998. |
| 10:48:13 | 23 | Q.    What were the circumstances? |
| 10:48:22 | 24 | A.    I had filed a grievance because I was |

| | | |
|---|---|---|
| 10:48:27 | 1 | getting reprimanded for my son sitting at a computer |
| 10:48:35 | 2 | desk and the computer was on. |
| 10:48:48 | 3 | Q. Who is Bruce Jewett, in more detail? I |
| 10:48:52 | 4 | mean, you told me he was the director, but the |
| 10:48:54 | 5 | director of what? |
| 10:48:55 | 6 | A. Of the Department of Jobs and Family |
| 10:48:56 | 7 | Services. |
| 10:49:00 | 8 | Q. Why did you happen to be speaking to Bruce |
| 10:49:03 | 9 | Jewett at that point? Was that part of the |
| 10:49:06 | 10 | grievance? |
| 10:49:07 | 11 | A. Yes. |
| 10:49:07 | 12 | Q. So was there a hearing on the grievance? |
| 10:49:09 | 13 | A. Yes. |
| 10:49:09 | 14 | Q. Who was present for that hearing? |
| 10:49:11 | 15 | A. Linda Day. |
| 10:49:12 | 16 | Q. Okay. |
| 10:49:16 | 17 | A. And Bob Bullock. |
| 10:49:19 | 18 | Q. Who is Bob Bullock? |
| 10:49:23 | 19 | A. Union president. |
| 10:49:23 | 20 | Q. Was he there as your union representative? |
| 10:49:27 | 21 | A. Yes. |
| 10:49:28 | 22 | Q. You and I talked about the union in your |
| 10:49:32 | 23 | last deposition. You said that you were at one |
| 10:49:34 | 24 | point a dues-paying member of the union, then at one |

10:49:38  1   point you got discouraged, downhearted I think you

10:49:42  2   said, and you stopped paying dues?

10:49:44  3        A.   Yes.

10:49:46  4        Q.   Okay.  Now, the hearing was for the

10:49:47  5   purpose of the grievance that you had filed over a

10:49:52  6   reprimand you received concerning your son sitting

10:49:54  7   at a computer desk?

10:49:56  8        A.   Yes.

10:49:56  9        Q.   Was it Linda Day who had reprimanded you?

10:50:06  10       A.   Yes.

10:50:09  11       Q.   Why does the word "fear" appear on the

10:50:13  12  label?

10:50:14  13       A.   Because Bruce is, in my opinion, talking

10:50:20  14  to me in a harsh tone, yelling and talking to me in

10:50:25  15  a harsh tone.

10:50:35  16       Q.   What does that have to do with the issues

10:50:38  17  in this lawsuit?

10:50:40  18       A.   Because that is the pattern -- pattern he

10:50:51  19  set so Linda Day could do what she wanted to do to

10:50:54  20  me.

10:50:55  21       Q.   What was the result of the hearing on the

10:50:56  22  grievance?

10:50:58  23       A.   The reprimand remained in my file.

10:51:07  24       Q.   Was there any discipline imposed upon you

170

10:51:12  1  as a result of the subject matter of the reprimand?

10:51:15  2      A.    Well, I was told that my son should not

10:51:21  3  come into the building.

10:51:23  4      Q.    How old was your son at the time?

10:51:26  5      A.    To the best of my knowledge, maybe 16, 17.

10:51:34  6      Q.    What is his date of birth?

10:51:37  7      A.    February 22nd, '80.

10:51:44  8      Q.    On February 22nd of 1998 then he would

10:51:47  9  have turned 18?

10:51:54  10      A.    Let me think.

10:51:56  11      Q.    You said he was --

10:51:58  12      A.    Okay.  18.  Well, he may -- let me think.

10:52:03  13  Yes.

10:52:06  14      Q.    Do you know what month the hearing with

10:52:11  15  Mr. Jewett took place?

10:52:21  16      A.    To the best of my knowledge, maybe

10:52:22  17  October.

10:52:24  18      Q.    If it were in October then your son would

10:52:26  19  have been 18?

10:52:28  20      A.    Yes.

10:52:30  21      Q.    Do you know when it was that he was

10:52:34  22  supposedly sitting at the computer desk when it was

10:52:36  23  on?

10:52:38  24      A.    When it was --

10:52:40  1        Q.    I mean, are we talking about something

10:52:41  2    that occurred in 1998?

10:52:43  3        A.    Yes.

10:52:44  4        Q.    Was it shortly before October of 1998 or

10:52:47  5    do you think it was many, many months before that?

10:52:50  6        A.    No.   It was the same period of time.

10:52:55  7        Q.    Okay.   Was your son employed by Butler

10:52:57  8    County?

10:52:59  9        A.    No.

10:53:04  10        Q.    So you believe that a person, a reasonable

10:53:07  11    person listening to this tape that records the

10:53:09  12    hearing with Bruce Jewett would understand that he

10:53:12  13    was talking to you in a harsh tone?

10:53:15  14        A.    Yes.

10:53:16  15        Q.    And that he was yelling at you, did you

10:53:20  16    say?

10:53:20  17        A.    Yes.

10:53:21  18        Q.    Did he use any curse words?

10:53:31  19        A.    To the best of my knowledge, I believe he

10:53:33  20    did.

10:53:34  21        Q.    Okay.   What do you remember that he said

10:53:36  22    in that vein?

10:53:40  23        A.    Well, was just yelling and -- you have to

10:53:43  24    hear it.

172

10:53:43  1       Q.   How long was the hearing, ma'am,

10:53:48  2  approximately?

10:53:51  3       A.   I could not tell you.

10:53:53  4       Q.   Do you know where the hearing was held?

10:53:56  5       A.   In the Hamilton office.

10:53:57  6       Q.   And who was present -- oh, we've already

10:54:00  7  gone over that.

10:54:01  8            Bruce Jewett, his last name, is that

10:54:08  9  J-E-W-E-T-T?

10:54:10 10       A.   Yes.

10:54:14 11       Q.   How long was he the director of the

10:54:16 12  department you worked in?

10:54:17 13       A.   To the best of my knowledge, 1998.

10:54:24 14       Q.   Who succeeded him as director?  In other

10:54:26 15  words, who was the next director after him?

10:54:29 16       A.   He's still there, to the best of my

10:54:31 17  knowledge.

10:54:33 18       Q.   So he's still director there.  And has he

10:54:35 19  always been the director while you were working?

10:54:37 20       A.   No.

10:54:42 21       Q.   Who was the director that was there before

10:54:44 22  Mr. Jewett?

10:54:45 23       A.   Diane Logsdon.

10:54:56 24       Q.   Was the hearing recorded by any other

10:54:58  1  means other than your tape-recorder, that you know

10:55:02  2  of?

10:55:02  3       A.    No.

10:55:02  4       Q.    There was not a court reporter present I

10:55:04  5  take it?

10:55:04  6       A.    No.

10:55:05  7       Q.    And did anybody take notes of the hearing?

10:55:12  8       A.    To the best of my knowledge, I do not

10:55:12  9  know.

10:55:14  10      Q.    All right.  Now, did you talk to

10:55:17  11 Mr. Bullock about what you might do if you were

10:55:19  12 dissatisfied with the outcome of the grievance

10:55:22  13 procedure?

10:55:24  14      A.    To the best of my knowledge, I do not

10:55:30  15 know.

10:55:32  16      Q.    Did you file an unfair labor practice

10:55:35  17 ultimately as a result of this reprimand?

10:55:38  18      A.    No.

10:55:39  19      Q.    You have filed unfair labor practice

10:55:48  20 charges against Butler County in the past, have you

10:55:48  21 not?

10:55:48  22      A.    Yes.

10:55:48  23      Q.    Did you file an unfair labor practice

10:55:48  24 charge against Butler County as a result of the

10:55:51  1  utility cart?

10:55:55  2      A.    To the best of my knowledge, I believe I

10:55:57  3  did.

10:55:59  4      Q.    Did you file one, again, an unfair labor

10:56:01  5  practice charge, against Butler County over the

10:56:07  6  reprimand that you had for not giving up notes of

10:56:12  7  comings and goings of your coworkers in October of

10:56:17  8  2000?

10:56:18  9      A.    To the best of my knowledge, I cannot tell

10:56:20 10  you that.

10:56:21 11      Q.    All right.  Are there any other matters

10:56:24 12  you can remember now that you have filed unfair

10:56:26 13  labor practice charges against Butler County over?

10:56:31 14      A.    To the best of my knowledge, at this time,

10:56:32 15  I can't tell you.

10:56:34 16      Q.    Do you know if you filed more than one

10:56:36 17  unfair labor practice charge against Butler County?

10:56:39 18      A.    Yes.

10:56:39 19      Q.    Do you think that you filed more than

10:56:44 20  three?

10:56:44 21      A.    Yes.

10:56:46 22      Q.    Have any of those unfair labor practice

10:56:48 23  charges been determined to be well founded?

10:56:56 24      A.    To the best of my knowledge, no.  They

175

10:56:59 1    were dismissed.

10:57:00 2        Q.    All of them?

10:57:02 3        A.    To the best of my knowledge, yes.

10:57:04 4        Q.    Okay.  Have you contended in an unfair

10:57:16 5    labor practice charge against Butler County that you

10:57:17 6    were discriminated against because of your race?

10:57:22 7        A.    What did you mean by "contended"?

10:57:24 8        Q.    Asserted, wrote down, alleged that it was

10:57:29 9    an unfair labor practice about something Butler

10:57:32 10   County had done and it amounted to racial

10:57:36 11   discrimination?

10:57:38 12       A.    Yes.

10:57:39 13       Q.    What happened in your life that you felt

10:57:45 14   was racially motivated as well as an unfair labor

10:57:48 15   practice by Butler County?

10:57:52 16       A.    Their action.

10:57:53 17       Q.    You have to be more specific, ma'am.

10:57:56 18       A.    Their action.  Everything they did.  Their

10:57:59 19   action on how they treated me.

10:58:04 20       Q.    Well, when you made your unfair labor

10:58:07 21   practice charge were you required to give specifics?

10:58:11 22       A.    I complained to the EEOC.  I gave

10:58:17 23   specifics.

10:58:18 24       Q.    What specifics were you speaking of?

10:58:23  1      A.    Both.  I'm sorry.  Both, I did.

10:58:26  2      Q.    Even on the unfair labor practice charge

10:58:28  3  you gave specifics, right?

10:58:29  4      A.    Yes.

10:58:31  5      Q.    Okay.  And what specifics did you give as

10:58:32  6  far as the unfair labor practices that you thought

10:58:35  7  were racially motivated?

10:58:48  8      A.    Butler County singled me out to -- to -- I

10:58:54  9  could prevent -- to submit false statements against

10:58:57 10  me to make it appear that I was doing something that

10:58:59 11  I wasn't.  The fact that also everybody that was

10:59:08 12  against me were white.  And they did not give me the

10:59:14 13  utility cart they gave everybody else, like Dawn.

10:59:17 14  She was white.  I know there's probably more, but

10:59:26 15  that's all I can re-- you know.

10:59:29 16      Q.    Who besides Dawn was given a utility cart?

10:59:32 17      A.    Just Dawn, in the Hamilton office.

10:59:39 18      Q.    Were there blacks and whites in the

10:59:42 19  Hamilton office?

10:59:42 20      A.    Yes.

10:59:43 21      Q.    Do you know if blacks and whites used the

10:59:45 22  utility cart at the Hamilton office?

10:59:46 23      A.    No.

10:59:47 24      Q.    You don't know?

| | | |
|---|---|---|
| 10:59:47 | 1 | A.   No. |
| 10:59:49 | 2 | Q.   Okay.  You say all of those who were |
| 10:59:56 | 3 | against you were white? |
| 10:59:57 | 4 | A.   Yes. |
| 10:59:57 | 5 | Q.   Who were you talking about? |
| 10:59:58 | 6 | A.   All of those who made false statements |
| 11:00:00 | 7 | against me. |
| 11:00:00 | 8 | Q.   And who are they? |
| 11:00:06 | 9 | A.   Anyone from Melissa Gully. |
| 11:00:11 | 10 | Q.   Okay. |
| 11:00:12 | 11 | A.   Pam, June Hom, Linda Day, Sherry Compton. |
| 11:00:20 | 12 | Q.   And who's Pam? |
| 11:00:24 | 13 | A.   Pam -- I don't know how to pronounce her |
| 11:00:26 | 14 | last name.  Suldosky (phonetic) maybe. |
| 11:00:30 | 15 | Q.   Can you describe her position with Butler |
| 11:00:32 | 16 | County? |
| 11:00:33 | 17 | A.   At that time, to the best of my knowledge, |
| 11:00:36 | 18 | she was a case aide, maybe a case worker. |
| 11:00:41 | 19 | Q.   What false statement did she give against |
| 11:00:43 | 20 | you? |
| 11:00:44 | 21 | A.   Well, she claimed or alleged that she -- |
| 11:00:50 | 22 | that I did -- that I was talking disrespectful to |
| 11:00:57 | 23 | her in a meaning -- in a demeaning tone.  That was |
| 11:01:01 | 24 | not true. |

178

11:01:01  1      Q.    What false statement did Sherry Compton

11:01:05  2  give against you?

11:01:07  3      A.    She's basically the same as Pam.  She said

11:01:10  4  I was disrespectful.  And -- and I approached her in

11:01:13  5  a disrespectful and demeaning manner.

11:01:15  6      Q.    Did Sherry Compton make that statement to

11:01:18  7  Linda Day?

11:01:18  8      A.    Well, you have the written statement.

11:01:21  9      Q.    I may -- do -- I may have it, but I'm

11:01:23 10  asking you a question under oath today that you have

11:01:25 11  to answer.  Do you know if Sherry Compton made that

11:01:29 12  statement to Linda Day?

11:01:31 13      A.    I cannot tell you who she gave the

11:01:34 14  statement to.  All I can tell you is that she made

11:01:37 15  the statement.

11:01:42 16      Q.    June Hom, did she make a statement to

11:01:45 17  Linda Day about you that was false?

11:01:47 18      A.    Well, especially on the computer with my

11:01:53 19  son, yes.

11:01:57 20      Q.    So June Hom was involved in the activity

11:02:00 21  that was grieved in 1998?

11:02:02 22      A.    Yes.

11:02:04 23      Q.    Involving your son and the computer?

11:02:05 24      A.    Yeah.

179

11:02:08  1     Q.    Anything else that June Hom said against
11:02:13  2  you that was false?
11:02:14  3     A.    Yes.  She have always -- well, yes.
11:02:17  4     Q.    Tell me what that was, ma'am.
11:02:18  5     A.    Well, she stated that I had taken a
11:02:23  6  three-hour lunch break on a 15-minute break in 1988,
11:02:32  7  and that was not true.
11:02:37  8     Q.    Were you disciplined for that?
11:02:39  9     A.    I feared that no -- I feared that I would
11:02:42 10  have been disciplined, but she made the false
11:02:44 11  statement against me.
11:02:46 12     Q.    No discipline, though, was imposed upon
11:02:49 13  you?
11:02:49 14     A.    No.
11:02:49 15     Q.    And when I say "discipline," I guess for
11:02:52 16  purposes of that question I should be clear, I'm
11:02:56 17  also including any type of reprimand.  Were you
11:03:01 18  reprimanded?
11:03:01 19     A.    No.
11:03:02 20     Q.    Your request for a utility cart came in
11:03:30 21  2000?
11:03:30 22     A.    No.
11:03:31 23     Q.    When did that come?
11:03:32 24     A.    It came in the year 1998 or 1999 when I

11:03:38  1  typed the requisition for Dawn Sullivan -- typed up

11:03:50  2  the requisition for purchase order.

11:03:52  3      Q.    You had a discussion with Linda Day you

11:03:53  4  said on August 21, 2000 which you requested a

11:03:57  5  plastic utility cart, correct?

11:03:59  6      A.    Yes.

11:04:05  7      Q.    You were not disciplined for requesting a

11:04:07  8  utility cart, were you?

11:04:20  9      A.    Yes.

11:04:21  10      Q.    In what way?

11:04:22  11      A.    The retaliation and the attack that I

11:04:26  12  received from the co-worker as well as Linda Day.

11:04:30  13      Q.    Now tell me what discipline you had then.

11:04:34  14      A.    Oh, the conspiring to force me out of my

11:04:37  15  job position.  So that is discipline to me, or they

11:04:41  16  hurt me.

11:04:42  17      Q.    You requested permanent disability leave,

11:04:45  18  did you not?

11:04:46  19      A.    Yes.

11:04:47  20      Q.    When did you do that?

11:04:50  21      A.    In 2001.

11:04:52  22      Q.    Was it in the winter of 2001, February?

11:04:57  23      A.    To the best -- no, not winter.  No.

11:04:59  24      Q.    March?

181

11:05:00  1        A.    Probably around May.

11:05:04  2        Q.    Had you been off on temporary leave before

11:05:06  3   that because of surgery on your foot?

11:05:08  4        A.    Yes.

11:05:09  5        Q.    Okay.  Did you go on temporary disability

11:05:12  6   leave beginning in February of 2001?

11:05:15  7        A.    Yes.

11:05:17  8        Q.    Did you stay off work continuously then

11:05:19  9   until you requested permanent medical disability?

11:05:23  10       A.    Yes.

11:05:25  11       Q.    Okay.  Dr. Janis, was that the doctor that

11:05:28  12   did the foot surgery for you?

11:05:30  13       A.    Yes.

11:05:31  14       Q.    Did Dr. Janis fill out forms for you

11:05:34  15   attesting to your disabilities?

11:05:36  16       A.    Yes.

11:05:42  17       Q.    As a result of your request to be approved

11:05:44  18   for permanent medical disability, you were, in fact,

11:05:47  19   approved, correct?

11:05:48  20       A.    Yes.

11:05:51  21       Q.    Did you then participate in the Public

11:05:54  22   Employees Fund for people who have disabilities?

11:05:59  23       A.    Yes.

11:05:59  24       Q.    Did you participate on the basis that you

182

11:06:03  1    were 100 percent disabled?

11:06:06  2         A.    To the best of my knowledge, I cannot tell

11:06:10  3    you that.

11:06:11  4         Q.    All right.  Did you fill out an

11:06:13  5    application for the Public Employees Retirement

11:06:16  6    system in connection with your disability?

11:06:17  7         A.    Yes.

11:06:19  8         Q.    And did you support that with medical

11:06:20  9    information from Dr. Janis?

11:06:22  10        A.    Yes.

11:06:22  11        Q.    Before you went on temporary medical

11:06:32  12    disability in February of 2001?

11:06:34  13        A.    Yeah.

11:06:34  14        Q.    Are you with me?

11:06:37  15        A.    (Nodding head.)

11:06:37  16        Q.    Okay.  Were you suspended from work

11:06:40  17    without pay at any time from August 21,

11:06:45  18    2000 forward?

11:06:46  19        A.    No.

11:06:47  20        Q.    Were you ever denied a promotion during

11:06:54  21    that period of time?

11:06:55  22        A.    No.

11:06:59  23        Q.    What financial loss did you sustain

11:07:01  24    between August 21, 2000 and the time that you

11:07:05  1  requested temporary medical disability?

11:07:14  2      A.    Filing a suit with Butler County as well

11:07:18  3  as I'm on permanent disability.

11:07:24  4      Q.    You have had some problems with rheumatoid

11:07:30  5  arthritis; is that correct?

11:07:32  6      A.    Yes.

11:07:33  7      Q.    Do you remember when you were first

11:07:34  8  diagnosed with rheumatoid arthritis?

11:07:45  9      A.    June of 2000.

11:07:47  10     Q.    You've had some problems with bunions?

11:07:50  11     A.    No.

11:07:51  12     Q.    Have you had any problems with a neuroma

11:07:56  13  in your foot?

11:07:57  14     A.    To the best of my knowledge, I cannot

11:08:00  15  answer that.

11:08:00  16     Q.    Dr. Janis's records go back to 1992 or so,

11:08:05  17  as far as his treatment of you.  Does that sound

11:08:09  18  about right, when he began treating you?

11:08:11  19     A.    Yeah.

11:08:11  20     Q.    And you were referred to him by a

11:08:13  21  physician in Middletown?

11:08:15  22     A.    No.

11:08:16  23     Q.    Okay.  How did you come to see Dr. Janis?

11:08:17  24     A.    I was referred to him by Dr. Walker.

184

11:08:21  1      Q.    Where's Dr. Walker's office located?

11:08:24  2      A.    In Springboro.

11:08:27  3      Q.    Okay.

11:08:27  4      A.    No.  Wait.  To the -- to the best of my

11:08:31  5   knowledge, I believe Springboro.  That's not

11:08:35  6   Springboro.  Centerville.

11:08:37  7      Q.    Is it Sure-Care?

11:08:38  8      A.    No.

11:08:39  9      Q.    Is there a practice that he's with?

11:08:41  10     A.    No.  He --

11:08:44  11           MS. HAGANS:  He was in Kettering.

11:08:45  12     A.    Kettering.  Kettering.

11:08:51  13     Q.    What was the problem that you were

11:08:53  14  experiencing that you needed Dr. Janis's help on in

11:08:56  15  1992?

11:08:57  16     A.    Butler County had -- in 1992?

11:09:01  17     Q.    Yes, ma'am.

11:09:02  18     A.    They had increased my workload and my feet

11:09:05  19  was hurting, so I needed to wear comfortable shoes.

11:09:10  20     Q.    Dr. Janis wrote in 1992 that you had been

11:09:14  21  having the onset of pain in your left foot worse

11:09:17  22  than the right foot for about two and a half years

11:09:21  23  before 1992, does that sound right?

11:09:23  24     A.    Yes.

185

11:09:26  1      Q.    When did Butler County increase your

11:09:27  2  workload?

11:09:30  3      A.    1990.

11:09:34  4      Q.    And what was that increase?

11:09:38  5      A.    Doing my job as a machine operator and

11:09:46  6  making me a purchaser.

11:09:49  7      Q.    How did that increase your activities to

11:09:53  8  the point that it aggravated your feet?

11:09:55  9      A.    I was on my feet, for most of the period

11:10:02  10 of the day, I was on my feet.

11:10:04  11     Q.    Doing what?

11:10:07  12     A.    Stock, stocking merchandise, ordering

11:10:11  13 merchandise, delivering merchandise to people within

11:10:15  14 the agency, printing forms.  I was constantly on my

11:10:19  15 feet.

11:10:19  16     Q.    Were you printing forms before that?

11:10:22  17     A.    Yes.

11:10:22  18     Q.    Were you delivering stock before that?

11:10:24  19     A.    No, just forms.

11:10:28  20     Q.    Who is Dr. Charles Hanshaw of Middletown,

11:10:31  21 Ohio?

11:10:32  22     A.    He was a family physician.

11:10:36  23     Q.    Was he your family physician at one point?

11:10:38  24     A.    At one point.

186

| | | |
|---|---|---|
| 11:10:49 | 1 | Q.    When did you last see Dr. Hanshaw? |
| 11:10:58 | 2 | A.    To the best of my ability, I cannot tell |
| 11:10:58 | 3 | you that. |
| 11:10:58 | 4 | Q.    There's a letter from Dr. Janis to him on |
| 11:10:58 | 5 | December 9, 1997.  Do you think you were seeing |
| 11:11:02 | 6 | Dr. Hanshaw in 1998? |
| 11:11:04 | 7 | A.    To the best of my knowledge, I cannot tell |
| 11:11:06 | 8 | you that. |
| 11:11:07 | 9 | Q.    Has Dr. Janis ever removed any bunions |
| 11:11:30 | 10 | from your feet? |
| 11:11:36 | 11 | A.    To the best of my knowledge, I cannot tell |
| 11:11:39 | 12 | you that. |
| 11:11:40 | 13 | Q.    Do you know if he's ever removed any bone |
| 11:11:44 | 14 | spurs from your feet? |
| 11:11:45 | 15 | A.    Yes. |
| 11:11:52 | 16 | Q.    Specifically bone spurs in the heel area? |
| 11:11:58 | 17 | A.    Yes.  And side. |
| 11:12:27 | 18 | Q.    Do you remember participating in a job |
| 11:12:30 | 19 | audit? |
| 11:12:31 | 20 | A.    Yes. |
| 11:12:31 | 21 | Q.    What do you remember about the job audit? |
| 11:12:39 | 22 | A.    I requested an audit. |
| 11:12:40 | 23 | Q.    Why did you request an audit? |
| 11:12:45 | 24 | A.    Because I was aware that my job's |

11:12:54  1    duties -- I was not getting paid for them.

11:13:00  2        Q.    Explain that for me if you would.

11:13:02  3        A.    I realized that Butler County has -- has

11:13:06  4    not -- they had me doing purchasing work and -- as

11:13:11  5    well as procurement work.

11:13:14  6        Q.    Did you file a grievance?

11:13:17  7        A.    No.

11:13:20  8        Q.    Is a job audit something that you have a

11:13:23  9    right to request under the contract that the union

11:13:26  10   has with the county?

11:13:28  11       A.    Yes.

11:13:32  12             (Discussion off the record.)

11:14:09  13       Q.    How was the job audit done, in your case?

11:14:11  14       A.    Betty Proctor came to visit one day at

11:14:17  15   Butler County and sit with me for maybe an hour at

11:14:22  16   Butler County.

11:14:23  17       Q.    Who is Betty Proctor?

11:14:25  18       A.    Personnel director.  She may not be the

11:14:32  19   director, but personnel officer.

11:14:34  20       Q.    And then what happened next as far as a

11:14:37  21   job audit was concerned?

11:14:38  22       A.    Well, I received a letter saying that my

11:14:41  23   job -- they gave me a letter indicating that my job

11:14:45  24   will remain, I guess the same, and that basically

188

11:14:51  1  denying any -- any kind of action to me, beneficial

11:14:58  2  action to me.

11:15:00  3      Q.   Did you file a grievance over that?

11:15:03  4      A.   No.

11:15:03  5      Q.   Why?

11:15:04  6      A.   I was running out of time.  I was sick.  I

11:15:08  7  was getting ready to have surgery.

11:15:19  8      Q.   Who was the letter from about the job

11:15:20  9  audit you said you got?

11:15:22  10      A.   Heath MacAlpine.

11:15:23  11      Q.   And who is he?

11:15:24  12      A.   Assistant director.

11:15:26  13      Q.   Of the jobs and family services department

11:15:29  14  of Butler County?

11:15:30  15      A.   Yes.  And may I give you another reason.

11:15:34  16  You asked me why I didn't file a grievance.

11:15:37  17      Q.   Yes, ma'am.

11:15:38  18      A.   Also Bob Bullock, the union

11:15:40  19  representative, he -- I did not feel that I could go

11:15:45  20  to him and ask for any assistance.

11:15:51  21      Q.   Did you ask the union to provide you a

11:15:53  22  different union representative?

11:15:56  23      A.   No.

11:15:57  24      Q.   What made you feel that way about Bob

189

11:15:59  1   Bullock?

11:16:01  2       A.    Bob conspired with the supervisor.  He was

11:16:06  3   not fairly representing me.

11:16:10  4       Q.    What facts do you have to support that

11:16:12  5   allegation?

11:16:18  6       A.    The fact speaks for itself.

11:16:20  7       Q.    What facts speak for themselves?

11:16:22  8       A.    All the negative things that has been

11:16:24  9   happening to me.  He did not represent me fairly.

11:16:26  10      Q.    So the fact that things didn't come out

11:16:28  11  the way you wanted them would suggest to you that he

11:16:30  12  was not doing the job?

11:16:32  13      A.    Not the way I wanted them to be, but the

11:16:35  14  way that it came out to be.  He did not advise me

11:16:40  15  properly or fairly.

11:16:47  16      Q.    In what way did he not advise you

11:16:49  17  properly?

11:16:54  18      A.    When I filed a grievance, a grievance mean

11:16:58  19  a meeting instead of grievance.  That's one example.

11:17:04  20      Q.    Can you give me any others?

11:17:06  21      A.    No, just that one.

11:17:08  22      Q.    What examples can you give me where he did

11:17:12  23  not advise you fairly or represent you fairly?

11:17:15  24      A.    That's one of them.

11:17:16  1      Q.   Any others that you can give to me?

11:17:21  2      A.   At this time, to the best of my ability,

11:17:22  3  no.

11:17:24  4      Q.   Okay.  Have you put anything in writing to

11:17:26  5  the union about your beliefs concerning Mr.

11:17:33  6  Bullock's fairness or his conspiring with your

11:17:36  7  supervisors?

11:17:37  8      A.   I filed an unfair labor practice.

11:17:41  9      Q.   How was that handled?

11:17:43  10     A.   It was dismissed.

11:17:45  11     Q.   Your unfair labor practice charge that you

11:17:47  12  just talked about was against Mr. Bullock?

11:17:50  13     A.   Yes, to --

11:17:55  14     Q.   Okay.  Did you appeal the dismissal of

11:17:57  15  that unfair labor practice charge?

11:17:58  16     A.   No.

11:17:59  17     Q.   Have you ever filed an appeal of an unfair

11:18:03  18  labor practice charge?

11:18:03  19     A.   No.

11:18:15  20     Q.   To the best of your knowledge, have we

11:18:18  21  talked about all of the subject matter that would be

11:18:21  22  on Exhibit D, the microcassette that has "Bruce

11:18:27  23  Jewett" written on it?

11:18:28  24     A.   Yes.

191

| | | |
|---|---|---|
| 11:18:29 | 1 | Q. I noticed that "Bruce Jewett" appears to |
| 11:18:31 | 2 | be written in a different type of ink than the word |
| 11:18:36 | 3 | "fear." Do you recall if those were written at the |
| 11:18:39 | 4 | same time or not? |
| 11:18:40 | 5 | A. No, they weren't. |
| 11:18:41 | 6 | Q. Which was written first? |
| 11:18:42 | 7 | A. Probably Bruce's name. |
| 11:18:45 | 8 | Q. All right. And then do you know when the |
| 11:18:49 | 9 | word "fear" was written on here? |
| 11:18:52 | 10 | A. Once I heard the tape. |
| 11:18:53 | 11 | Q. Can you tell me approximately when that |
| 11:18:55 | 12 | would have been? |
| 11:19:01 | 13 | A. Probably the same day. |
| 11:19:02 | 14 | Q. When's the last time you listened to these |
| 11:19:11 | 15 | five tapes? |
| 11:19:23 | 16 | A. To the best of my ability, it would have |
| 11:19:26 | 17 | to be, in part, say, maybe last week. I didn't |
| 11:19:36 | 18 | listen to them entirely. |
| 11:19:39 | 19 | Q. Do you think you have any other |
| 11:19:41 | 20 | microcassettes that you were unable to locate that |
| 11:19:44 | 21 | have conversations recorded with Butler County |
| 11:19:54 | 22 | personnel? |
| 11:19:54 | 23 | A. To the best of my knowledge, probably yes. |
| 11:19:54 | 24 | Q. Where do you think they are? |

192

11:19:54  1      A.    They -- they -- somewhere in my home.

11:19:56  2      Q.    Have you made an effort to try to locate

11:20:00  3   them?

11:20:00  4      A.    Yes.

11:20:01  5      Q.    If you've done that, and I'm not saying

11:20:04  6   you didn't, but why -- why do you think you still

11:20:06  7   would not have found them and they could still be in

11:20:09  8   your home?

11:20:10  9      A.    Because my house is a small house, and

11:20:12  10  when I'm sick the stuff that was laid out was packed

11:20:20  11  up -- well, I have things out.  Someone else came

11:20:24  12  and did my house or cleaned my house, and it could

11:20:28  13  be possible they could be anywhere without my

11:20:31  14  knowledge.

11:20:36  15     Q.    Have you looked for such tapes on more

11:20:37  16  than one occasion?

11:20:39  17     A.    Yes.

11:20:40  18     Q.    When's the most recent time you looked for

11:20:43  19  any microcassette tapes?

11:20:45  20     A.    Last week.

11:20:46  21     Q.    Do you think you have any of these larger

11:20:48  22  cassettes like I'm pointing to here that your sister

11:20:52  23  has been using to record our hearing today, or our

11:20:54  24  deposition today?  Do you think you have any of that

| | | |
|---|---|---|
| 11:20:57 | 1 | size that would have conversations that you had with |
| 11:21:00 | 2 | any Butler County personnel? |
| 11:21:01 | 3 | A.   No. |
| 11:21:07 | 4 | Q.   The tapes that you made when you went to |
| 11:21:09 | 5 | the post office to check on Certified Mail |
| 11:21:13 | 6 | procedures and when you talked to me about your |
| 11:21:15 | 7 | first deposition and when you talked to my office |
| 11:21:19 | 8 | about scheduling your IME appointment, those were |
| 11:21:24 | 9 | all on these larger cassettes, right? |
| 11:21:26 | 10 | A.   Yes. |
| 11:21:27 | 11 | Q.   But you're fairly confident that you don't |
| 11:21:30 | 12 | have any of these larger cassettes with any |
| 11:21:33 | 13 | conversations of Butler County people on them? |
| 11:21:35 | 14 | A.   To the best of my knowledge, I don't, to |
| 11:21:40 | 15 | the best of my knowledge. |
| 11:21:45 | 16 | Q.   Okay.   Let's look at what has been marked |
| 11:21:49 | 17 | Exhibit E.   This is a microcassette tape holder with |
| 11:21:52 | 18 | a microcassette on the inside.   This is one of the |
| 11:21:54 | 19 | tapes that you brought with you today, correct? |
| 11:21:56 | 20 | A.   Yeah. |
| 11:21:57 | 21 | Q.   If I open up the holder and look at the |
| 11:21:59 | 22 | tape itself on side A there appears to be |
| 11:22:02 | 23 | handwriting. |
| 11:22:03 | 24 | A.   Yes. |

194

| Time | Line | |
|---|---|---|
| 11:22:03 | 1 | Q.    Is that your handwriting? |
| 11:22:04 | 2 | A.    Yes. |
| 11:22:05 | 3 | Q.    Can you read it for me? |
| 11:22:08 | 4 | A.    "Kat," K-A-T, and then after -- let me |
| 11:22:14 | 5 | see.  It's got "day after," and it's got "payday, |
| 11:22:20 | 6 | 8/18, 2000," and "Are you watching me?" |
| 11:22:27 | 7 | Q.    That's on side A.  Do you have something |
| 11:22:29 | 8 | written on side B label? |
| 11:22:31 | 9 | A.    "10/17/2000." |
| 11:22:35 | 10 | Q.    What does "10/17/2000" refer to, ma'am? |
| 11:22:39 | 11 | A.    I believe it refers to -- it's got "LD" |
| 11:22:45 | 12 | and "JH."  I believe it refers to Linda Day and June |
| 11:22:50 | 13 | Hom. |
| 11:22:57 | 14 | Q.    Are these separate conversations or a |
| 11:23:00 | 15 | conversation with both of them at the same time? |
| 11:23:02 | 16 | A.    I believe it's a conversation with both at |
| 11:23:04 | 17 | the same time. |
| 11:23:05 | 18 | Q.    And is it on the date of October 17, 2000? |
| 11:23:09 | 19 | A.    Yes. |
| 11:23:10 | 20 | Q.    Do you remember the circumstances of that |
| 11:23:11 | 21 | conversation? |
| 11:23:14 | 22 | A.    To the best of my knowledge, it is that |
| 11:23:20 | 23 | Linda Day called me in to a hearing or meeting. |
| 11:23:27 | 24 | Q.    And what happened? |

11:23:29   1        A.    Well, she asked me about Sherry, Sherry

11:23:33   2   Compton.

11:23:34   3        Q.    What did she ask you about?

11:23:38   4        A.    Oh.  She asked me was I approaching people

11:23:42   5   in a disrespectful, demeaning manner.  And she

11:23:48   6   wanted -- she said that I was documenting people's

11:23:57   7   comings and goings.  I believe that's what it says.

11:24:03   8        Q.    Have you done a transcript of this side of

11:24:05   9   the tape?

11:24:06   10       A.    No.

11:24:08   11       Q.    If I listen to this tape will I hear your

11:24:10   12   voice?

11:24:11   13       A.    Yes.

11:24:11   14       Q.    Will I hear Linda Day?

11:24:13   15       A.    Yes.

11:24:14   16       Q.    Will I hear June Hom?

11:24:16   17       A.    No, not June.

11:24:17   18       Q.    What was June's role?

11:24:20   19       A.    Linda Day requested that she be there.

11:24:23   20       Q.    So she was present when this conversation

11:24:25   21   took place?

11:24:26   22       A.    Yes.

11:24:26   23       Q.    But she does not say anything on tape?

11:24:28   24       A.    Right.