196

| | | |
|---|---|---|
| 11:24:29 | 1 | Q.    Did she say anything, as you recall, that |
| 11:24:31 | 2 | didn't make it on tape? |
| 11:24:34 | 3 | A.    Excuse me? |
| 11:24:35 | 4 | Q.    Sometimes tape recorders don't pick up |
| 11:24:38 | 5 | everything that's said.  Do you believe June Hom |
| 11:24:41 | 6 | said something that's not on the tape? |
| 11:24:43 | 7 | A.    No. |
| 11:24:47 | 8 | Q.    How long did this conversation with Linda |
| 11:24:49 | 9 | Day take? |
| 11:24:51 | 10 | A.    To the best of my knowledge, maybe 10 |
| 11:24:53 | 11 | minutes.   Maybe. |
| 11:24:53 | 12 | Q.    And where did it take place? |
| 11:24:56 | 13 | A.    In one of the conference rooms. |
| 11:25:02 | 14 | Q.    Was the door closed? |
| 11:25:04 | 15 | A.    To the best of my knowledge, I can't tell |
| 11:25:05 | 16 | you. |
| 11:25:05 | 17 | Q.    What does this have on it that would |
| 11:25:17 | 18 | pertain to your lawsuit? |
| 11:25:23 | 19 | A.    Their action against me. |
| 11:25:25 | 20 | Q.    Okay.  Tell me, what kind of action? |
| 11:25:28 | 21 | A.    They wanted my notes, my personal notes, |
| 11:25:31 | 22 | and they wanted to -- well -- well, that day she did |
| 11:25:37 | 23 | not tell me about Sherry.  She basically was |
| 11:25:41 | 24 | accusing me of approaching people in a |

| | | |
|---|---|---|
| 11:25:45 | 1 | disrespectful, unprofessional manner. |
| 11:25:48 | 2 | Q.   She said she had had some people tell her |
| 11:25:50 | 3 | that you were talking to them disrespectfully? |
| 11:25:53 | 4 | A.   Yes. |
| 11:25:53 | 5 | Q.   And you denied it? |
| 11:25:57 | 6 | A.   Yes. |
| 11:25:57 | 7 | Q.   And she asked you to watch it; is that |
| 11:26:06 | 8 | correct? |
| 11:26:07 | 9 | A.   Excuse me? |
| 11:26:08 | 10 | Q.   Did she ask you to watch how you spoke to |
| 11:26:10 | 11 | other people? |
| 11:26:14 | 12 | A.   To the best of my knowledge, it may be |
| 11:26:18 | 13 | possible, I think -- but she told me that -- no. |
| 11:26:21 | 14 | Huh-uh.  No.  She asked me had I spoken with |
| 11:26:26 | 15 | somebody -- I don't believe -- no, she did not say |
| 11:26:35 | 16 | watch. |
| 11:26:35 | 17 | Q.   Did she say, Be careful how you speak to |
| 11:26:35 | 18 | other people, that they may perceive the way you're |
| 11:26:35 | 19 | talking to them to be offensive? |
| 11:26:37 | 20 | A.   On this tape I cannot, to the best of my |
| 11:26:39 | 21 | knowledge, I cannot say. |
| 11:26:40 | 22 | Q.   All right.  Let me ask you about A side. |
| 11:26:49 | 23 | All right? |
| 11:26:50 | 24 | A.   (Nodding head.) |

198

| | | |
|---|---|---|
| 11:26:51 | 1 | Q.   This is a conversation that you had with |
| 11:26:54 | 2 | Sherry Compton? |
| 11:26:56 | 3 | A.   Yes. |
| 11:26:58 | 4 | Q.   Is Sherry Compton sometimes referred to as |
| 11:27:01 | 5 | Kat? |
| 11:27:02 | 6 | A.   Yes. |
| 11:27:03 | 7 | Q.   C-A-T? |
| 11:27:06 | 8 | A.   Kat.   That's all I know.   Kat.   I can't |
| 11:27:09 | 9 | tell you if it's K-A-T or C-A-T. |
| 11:27:14 | 10 | Q.   Because you've got it spelled on here |
| 11:27:16 | 11 | K-A-T? |
| 11:27:17 | 12 | A.   Right.   Her name's Kathy as well, I |
| 11:27:19 | 13 | believe. |
| 11:27:20 | 14 | Q.   So that's where Kat comes from? |
| 11:27:22 | 15 | A.   Yes. |
| 11:27:23 | 16 | Q.   Nickname? |
| 11:27:24 | 17 | A.   Excuse me? |
| 11:27:25 | 18 | Q.   Is it a nickname, as best you understand? |
| 11:27:28 | 19 | A.   Yes. |
| 11:27:29 | 20 | Q.   Okay.   Why were you having a conversation |
| 11:27:36 | 21 | with Sherry Compton that was recorded here? |
| 11:27:38 | 22 | A.   I asked her was she watching me. |
| 11:27:40 | 23 | Q.   And why was that of concern to you? |
| 11:27:42 | 24 | A.   Because she was watching me. |

199

| 11:27:45 | 1 | Q. If she were watching you, why would that |
| 11:27:49 | 2 | be of concern to you? |
| 11:27:53 | 3 | A. Because -- because she was watching me. |
| 11:27:58 | 4 | Q. You weren't doing anything wrong, were |
| 11:28:00 | 5 | you? |
| 11:28:00 | 6 | A. Pardon? |
| 11:28:01 | 7 | Q. You were not doing anything wrong, were |
| 11:28:02 | 8 | you? |
| 11:28:03 | 9 | A. No. |
| 11:28:04 | 10 | Q. So what would be the problem with her |
| 11:28:06 | 11 | watching you? |
| 11:28:07 | 12 | A. Because she watched me for all day, |
| 11:28:09 | 13 | basically. |
| 11:28:11 | 14 | Q. Now, did she tell you that she was not |
| 11:28:13 | 15 | watching you? |
| 11:28:14 | 16 | A. Yes. |
| 11:28:14 | 17 | Q. Have you done a transcript of this |
| 11:28:19 | 18 | conversation with Sherry Compton? |
| 11:28:22 | 19 | A. Yes. |
| 11:28:22 | 20 | Q. Have you marked it as an exhibit? |
| 11:28:24 | 21 | A. Yes. |
| 11:28:24 | 22 | Q. Is there a reason why you did a transcript |
| 11:28:33 | 23 | of that conversation and would not have done one for |
| 11:28:36 | 24 | the B side that contains the meeting that you had |

200

11:28:40  1   with Linda Day?

11:28:42  2       A.   Well, on the B side, 10/17, 2000, I

11:28:49  3   haven't -- I've been sickly and I just haven't --

11:28:53  4   these tapes makes me feel bad.

11:28:56  5       Q.   Okay.

11:28:58  6       A.   So I do it when I can.

11:29:06  7       Q.   Why is the word "payday" written on this

11:29:09  8   cassette, ma'am?

11:29:10  9       A.   Because that's probably the day we got

11:29:12 10   paid.

11:29:13 11       Q.   The day you talked to Sherry Compton was

11:29:16 12   the day you got paid?

11:29:19 13       A.   No.  Payday, August 18th, 2000, day after

11:29:28 14   that -- it's two different inks on there.

11:29:31 15       Q.   Okay.  Do you think you wrote "payday" on

11:29:33 16   there at a time different than what "Kat" was

11:29:36 17   written on there?

11:29:37 18       A.   Yes.

11:29:40 19       Q.   Do you know why you wrote "payday" on

11:29:42 20   there?

11:29:42 21       A.   I guess to verify the day.

11:29:45 22       Q.   Does this side A have more on it than your

11:29:52 23   conversation with Sherry Compton?

11:29:57 24       A.   Yes, probably so, because it got "payday."

```
11:30:00   1        Q.   Okay.  What else does it have on there
11:30:01   2   then?
11:30:02   3        A.   To the best of my knowledge, I can't -- I
11:30:04   4   don't know.
11:30:04   5        Q.   Payday doesn't help you recall?
11:30:06   6        A.   Well, no.  On -- the 8/18 do.  Sadie
11:30:11   7   Williams was fired on the 17th.
11:30:19   8        Q.   Sadie Williams was fired on the 17th of
11:30:22   9   August of 2000?
11:30:23  10        A.   Yes.
11:30:25  11        Q.   All right.
11:30:27  12        A.   And it do now.  Yes, it does.  Butler
11:30:31  13   County came after me on 8/18, 2000.
11:30:35  14        Q.   What do you mean by Butler County came
11:30:36  15   after you on August 18, 2000?
11:30:38  16        A.   They proceeded to start making false
11:30:43  17   accusations against me.
11:30:48  18        Q.   Who made a false accusation against you on
11:30:50  19   August 18?
11:30:51  20        A.   Linda Day would not state at that time who
11:30:54  21   did.
11:31:40  22        Q.   So what else do you think now, if
11:31:42  23   anything, is on this side A besides the conversation
11:31:46  24   with Sherry Compton?  Is there a conversation with
```

202

| | | |
|---|---|---|
| 11:31:48 | 1 | Linda Day? |
| 11:31:50 | 2 | A. Yes, I believe. |
| 11:31:52 | 3 | Q. And this conversation has to do with her |
| 11:31:55 | 4 | telling you that people were making complaints about |
| 11:32:00 | 5 | you? |
| 11:32:00 | 6 | A. You -- yes. You have it. |
| 11:32:04 | 7 | Q. Well, I thought that was in October, but |
| 11:32:06 | 8 | we're talking here about August the 18th. |
| 11:32:09 | 9 | A. Yes. |
| 11:32:09 | 10 | Q. So I may be confused. I'm simply trying |
| 11:32:13 | 11 | to understand what you think is on this tape. |
| 11:32:14 | 12 | A. Yes. You have that transcript. |
| 11:32:16 | 13 | Q. Of August 18? |
| 11:32:18 | 14 | A. Yes. |
| 11:32:19 | 15 | Q. And it's an exhibit? |
| 11:32:21 | 16 | A. Yes. |
| 11:32:22 | 17 | Q. Okay. Who was present when that |
| 11:32:26 | 18 | conversation occurred? |
| 11:32:28 | 19 | A. Linda Day and myself. |
| 11:32:31 | 20 | Q. Anybody else? |
| 11:32:32 | 21 | A. No. |
| 11:32:55 | 22 | Q. So side A has a conference or conversation |
| 11:32:59 | 23 | that you had with Sherry Compton, it has a |
| 11:33:05 | 24 | conversation that you had with Linda Day. Do you |

11:33:10  1  think it has more on it than that?

11:33:12  2      A.   To the best of my knowledge, those are the

11:33:15  3  only two conversations, I believe.

11:33:17  4      Q.   All right.  To the best of your knowledge,

11:33:25  5  did either Linda Day or Sherry Compton know that you

11:33:29  6  were taping the conversation that you had with them?

11:33:34  7      A.   No.

11:33:35  8      Q.   Did you initiate the conversation with

11:33:36  9  Sherry Compton?

11:33:37  10      A.   Yes.

11:33:41  11      Q.   Did you initiate the conversation with

11:33:43  12  Linda Day?

11:33:43  13      A.   No.

11:33:44  14      Q.   Where did that conversation take place?

11:33:46  15      A.   Which one?

11:33:47  16      Q.   I'm sorry.  The one with Linda Day.

11:33:49  17      A.   In the conference room.

11:33:50  18      Q.   How about the one with Sherry Compton?

11:33:58  19      A.   By the bathroom or break room.

11:34:00  20      Q.   Do you know of anyone that was within

11:34:02  21  hearing distance of your conversation with Sherry

11:34:04  22  Compton?

11:34:07  23      A.   To the best of my knowledge, no, because

11:34:09  24  we had walked from one area right into the aisle

204

| | | |
|---|---|---|
| 11:34:15 | 1 | where it wasn't nobody there, as far as I'm aware |
| 11:34:19 | 2 | of. |
| 11:34:19 | 3 | Q.    Had you talked to an employee by the name |
| 11:34:31 | 4 | of Tammy about your concern that Sherry Compton was |
| 11:34:31 | 5 | watching you? |
| 11:34:31 | 6 | A.    Yes. |
| 11:34:31 | 7 | Q.    And who is Tammy? |
| 11:34:32 | 8 | A.    Security. |
| 11:34:33 | 9 | Q.    For Butler County, Department of Job and |
| 11:34:35 | 10 | Family Services? |
| 11:34:38 | 11 | A.    Yes. |
| 11:34:38 | 12 | Q.    And what, in the area of security, what |
| 11:34:41 | 13 | did she actually do in her job? |
| 11:34:46 | 14 | A.    Which one, Tammy? |
| 11:34:48 | 15 | Q.    Tammy. |
| 11:34:48 | 16 | A.    In the front area. |
| 11:34:50 | 17 | Q.    Was Sherry Compton in security as well? |
| 11:34:53 | 18 | A.    Yes. |
| 11:34:54 | 19 | Q.    And what did she do? |
| 11:34:56 | 20 | A.    She stayed in the back the majority of the |
| 11:35:00 | 21 | time. |
| 11:35:00 | 22 | Q.    All right. |
| 11:35:02 | 23 | A.    But sometimes she would be in the front. |
| 11:35:05 | 24 | Q.    Where was she when you say that you saw |

11:35:09  1  her watching you?

11:35:10  2      A.    In the back.

11:35:14  3      Q.    And where in the back was she?

11:35:16  4      A.    Basically around, I'm going to say two

11:35:21  5  seats from my left -- no, two seats from my right

11:35:25  6  and back maybe two seats.  She was like right behind

11:35:29  7  me watching me.

11:35:31  8      Q.    Was she standing or seated?

11:35:32  9      A.    Seated.

11:35:34  10     Q.    Was that her desk?

11:35:35  11     A.    No.

11:35:36  12     Q.    Who's desk was it?

11:35:38  13     A.    Susan Oakes.

11:35:39  14     Q.    And who is Susan Oakes?

11:35:41  15     A.    She was a case worker there.  And Susan

11:35:44  16  was not there for the day.

11:35:50  17     Q.    Do you know who Sherry Compton's

11:35:54  18  supervisor was?

11:35:59  19     A.    He same -- no, but he came into the

11:36:02  20  office.

11:36:02  21     Q.    When?

11:36:05  22     A.    After they submitted letters.  After

11:36:09  23  Sherry submitted her statement to Butler County.

11:36:20  24     Q.    Sherry Compton submitted a statement in

206

| | | |
|---|---|---|
| 11:36:22 | 1 | which she discussed her conversation with you, |
| 11:36:26 | 2 | correct? |
| 11:36:26 | 3 | A.    Yes. |
| 11:36:28 | 4 | Q.    You've reviewed that statement? |
| 11:36:31 | 5 | A.    Yes. |
| 11:36:32 | 6 | Q.    Is there anything false in that statement? |
| 11:36:36 | 7 | A.    Yes. |
| 11:36:36 | 8 | Q.    What is it that's false in that statement? |
| 11:36:38 | 9 | A.    You have it. |
| 11:36:40 | 10 | Q.    I have the statement, but I don't know |
| 11:36:42 | 11 | what you say is false. |
| 11:36:43 | 12 | A.    Yes, you have.  I submitted a transcript |
| 11:36:45 | 13 | to you. |
| 11:36:45 | 14 | Q.    Well, what do you say was false that |
| 11:36:48 | 15 | Sherry said? |
| 11:36:49 | 16 | A.    Well, you have her statement and what I |
| 11:36:51 | 17 | wrote, how she said I approached her in a demeaning |
| 11:36:54 | 18 | manner and disrespectful.  None of that was true. |
| 11:36:58 | 19 | Q.    Okay. |
| 11:36:59 | 20 | A.    And she also told me that I should have |
| 11:37:01 | 21 | came to her a long time ago.  And you read my |
| 11:37:05 | 22 | transcript.  It's different from her statement. |
| 11:37:17 | 23 | Q.    I read the transcript, and I thought that |
| 11:37:22 | 24 | she said in there to you that you should have come |

11:37:24  1    to her if you had a concern about her watching you.

11:37:27  2        A.    Yes.

11:37:28  3        Q.    She did say that, did she?

11:37:30  4        A.    I believe so, yes, but she said it in a

11:37:33  5    pleasant manner, as a concerned manner.  She didn't

11:37:38  6    say it in a negative manner.  It was like she was

11:37:41  7    sympathizing with what I was going through.

11:37:44  8        Q.    Okay.  In the transcript it seemed that

11:37:49  9    she took offense at the fact that you went to Tammy

11:37:52  10   before you went to her about this problem.

11:37:54  11       A.    Yes, she did.

11:38:11  12       Q.    I'm going to ask you about what's been

11:38:20  13   marked as Deposition Exhibit F, Ms. Hurston.  This

11:38:26  14   is another of the microcassettes that you brought

11:38:32  15   with you today, correct?

11:38:33  16       A.    Yes.

11:38:34  17       Q.    And if we open up the container -- there

11:38:43  18   we go -- there is no handwriting on the B side,

11:38:48  19   correct?

11:38:48  20       A.    Correct.

11:38:49  21       Q.    But there is handwriting on the A side,

11:38:52  22   correct?

11:38:52  23       A.    Yes.

11:38:53  24       Q.    Is that your handwriting?

11:38:55   1        A.    Yes.

11:38:56   2        Q.    Can you read it for me, please.

11:38:58   3        A.    It says "Written reprimand, 10/17/00."

11:39:03   4    Then it's got Linda Day, or "L. Day," and it's got

11:39:09   5    "BB MB."

11:39:12   6        Q.    What does that stand for, ma'am?

11:39:15   7        A.    It stands for Madeline Burns.

11:39:19   8        Q.    Madeline Burns?

11:39:22   9        A.    Yeah.

11:39:22  10        Q.    Who is Madeline Burns?

11:39:25  11        A.    Supervisor.

11:39:26  12        Q.    Why does it have that on it?  Why did you

11:39:29  13    write that there?

11:39:30  14        A.    Because Linda asked her to sit in on the

11:39:32  15    meeting.

11:39:36  16        Q.    Is her voice on this tape?

11:39:38  17        A.    No.

11:39:39  18        Q.    Whose voices are on the tape?

11:39:41  19        A.    Mine's, Linda Day and Bob Bullock.  That's

11:39:45  20    what the "BB" is for.

11:39:50  21        Q.    Do you know whether the whole one side of

11:39:54  22    this cassette is recorded?

11:39:58  23        A.    To the best of my knowledge, no.

11:40:00  24        Q.    Do you remember about how long this

11:40:01   1   hearing took?

11:40:09   2          A.    To the best of my knowledge, maybe 10 to

11:40:10   3   15 minutes, maybe.

11:40:15   4          Q.    Was there anybody present for the hearing

11:40:17   5   we haven't identified?

11:40:18   6          A.    No.

11:40:19   7          Q.    Where did it take place, ma'am?

11:40:28   8          A.    To the best of my knowledge, the

11:40:29   9   conference room.

11:40:30  10          Q.    In Middletown?

11:40:32  11          A.    Yes.

11:40:33  12          Q.    Was there any record kept of the hearing,

11:40:34  13   such as a court reporter, a tape-recorder, other

11:40:39  14   than your own, any notes being taken?

11:40:42  15          A.    To the best of my knowledge, no.

11:40:43  16          Q.    Okay.    This was a hearing where Bob

11:40:50  17   Bullock was there as union representative?

11:40:54  18          A.    Yes.

11:41:01  19          Q.    What occurred during the hearing, in

11:41:03  20   general?

11:41:05  21          A.    I received the reprimand, the written

11:41:08  22   reprimand.

11:41:09  23          Q.    What was that written reprimand based

11:41:13  24   upon?

210

11:41:14    1        A.    Sherry Compton and not giving my personal
11:41:20    2   notes.
11:41:21    3        Q.    Okay.  Could you explain what personal
11:41:26    4   notes you're referring to?
11:41:27    5        A.    I had personal notes that I kept at home
11:41:31    6   or in my car.  They wanted me to bring my notes in
11:41:36    7   and give them my notes.
11:41:39    8        Q.    And you wouldn't do that?
11:41:41    9        A.    Right.
11:41:42   10        Q.    What were these notes for?  What was the
11:41:46   11   purpose of keeping these notes?
11:41:47   12        A.    I was just keeping the notes as a
11:41:50   13   protection for myself, because they were after me.
11:41:57   14        Q.    Did you and Linda Day have a discussion
11:42:11   15   about those notes the day before the hearing?
11:42:11   16        A.    Yes.  That was the day.  Let me see.  Yes,
11:42:12   17   on the 17th is when we had the discussion.
11:42:15   18        Q.    And she, as I understand the documents
11:42:19   19   here, she says that she ordered you to give her
11:42:23   20   those notes; do you remember that?
11:42:25   21        A.    She asked me if I had any notes.  I told
11:42:30   22   her I had personal notes.  So, what she did, she
11:42:35   23   told me -- she didn't ask me where they were at, she
11:42:41   24   just told me to, I guess, bring them in, bring any

211

11:42:45  1    personal notes I had in.  And -- well, she asked me

11:42:52  2    did I writing down the comings and the goings of

11:42:57  3    employees, and at that time I was not.

11:42:59  4        Q.    But you did tell her that you did have

11:43:01  5    such notes, didn't you?

11:43:02  6        A.    Yes, I did tell her I have notes, yeah.

11:43:04  7        Q.    And that the notes involved the comings

11:43:07  8    and goings of the employees there?

11:43:09  9        A.    Yes, they do.

11:43:10  10        Q.    Okay.  But you told her that, and then she

11:43:15  11    told you to turn them over, and you said they're

11:43:17  12    your personal notes and you didn't want to turn them

11:43:21  13    over, right?

11:43:21  14        A.    Right.

11:43:22  15        Q.    Okay.  And then the next day you were

11:43:24  16    given a written reprimand for your contact, you

11:43:27  17    said, with Sherry Compton and for your failure to

11:43:31  18    bring the notes in?

11:43:32  19        A.    Yes.  Well, she asked me would I bring --

11:43:35  20    they asked me would I bring my notes in and put them

11:43:37  21    in an envelope.  And I told them no.

11:43:40  22        Q.    Do you still have those notes today?

11:43:43  23        A.    Yes.

11:43:44  24        Q.    Do you intend to use them as evidence in

212

11:43:47  1  this case?

11:43:47  2       A.   It's a possibility.

11:43:49  3       Q.   Okay.  Have you produced them?

11:43:52  4       A.   No.

11:43:55  5       Q.   We would ask that you make copies of them

11:43:57  6  and produce them, if you're going to use them as

11:44:00  7  evidence.

11:44:00  8       A.   If I'm going to use them as evidence I

11:44:03  9  will.

11:44:04  10       Q.   When do you think you'll make that

11:44:05  11  decision, ma'am?

11:44:07  12       A.   Well, don't we have to do a pretrial?

11:44:09  13       Q.   Well, I'm entitled to discover things

11:44:12  14  before the pretrial.

11:44:13  15       A.   Well, if I use them I will, but I haven't

11:44:16  16  even looked at them.

11:44:19  17       Q.   Do you know where they are right now?  I

11:44:21  18  mean, could you say, Oh, I know they're in a

11:44:23  19  specific place in my house?

11:44:24  20       A.   Yes.

11:44:25  21       Q.   Okay.  So this isn't something that may

11:44:27  22  have gotten put somewhere else by somebody that

11:44:33  23  cleaned your house?

11:44:34  24       A.   Right.

213

11:44:34　1　　　　Q.　Okay.　Are we talking about volumes and

11:44:36　2　volumes of paper?

11:44:39　3　　　　A.　No.

11:44:40　4　　　　Q.　Are we talking about more than 10 sheets?

11:44:43　5　　　　A.　Maybe.

11:44:44　6　　　　Q.　Is there any way you can estimate for me

11:44:46　7　how many sheets we're talking about?

11:44:48　8　　　　A.　No.

11:44:48　9　　　　Q.　Do you think it's as much as a full legal

11:44:52　10　pad of paper?

11:44:53　11　　　　A.　To the best of my ability, no.

11:44:57　12　　　　Q.　Whose comings and goings were you

11:44:59　13　recording?

11:45:00　14　　　　A.　I wasn't recording who's comings and

11:45:03　15　goings.　I was just recording my transactions of me

11:45:07　16　and what I do and what involves me.

11:45:11　17　　　　Q.　Why did you tell Linda Day that you were

11:45:15　18　keeping notes of comings and goings of people?

11:45:18　19　　　　A.　If I did I would have to put down me, if I

11:45:21　20　went to the doctor.　Or say for instance if somebody

11:45:25　21　came to me, asked me for something or I talked to

11:45:28　22　someone, I may have put them down.　Anybody that

11:45:31　23　came in contact with me or -- or basically have

11:45:35　24　something to do with me.

| 11:45:40 | 1 | Q. So let me see if I understand what you're |
| 11:45:41 | 2 | telling me. If a person took a break, would that |
| 11:45:46 | 3 | kind of information, as far as the time they took on |
| 11:45:49 | 4 | their break, would that be in your notes? |
| 11:45:52 | 5 | A. Only -- only if it involves me or has |
| 11:45:56 | 6 | something to do with me. |
| 11:46:06 | 7 | (Discussion off the record.) |
| 11:46:13 | 8 | MR. MCGOWAN: While we were off the |
| 11:46:14 | 9 | tape-recorder Ms. Hurston had indicated that |
| 11:46:17 | 10 | she needed to take a break, and I'm fine with |
| 11:46:19 | 11 | that. |
| 11:46:20 | 12 | THE WITNESS: Yes. |
| 11:46:21 | 13 | (Recess taken: 11:46 a.m. - 11:56 a.m.) |
| 11:57:01 | 14 | BY MR. MCGOWAN: |
| 11:57:02 | 15 | Q. You were talked to about a break that you |
| 11:57:04 | 16 | allegedly took that was more than 15 minutes; do you |
| 11:57:08 | 17 | remember that? |
| 11:57:09 | 18 | A. It was alleged that I took 15-minute |
| 11:57:13 | 19 | break -- I mean, took over 15 minutes. |
| 11:57:15 | 20 | Q. Took over 15 minutes. So the fact that |
| 11:57:18 | 21 | you were talked to about that, would that mean that |
| 11:57:20 | 22 | your notes may contain times when other people took |
| 11:57:24 | 23 | breaks more than 15 minutes long? |
| 11:57:30 | 24 | A. If I saw it and it pertained with me or |

11:57:33  1  had something to do with me.

11:57:35  2      Q.    I'm trying to understand what it would

11:57:37  3  take for you to feel it was connected to you or had

11:57:42  4  something to do with you, so that you would write it

11:57:45  5  down.

11:57:45  6      A.    Well, number one, I made the tape.    The

11:57:53  7  note reflects that tape.    It would have reflected

11:57:55  8  that tape.    So that would be my reason for -- for

11:58:00  9  writing it down.

11:58:02  10          MS. HAGANS:    Can I say something?

11:58:04  11          MR. MCGOWAN:    Technically, it's not

11:58:06  12      appropriate.    May we go off the record.

11:58:09  13              (Discussion off the record.)

11:59:14  14  BY MR. MCGOWAN:

11:59:21  15      Q.    Do you remember ever writing down the time

11:59:27  16  a person went on their break and then noting the

11:59:30  17  time that they came back on their break?

11:59:35  18      A.    To the best of my knowledge, it's a

11:59:36  19  possibility.

11:59:38  20      Q.    Is it a possibility that that person would

11:59:43  21  have been an employee of your department?

11:59:45  22      A.    Yes, to the best of my knowledge.    Yes.

11:59:49  23      Q.    And you would have done that perhaps

11:59:52  24  because you were being criticized for taking a break

216

11:59:55  1   that was more than 15 minutes long?

12:00:04  2        A.    No.

12:00:04  3        Q.    Why would you write that kind of

12:00:04  4   information down then, if you did?

12:00:04  5        A.    If it would just -- the main reason why

12:00:07  6   was to protect myself.

12:00:27  7        Q.    Exhibit F, as I look at the cassette tape,

12:00:30  8   it looks like it's half on one reel and half on the

12:00:33  9   other.  Do you see what I'm saying?

12:00:35  10       A.    Yeah.

12:00:35  11       Q.    Do you think that has anything to do with

12:00:38  12  what is recorded or what is not recorded on the

12:00:40  13  tape?

12:00:41  14       A.    I put it there so you can find the

12:00:45  15  conversation.

12:00:46  16       Q.    Okay.  Now, you're not going to let me

12:00:53  17  have these tapes, you said.  Are you willing to, at

12:00:59  18  my expense, make a copy of these tapes so that I

12:01:02  19  have them and I can go and listen to them when I

12:01:04  20  have a chance?

12:01:10  21       A.    What do you mean, take my tapes with you?

12:01:13  22       Q.    No.  You said already that you are not

12:01:15  23  going to agree to that.

12:01:17  24       A.    Right.

217

12:01:17  1        Q.   I'm asking you if you would agree, if I'll

12:01:21  2   pay for it, if you would take them to a shop that

12:01:25  3   can duplicate these tapes so that I can have a set

12:01:27  4   of my own to listen to.

12:01:30  5        A.   Well, you have the transcript.

12:01:31  6        Q.   I understand that, ma'am, but I'm also

12:01:35  7   entitled to have a copy of the tape, just like there

12:01:40  8   are copies of documents that we've exchanged in this

12:01:44  9   case.   There are people who can make copies of these

12:01:47  10  tapes so that I could have a set to listen to.

12:01:50  11       A.   But you haven't exchanged much information

12:01:53  12  with me like I have given you.   I've given you all

12:01:57  13  types of information and you barely gave me

12:02:00  14  anything.   I requested it and you did not give me

12:02:05  15  the information that I request.   And now you want

12:02:07  16  copies of the tape, but you aren't willing -- it

12:02:11  17  should be equal.   The same way I request things from

12:02:14  18  you and you don't give them to me, how -- how do you

12:02:17  19  think I feel?

12:02:19  20       Q.   Ma'am, I'm asking you, will you agree, if

12:02:22  21  I pay for it, to take these tapes to some place

12:02:27  22  locally to have them duplicated?

12:02:29  23       A.   If you're saying I don't have no choice

12:02:33  24  then I will have to.

218

12:02:36  1    Q.    I'm not saying you don't have a choice,
12:02:38  2  I'm asking you if you would agree to do that.
12:02:41  3    A.    You said if I don't have a -- but you're
12:02:45  4  asking me will I agree to do that, but I'm saying if
12:02:49  5  I don't have a choice I would.
12:02:51  6    Q.    So are you saying that unless the Court
12:02:54  7  orders you to do it you're not going to agree?
12:02:57  8    A.    Well, they have to be made.  If you
12:03:00  9  want -- like I'm saying, you said that you want a
12:03:02  10  copy, right?
12:03:03  11    Q.    Yes, ma'am.
12:03:05  12    A.    Request it and then we take it from there.
12:03:07  13    Q.    Well, I've already requested copies of
12:03:10  14  these tapes, and you've brought them here today
12:03:15  15  after the Court said that I was entitled for you
12:03:18  16  to --
12:03:18  17    A.    Bring them here.
12:03:21  18    Q.    -- bring them, yeah.  And just as we would
12:03:24  19  make a copy of an original document that you would
12:03:27  20  bring with you here today, I'm entitled to get a
12:03:29  21  copy of these tapes.
12:03:31  22    A.    Well --
12:03:31  23    Q.    And I'm willing to pay for them.  Okay?
12:03:35  24    A.    Uh-huh.

12:03:36  1        Q.    So I would like to have your agreement

12:03:38  2   that if I give you the location where there's a

12:03:41  3   company that will make copies of these here in

12:03:45  4   Middletown, that you would agree that you would

12:03:47  5   deliver these tapes to have copies made.

12:03:49  6        A.    I would not want to go where you go to

12:03:53  7   make those tapes.

12:03:54  8        Q.    Well, I don't go anywhere.

12:03:56  9        A.    Well --

12:03:56 10        Q.    I would just be trying to find somebody

12:03:57 11   that did them.  If you've got somebody in mind that

12:04:00 12   will do the work, that's fine.

12:04:02 13        A.    I was thinking I would rather someone --

12:04:05 14   if you pay for it, I would rather for someone else

12:04:09 15   to make the copies, other than someone you select.

12:04:13 16        Q.    Well then who would you select?

12:04:15 17        A.    I would have to first do some research.

12:04:19 18        Q.    That's what I would have to do also,

12:04:21 19   ma'am.  I don't know of anybody in Middletown.  I

12:04:24 20   would have to do research.  So I'm trying to work

12:04:29 21   this out with you as to how you want to proceed.  If

12:04:32 22   you are not going to accept somebody that I select,

12:04:36 23   will you do the research and select somebody and let

12:04:39 24   me know who it is I need to pay?

220

12:04:41  1      A.    Okay.

12:04:43  2      Q.    And will you tell me who that is so I can

12:04:46  3  touch base with them and find out how much they want

12:04:48  4  to do this?

12:04:49  5      A.    Okay.

12:04:55  6      Q.    Do you think you could do that in the next

12:04:56  7  week?

12:04:59  8      A.    I will try.

12:05:01  9      Q.    Okay.    That's fair enough.

12:05:09  10      Now, when I took your deposition before I

12:05:13  11  had asked you if you had written anything down such

12:05:17  12  as a summary of what happened during a meeting that

12:05:22  13  you had with Linda Day.  And you said you did do

12:05:27  14  that and you had it at home.  And I said, could you

12:05:30  15  bring that and give it to me along with the other

12:05:32  16  documents I have asked for.  And you said yes.  Do

12:05:35  17  you have that summary with you today?

12:05:38  18      A.    You have one in the transcript.    That's

12:05:40  19  what I mean.

12:05:42  20      Q.    All right.  So had you already prepared a

12:05:44  21  transcript when you answered this question?

12:05:47  22      A.    No.  I -- I don't know.  I don't know.  I

12:05:50  23  might have been working on it -- on one.  I don't

12:05:54  24  know.  I might have had some notes or something, but

221

12:06:06  1  I don't know.  I can't -- to the best of my
12:06:06  2  knowledge, I don't know.
12:06:29  3      Q.   Let me read to you some questions and
12:06:31  4  answers that were part of our last session of your
12:06:35  5  deposition so that you understand what I'm going to
12:06:37  6  be asking.
12:06:43  7          You said:  We had an OZ principal meeting.
12:06:46  8  That's where our whole unit got together and discuss
12:06:49  9  our unit.  I asked Dawn in that meeting, do I help
12:06:53  10  her, do I assist?  And she said yes.  At that time
12:06:57  11  Linda Day didn't say nothing.  She didn't make no
12:07:02  12  comment.
12:07:02  13          Question:  Was that a conversation that
12:07:03  14  was taped?
12:07:05  15          Answer:  Yes.
12:07:06  16          Question:  With Dawn?
12:07:08  17          Answer:  Yes.
12:07:11  18          Is that the tape we have here today that
12:07:13  19  you brought with you?
12:07:14  20      A.   No.  No.
12:07:15  21      Q.   Where is that tape, ma'am?
12:07:16  22      A.   I don't know.  To the best of my knowledge
12:07:18  23  right now, I don't know.
12:07:24  24      Q.   Do you still believe though that that was

222

| | | |
|---|---|---|
| 12:07:26 | 1 | taped? |
| 12:07:26 | 2 | A.   Yes. |
| 12:07:26 | 3 | Q.   And have you looked for that tape? |
| 12:07:28 | 4 | A.   Yes, I have looked for all of my tapes. |
| 12:07:31 | 5 | Q.   Okay.  Ma'am, I'm going to show you what |
| 12:08:26 | 6 | you marked as Plaintiff's Exhibit 01-A in documents |
| 12:08:32 | 7 | that you furnished to me in this case.  Do you |
| 12:08:35 | 8 | remember that? |
| 12:08:39 | 9 | A.   Yes. |
| 12:08:42 | 10 | Q.   Just so that we're clear, could you tell |
| 12:08:45 | 11 | me which of these tapes that you brought with you |
| 12:08:47 | 12 | today correspond with the transcript that you've |
| 12:08:51 | 13 | marked as that exhibit number? |
| 12:08:55 | 14 | A.   Okay.  Written transcript of meeting with |
| 12:08:57 | 15 | Linda Day at 3:15 on August 18th, 2000.  It would be |
| 12:09:13 | 16 | probably this one, E. |
| 12:09:17 | 17 | Q.   All right.  Which side, A or B, ma'am? |
| 12:09:20 | 18 | A.   E, A. |
| 12:09:21 | 19 | Q.   The A side of Exhibit E? |
| 12:09:25 | 20 | A.   Yes. |
| 12:09:26 | 21 | Q.   Okay.  Now I'm going to hand you what you |
| 12:09:33 | 22 | had previously marked as Plaintiff's Exhibit 01-D. |
| 12:09:39 | 23 | Do you recognize that as a transcript you prepared? |
| 12:09:41 | 24 | A.   Yes. |

223

| 12:09:42 | 1 | Q. Can you tell me which of these tapes that |
| 12:09:44 | 2 | would correlate with? |
| 12:09:48 | 3 | A. It would be the A side of E. |
| 12:09:54 | 4 | Q. All right. Exhibit E, the A side, |
| 12:10:00 | 5 | correct? |
| 12:10:00 | 6 | A. Yes. |
| 12:10:01 | 7 | Q. Okay. Now I'm going to hand you |
| 12:10:07 | 8 | Plaintiff's Exhibit 01-C. Do you recognize that as |
| 12:10:10 | 9 | another transcript? |
| 12:10:11 | 10 | A. Yes. |
| 12:10:12 | 11 | Q. Which tape does that correlate with, |
| 12:10:15 | 12 | ma'am? |
| 12:10:25 | 13 | A. It would be -- it would be C -- I mean -- |
| 12:10:33 | 14 | C. Deposition -- |
| 12:10:35 | 15 | Q. -- Exhibit C. Yes. |
| 12:10:36 | 16 | A. Uh-huh. |
| 12:10:36 | 17 | Q. And what side? |
| 12:10:37 | 18 | A. B. |
| 12:10:38 | 19 | Q. All right. B side. Thank you. |
| 12:10:50 | 20 | May I see those transcripts again, please. |
| 12:10:52 | 21 | Please. |
| 12:11:04 | 22 | I'm going to hand you what's been marked |
| 12:11:07 | 23 | as Plaintiff's Exhibit 01-B by you in materials |
| 12:11:11 | 24 | provided to me. Do you recognize that as another |

224

12:11:13    1    transcript?

12:11:14    2        A.    Yes.

12:11:15    3        Q.    You prepared that?

12:11:16    4        A.    Yeah.

12:11:16    5        Q.    Which tape would that correlate with,

12:11:19    6    ma'am?

12:11:19    7        A.    It would be B -- I mean, it would be C.

12:11:25    8        Q.    And which side of the tape?

12:11:27    9        A.    B.

12:11:28    10       Q.    Okay.

12:12:38    11                               (Deposition Exhibit G
12:12:38                                     was marked for identi-
12:12:38    12                               fication.)

12:12:38    13       Q.    Ma'am, could you tell me if you received

12:12:41    14   what's been marked as Exhibit G?  It's a letter

12:12:44    15   addressed to you in June of 2001, I believe.

12:13:25    16       A.    To the best of my ability, I haven't seen

12:13:30    17   this.  To the best of my ability or best of my

12:13:41    18   knowledge, I don't recall seeing this.

12:13:51    19       Q.    Do you ever recall receiving

12:13:53    20   correspondence from Margie Laut, L-A-U-T, Human

12:13:56    21   Resources Director of Butler County?

12:13:59    22       A.    I remember speaking to her, and yes, I

12:14:03    23   recall one letter from her.

12:14:09    24       Q.    Do you remember when that was?

225

12:14:15  1       A.   I would say 2001, maybe.  To the best of
12:14:19  2   my ability, 2001.
12:14:22  3       Q.   In June of 2001 were you living at 1812
12:14:26  4   Grand Avenue at the time?
12:14:28  5       A.   Yeah, but that is not the letter I
12:14:29  6   received.
12:14:30  7       Q.   Is the correct ZIP Code for your address
12:14:33  8   Middletown, Ohio, 45044?
12:14:35  9       A.   Yes, but that's not the letter I received.
12:14:39 10   Yes.  To the best of my ability, I remember her
12:14:46 11   writing a letter, and it was like telling me that,
12:14:49 12   come back to work or I will be terminated or fired
12:14:52 13   or something like that.  It didn't have this.  This
12:14:57 14   wasn't the letter.  It was telling me that I should
12:15:00 15   have been back to work.
12:15:03 16       Q.   What was the last day you actually worked
12:15:06 17   at Butler County?
12:15:07 18       A.   February 27th, 2001.
12:15:09 19       Q.   Was that the day before a surgery that you
12:15:11 20   had?
12:15:12 21       A.   Yes.
12:15:12 22       Q.   By Dr. Janis?
12:15:14 23       A.   Yes.  February 27th, 2001.
12:15:18 24       Q.   Okay.

| | |
|---|---|
| 12:15:19 | 1 |
| 12:15:23 | 2 |

A.    I do not recall this letter, June 13th,

2001.

MR. MCGOWAN:  Would you mark this, please.

(Deposition Exhibit H
was marked for identi-
fication.)

Q.    Let me ask you to look at Deposition

Exhibit H.  Ask you if you remember seeing that

before?

A.    I remember this letter.  I don't know if

this is exactly the word that was stated, but I

remember this letter, January 16th, 2001.

MR. MCGOWAN:  Would you mark this, please.

(Deposition Exhibit I
was marked for identi-
fication.)

Q.    Hand you what's been marked as Deposition

Exhibit I.  Do you remember receiving that letter?

A.    February 16th, 2001, to the best of my

knowledge, I haven't seen this one.  To the best of

my knowledge, I received a letter saying that I was

supposed to come back to work.

Q.    Is that letter one that has your correct

address on it?

A.    This letter here has my correct address on

it.  I haven't seen this letter, to the best of my

227

12:17:37  1  knowledge.  I know I haven't.  Or at least I think I

12:17:50  2  haven't seen this.

12:17:52  3                              (Deposition Exhibit J
12:17:52                                 was marked for identi-
12:17:52  4                              fication.)

12:17:52  5      Q.    Let me ask you to take a look at what has

12:18:03  6  been marked as Deposition Exhibit J.  It consists of

12:18:03  7  two pages.  I'll ask you if you've ever seen that

12:18:03  8  before.

12:18:24  9      A.    To the best of my knowledge, I have seen

12:18:25  10  papers similar to this, but I cannot say, to the

12:18:28  11  best of my knowledge, I don't believe I've seen

12:18:31  12  these, "Permanent Disability, 5-17-01."  "PERS

12:18:37  13  Disability Filed, Copy of Filing Attached."  I don't

12:18:42  14  think I ever received anything that said "PERS

12:18:46  15  Disability Filed, Copy of Filing Attached."

12:18:51  16      Q.    P-E-R-S stands for Public Employees

12:18:55  17  Retirement System?

12:18:56  18      A.    Yeah.  Yeah.  Uh-huh.

12:18:59  19      Q.    You did file a disability application with

12:19:03  20  PERS, correct?

12:19:04  21      A.    Yes.  Uh-huh.

12:19:05  22      Q.    Would you agree with me that this appears

12:19:07  23  to be a doctor's statement from Dr. Janis concerning

12:19:10  24  you?

228

| | | |
|---|---|---|
| 12:19:10 | 1 | A.    It appears to be, yes, it does.    And I |
| 12:19:15 | 2 | know that my doctor had faxed information that is |
| 12:19:24 | 3 | made -- probably looked the same as this, but I |
| 12:19:28 | 4 | cannot tell you that I actually saw this. |
| 12:19:33 | 5 | Q.    Did you ask Dr. Janis to provide some |
| 12:19:36 | 6 | information to PERS in connection with your request |
| 12:19:39 | 7 | for a disability application? |
| 12:19:43 | 8 | A.    I filled the application, yes. |
| 12:20:20 | 9 | (Deposition Exhibit K |
| 12:20:20 | | was marked for identi- |
| 12:20:20 | 10 | fication.) |
| 12:20:21 | 11 | Q.    Asking you to look at Deposition Exhibit |
| 12:20:24 | 12 | A, Ms. Hurston.    Do you recall receiving that |
| 12:20:27 | 13 | letter? |
| 12:21:03 | 14 | A.    I do not recall this letter of May 7th, |
| 12:21:05 | 15 | 2001.    To the best of my ability, I haven't read |
| 12:21:11 | 16 | this before.    It's the May 7th, 2001 letter, from |
| 12:21:22 | 17 | Margie Laut. |
| 12:22:12 | 18 | (Deposition Exhibit L |
| 12:22:12 | | was marked for identi- |
| 12:22:12 | 19 | fication.) |
| 12:22:12 | 20 | Q.    Handing you what has been marked as |
| 12:22:16 | 21 | Deposition Exhibit L.    Is that your signature that |
| 12:22:18 | 22 | appears on the document, ma'am? |
| 12:22:19 | 23 | A.    Yes. |
| 12:22:19 | 24 | Q.    Do you remember signing that on or about |

229

| | | |
|---|---|---|
| 12:22:22 | 1 | April 30, 2001? |
| 12:22:23 | 2 | A.    Yes.  Let me see.  That's my signature. |
| 12:22:42 | 3 | Date leave to begin:  2/28/01.  Expected duration: |
| 12:22:48 | 4 | 8 to 12 weeks.  I recall seeing this before, yeah. |
| 12:22:59 | 5 | Q.    And you signed it, right? |
| 12:23:00 | 6 | A.    Yes. |
| 12:23:01 | 7 | (Deposition Exhibit M |
| 12:23:01 | | was marked for identi- |
| 12:23:01 | 8 | fication.) |
| 12:23:01 | 9 | Q.    Let me ask you to look at Deposition |
| 12:23:03 | 10 | Exhibit M.  Do you recognize that as a copy of your |
| 12:23:05 | 11 | job description when you began to work as a machine |
| 12:23:10 | 12 | operator 2? |
| 12:23:12 | 13 | A.    No.  This is not my job description that I |
| 12:23:17 | 14 | received when I began to work for Butler County, no. |
| 12:23:25 | 15 | Deposition marked M is not a job description when I |
| 12:23:29 | 16 | began to work as a machine operator. |
| 12:23:36 | 17 | Q.    When did it become effective? |
| 12:23:41 | 18 | A.    This became, this job description of |
| 12:23:43 | 19 | 7/6/90 became effective on, I guess, 7/6/90.  I |
| 12:23:51 | 20 | recall seeing -- having this job description on |
| 12:23:58 | 21 | 7/9/1990. |
| 12:24:01 | 22 | Q.    When did you start working as a class 2 |
| 12:24:05 | 23 | machine operator for Butler County? |
| 12:24:07 | 24 | A.    It had to be in approximately '89, '88 |

12:24:12  1    1988-'89.  I have several different job descriptions

12:24:19  2    besides this one.

12:24:24  3        Q.    Where are they?

12:24:25  4        A.    You should have them.

12:24:27  5        Q.    Besides whatever you say about what I

12:24:32  6    should have, where do you have it?

12:24:33  7        A.    Where do -- I have a copy.  I got the

12:24:36  8    copies of the job description.  So I know you should

12:24:39  9    have it, too.

12:24:44  10       Q.    How many job descriptions do you have?

12:24:45  11       A.    Approximately four.

12:24:48  12       Q.    What are the dates on them?

12:24:54  13       A.    At this moment I cannot, to the best of my

12:24:58  14   knowledge, I can't give you the date on them.  If I

12:25:01  15   had the copies in front of me I could, but I don't

12:25:03  16   have the dates in front of me.

12:25:04  17       Q.    Are any of them before July of 1990?

12:25:07  18       A.    Yes.

12:25:11  19       Q.    Are any of them after July of 1990?

12:25:14  20       A.    The one -- yes, you -- you going to show

12:25:17  21   me one, right?  Of 2000 -- 2001.  They changed it

12:25:22  22   after that time.

12:25:23  23       Q.    After the job audit?

12:25:24  24       A.    .2001, yes, after the job audit they

231

12:25:28    1    changed it.

12:25:33    2        Q.    How was the job description changed as a

12:25:34    3    result of the job audit?

12:25:38    4        A.    They reduced my responsibility as a

12:25:43    5    purchaser and procurement.

12:25:55    6                                (Deposition Exhibit N
12:25:55                                     was marked for identi-
12:25:55    7                                fication.)

12:25:55    8        Q.    Would you look at Deposition Exhibit N and

12:25:57    9    tell me whether you received a letter like that.

12:26:24   10        A.    Your Exhibit N which state -- I have not,

12:26:32   11    to the best of my ability, have not seen this, this

12:26:39   12    letter.

12:26:40   13                                (Deposition Exhibit O
12:26:40                                     was marked for identi-
12:26:40   14                                fication.)

12:26:40   15        Q.    Would you look at Deposition Exhibit O and

12:26:42   16    tell me if that contains your signature.

12:26:45   17        A.    Uh-huh.    Because it's got on there -- on

12:26:51   18    this letter it states, "If you are unable to return

12:26:58   19    to work on May 1st, 2001 and require additional

12:27:04   20    Family Medical Leave, you will be required to

12:27:06   21    complete a new request for Family Medical Leave."    I

12:27:11   22    don't re-- never recall seeing this, to the best of

12:27:16   23    my ability.    And then, see that line, then?    That

12:27:20   24    look like that might have been copied (indicating).

232

12:27:24 1 Even like this one, some of these (indicating) look

12:27:27 2 like it could have been cut off and put my

12:27:30 3 signature.  I didn't sign any signature.  See these

12:27:39 4 lines through here (indicating)?  Somebody could cut

12:27:41 5 off a top of one letter and put it on top of another

12:27:45 6 letter and my signature would still be there.  It's

12:27:48 7 a line through here, a line through that letter as

12:27:53 8 well.

12:27:58 9   Q.   So does that contain your signature or

12:28:00 10 not, ma'am?

12:28:09 11   A.   I may have wrote that signature, but that

12:28:09 12 don't mean that letter.

12:28:09 13   Q.   Well, do you have any reason to believe

12:28:10 14 that there's been something cut off --

12:28:15 15     MS. HAGANS:  Oh, the tape.

12:28:37 16     (Discussion off the record.)

12:28:40 17   A.   What was your question?

12:28:42 18   Q.   My question is are you saying somebody cut

12:28:45 19 up Exhibit O and connected a portion of a page that

12:28:50 20 you signed to the rest of this document?

12:28:52 21   A.   It's a possibility.

12:28:53 22   Q.   No, I'm not asking what's possible.

12:28:55 23   A.   It's a possibility.

12:28:57 24   Q.   I guess anything's possible.  Are you

233

| 12:28:58 | 1 | saying somebody did that? |
| 12:29:00 | 2 | A.   What I'm saying, it's a possibility.   I |
| 12:29:02 | 3 | can't say.   I wasn't there to see. |
| 12:29:04 | 4 | Q.   Is it a possibility? |
| 12:29:05 | 5 | A.   It's a possibility.   See the line through |
| 12:29:07 | 6 | the paper?   I'm saying it's possible. |
| 12:29:11 | 7 | Q.   Is it possible that that line was created |
| 12:29:14 | 8 | by the copier and doesn't have anything to do with |
| 12:29:16 | 9 | whether something was cut or not? |
| 12:29:18 | 10 | A.   It looks like it has been cut, and this is |
| 12:29:21 | 11 | an even line. |
| 12:29:22 | 12 | Q.   Is it possible the copier created that |
| 12:29:25 | 13 | line without having anything to do with cutting it? |
| 12:29:28 | 14 | A.   These are neat lines.   It's a possibility |
| 12:29:29 | 15 | of a lot of things, sir. |
| 12:29:30 | 16 | Q.   Is it possible that that is, in fact, a |
| 12:29:33 | 17 | form that you signed and sent in? |
| 12:29:36 | 18 | A.   It's a -- see, this look like this may |
| 12:29:39 | 19 | have been added onto here, and I -- it's a |
| 12:29:43 | 20 | possibility.   It's a possibility I could have signed |
| 12:29:46 | 21 | it and it's a possibility that I didn't. |
| 12:29:49 | 22 | Q.   Okay.   But there's no question that |
| 12:29:51 | 23 | this -- |
| 12:29:52 | 24 | A.   The line is too neat. |

12:29:54  1      Q.    There's no --

12:29:55  2      A.    This -- this line is up under -- this line

12:29:58  3   is right up under that whole sentence.  See what I'm

12:30:02  4   saying here (indicating).  This line is up under

12:30:03  5   that whole sentence.  So I cannot say I signed that.

12:30:08  6          Just like this here where this question is

12:30:12  7   asked, on Deposition Exhibit N where it's got in

12:30:17  8   here -- that's -- that's what I said, to the best of

12:30:21  9   my knowledge, I don't know nothing about:  If you

12:30:23  10  are unable to return to work May 1st and require

12:30:26  11  additional Family Medical Leave, you will be

12:30:28  12  required to complete a new request for Family

12:30:32  13  Medical Leave and have your physician or

12:30:34  14  practitioner provide a new certification of your

12:30:38  15  medical condition.  I never seen that.  So,

12:30:43  16  therefore, this is a neat line, just like this here.

12:30:46  17  And if it was on the machine, unlessen this letter

12:30:51  18  here was scooted all the way down on the machine,

12:30:53  19  that would not happen.  That would not happen.

12:30:57  20      Q.    There's no question that that exhibit has

12:31:01  21  your signature on it, correct?

12:31:02  22      A.    It has my signature on it, but that don't

12:31:05  23  mean that I signed this paper.  See (indicating.)

          24

235

12:31:06  1                                    (Deposition Exhibit P
12:31:06                                        was marked for identi-
12:31:06  2                                     fication.)

12:31:29  3        Q.    Would you look at Exhibit P, and tell me

12:31:32  4   if that's your signature on that document.

12:31:38  5        A.    Again, this signature has Brenda K.

12:31:42  6   Hurston on it, but, again, just like all the other

12:31:46  7   papers you showed me, you can tell where this

12:31:51  8   straight line is in the paperwork.  And it's a

12:31:53  9   possibility that this document is not a real and

12:31:58  10  true and correct document, because the line, again,

12:32:02  11  is too straight, and some of this -- I know my

12:32:07  12  signature, but it's not guaranteed that this is

12:32:11  13  my -- this letter I signed.

12:32:13  14       Q.    But that is your signature?

12:32:15  15       A.    That is -- Deposition Exhibit P, all of

12:32:18  16  these got them line in it.  Even the letter

12:32:21  17  June 13th, 2001 has that same line in it.  So I

12:32:29  18  cannot tell you, to the best of my ability, that I

12:32:32  19  signed these sheets.

12:32:33  20       Q.    You don't know what that line means

12:32:35  21  though, do you?

12:32:36  22       A.    Could I have a copy?

12:32:38  23       Q.    Do you know what that line means?

12:32:40  24       A.    May I have a copy?

236

| | | |
|---|---|---|
| 12:32:40 | 1 | Q.    Do you know what the line means? |
| 12:32:42 | 2 | A.    May I have a copy, sir? |
| 12:32:43 | 3 | Q.    Do you know what the line means? |
| 12:32:44 | 4 | A.    Well, I know that it's a possibility that |
| 12:32:46 | 5 | I didn't sign these papers, and I would like to have |
| 12:32:49 | 6 | a copy. |
| 12:32:50 | 7 | Q.    Do you know what the line means? |
| 12:32:52 | 8 | A.    Do you know? |
| 12:32:54 | 9 | Q.    Ma'am, you're arguing. |
| 12:32:56 | 10 | A.    Why -- why are you asking me do I know |
| 12:32:57 | 11 | where the line is and what it means when you know I |
| 12:33:00 | 12 | can't tell you why. |
| 12:33:02 | 13 | Q.    Okay.  You can't tell me why there's a |
| 12:33:03 | 14 | line there, can you? |
| 12:33:04 | 15 | A.    But I used to work on -- on certain forms |
| 12:33:08 | 16 | and stuff and never has that happened.  Never has |
| 12:33:16 | 17 | that happened. |
| 12:33:26 | 18 | (Deposition Exhibit Q |
| 12:33:26 | | was marked for identi- |
| 12:33:26 | 19 | fication.) |
| 12:33:28 | 20 | Q.    Do you see any line on Exhibit Q similar |
| 12:33:34 | 21 | to the line you were talking about on the other |
| 12:33:35 | 22 | documents? |
| 12:33:39 | 23 | A.    I don't see no line there. |
| 12:33:40 | 24 | Q.    Is that your signature on Exhibit Q? |

237

12:33:42  1          A.     That's my signature there.

12:33:43  2          Q.     Did you sign that document?

12:33:45  3          A.     I cannot tell you whether I signed it or

12:33:48  4   not.  And this is my point right here (indicating).

12:34:03  5   These are the same letter.  Deposition Exhibit O and

12:34:12  6   Q are similar letter, one with the line in it and

12:34:15  7   one with the line not in it.

12:34:19  8          Q.     Do you see any difference in the two

12:34:20  9   documents except for that line?

12:34:21  10         A.     This one is stamped -- this one you got a

12:34:25  11  Received stamp on, on Deposition Exhibit O, you got

12:34:29  12  a Received stamp on it, March 20th, 2001.  And then

12:34:36  13  on Deposition Exhibit Q you do not have a stamp date

12:34:40  14  on it and it does not have a line.  And if these are

12:34:44  15  supposed to be the same document, where is the line?

12:34:47  16  Where is the line at?

12:34:50  17         Q.     What's the difference between the two of

12:35:01  18  them other than the stamp?

12:35:01  19         A.     Where is the line?  Do you see what I'm

12:35:01  20  saying?  And also, let me see -- let me see.  I see

12:35:03  21  they claim that I did it on both dates, don't it?

12:35:07  22  Hmm.  But only the one they've got Received on --

12:35:11  23  on -- has got a line on it altogether.

12:35:13  24              Plus, it's a lot of difference.  Even like

| | | |
|---|---|---|
| 12:35:17 | 1 | here, this -- this paper, see where Adoption -- on |
| 12:35:21 | 2 | Deposition Exhibit O, it has, "For Adoption" in the |
| 12:35:27 | 3 | "or," o-r, it is close to the edge of the paper and |
| 12:35:32 | 4 | almost completely off of the paper.  Where Exhibit |
| 12:35:35 | 5 | Deposition Exhibit Q -- I mean, Deposition Exhibit |
| 12:35:40 | 6 | Q, the whole word is on the paper and the margin is |
| 12:35:43 | 7 | approximately an inch.  Approximately an inch. |
| 12:35:50 | 8 | And then you notice here also the Revised |
| 12:35:54 | 9 | date is cut off at the top up here where it's faded, |
| 12:35:57 | 10 | where this date here (indicating) is completely on |
| 12:36:00 | 11 | the paper.  So, therefore, if I'm supposed to sign |
| 12:36:03 | 12 | both of these papers on the same date, the paper -- |
| 12:36:09 | 13 | there should not be a difference in them.  And this |
| 12:36:14 | 14 | is the same signature.  So you see that is the same |
| 12:36:19 | 15 | signature. |
| 12:36:20 | 16 | So it's a possibility that could have been |
| 12:36:22 | 17 | cut off and taped and then copied.  Also the staple |
| 12:36:27 | 18 | on the left corner of Deposition Exhibit Q, it's got |
| 12:36:33 | 19 | staple marks here.  Where is the staple mark in |
| 12:36:37 | 20 | Deposition Exhibit O? |
| 12:36:39 | 21 | Q.   What's that have to do with the body of |
| 12:36:41 | 22 | the document? |
| 12:36:42 | 23 | A.   Well, it has a lot.  It has a lot to do |
| 12:36:44 | 24 | the doc-- I may not have signed these papers. |

239

| | | |
|---|---|---|
| 12:36:47 | 1 | That's what it means. |
| 12:37:00 | 2 | (Discussion off the record.) |
| 12:37:01 | 3 | THE WITNESS:  Can I have a copy of these |
| 12:37:03 | 4 | things here? |
| 12:37:06 | 5 | MR. MCGOWAN:  The court reporter can make |
| 12:37:07 | 6 | a copy of anything you wish. |
| 12:37:08 | 7 | THE WITNESS:  Okay.  I would like to have |
| 12:37:10 | 8 | them all. |
| 12:37:41 | 9 | (Deposition Exhibit R |
| 12:37:41 | | was marked for identi- |
| 12:37:41 | 10 | fication.) |
| 12:37:42 | 11 | Q.   Showing you what's been marked as Exhibit |
| 12:37:45 | 12 | R, Deposition Exhibit R.  Do you remember receiving |
| 12:37:48 | 13 | a copy of that memo? |
| 12:37:59 | 14 | A.   This appears to be a copy that I received. |
| 12:38:06 | 15 | Defendant's Exhibit R -- Deposition R -- Exhibit R, |
| 12:38:11 | 16 | it appears to be a copy that I have seen. |
| 12:38:17 | 17 | (Deposition Exhibit S |
| 12:38:17 | | was marked for identi- |
| 12:38:17 | 18 | fication.) |
| 12:38:18 | 19 | Q.   I'd like to show you next Deposition |
| 12:38:20 | 20 | Exhibit S.  Does that appear to be a copy of an |
| 12:38:22 | 21 | amended unfair labor practice charge which you filed |
| 12:38:24 | 22 | against Butler County? |
| 12:38:25 | 23 | A.   It appears to be a copy that I could have |
| 12:38:28 | 24 | filled out. |

240

| | | |
|---|---|---|
| 12:38:29 | 1 | Q. Does it have your handwriting on it? |
| 12:38:34 | 2 | A. On the second page? It appears to be my |
| 12:38:48 | 3 | signature, but, again, it may not be. It's a |
| 12:38:52 | 4 | possibility. It's 01-ULP-01-0006. It appears to be |
| 12:39:00 | 5 | a copy that I have filled out. |
| 12:39:07 | 6 | Q. Besides your signature, do you see any |
| 12:39:09 | 7 | other handwriting on that exhibit that is yours? |
| 12:39:14 | 8 | A. The handwriting appears to be mine. |
| 12:39:18 | 9 | Q. Okay. |
| 12:39:35 | 10 | A. And that is the unfair labor practice |
| 12:39:38 | 11 | charge. |
| 12:39:38 | 12 | MS. HAGANS: What's the date on that? |
| 12:39:41 | 13 | THE WITNESS: Fax, January 23rd, 2001. |
| 12:39:47 | 14 | And it's regarding June Hom or Kat, almost next |
| 12:39:53 | 15 | to the bottom of the paragraph at the top. |
| 12:40:02 | 16 | And this is probably -- it's got page 04 |
| 12:40:06 | 17 | on this page, and it's three pages, but it's |
| 12:40:10 | 18 | got page 4, and it's a possibility this is -- |
| 12:40:14 | 19 | this is it. |
| 12:40:42 | 20 | I want a copy of that, too. And I need a |
| 12:40:59 | 21 | copy of this (indicating). I don't know if -- |
| 12:41:01 | 22 | this is a three-pager. I want a copy of this, |
| 12:41:04 | 23 | too (indicating). All of this. I'll take a |
| 12:41:09 | 24 | copy of all of it. I'll put it over here, if |

241

| | | |
|---|---|---|
| 12:41:11 | 1 | you don't mind. |
| 12:41:16 | 2 | MR. MCGOWAN: The court reporter will take |
| 12:41:18 | 3 | charge of those exhibits and can make copies of |
| 12:41:20 | 4 | any of the exhibits that you want or all of the |
| 12:41:22 | 5 | exhibits. That's between you and the court |
| 12:41:24 | 6 | reporter. |
| 12:41:24 | 7 | THE WITNESS: Okay. May I have a copy, |
| 12:41:27 | 8 | please. |
| 12:41:31 | 9 | THE REPORTER: Off the record. |
| 12:41:38 | 10 | (Discussion off the record.) |
| 12:41:51 | 11 | (Deposition Exhibit T |
| 12:41:51 | | was marked for identi- |
| 12:41:51 | 12 | fication.) |
| 12:41:54 | 13 | Q. Handing you what's been marked Exhibit T. |
| 12:41:57 | 14 | You received a copy of that report from |
| 12:41:59 | 15 | Dr. Sammarco? |
| 12:42:06 | 16 | A. I received a copy from you. |
| 12:42:07 | 17 | Q. Okay. Did you also receive a copy of a |
| 12:42:15 | 18 | report from Dr. Weaver? |
| 12:42:17 | 19 | A. I received a copy from you. |
| 12:42:19 | 20 | Q. Of Dr. Weaver's report? |
| 12:42:22 | 21 | A. Yeah. Do you have that copy with you? |
| 12:42:26 | 22 | Q. No, I don't. |
| 12:42:50 | 23 | MS. HAGANS: You don't have a report from |
| 12:42:53 | 24 | Dr. Weaver, right? |

242

| | | |
|---|---|---|
| 12:42:54 | 1 | MR. MCGOWAN:  I have a report from Dr. |
| 12:42:57 | 2 | Weaver.  I furnished it to her, but I don't |
| 12:42:59 | 3 | have it with me at this moment because I didn't |
| 12:43:02 | 4 | bring the entire file with me. |
| 12:43:05 | 5 | MS. HAGANS:  You don't have a copy of it, |
| 12:43:06 | 6 | right? |
| 12:43:07 | 7 | THE WITNESS:  I have a copy of Dr. |
| 12:43:08 | 8 | Weaver's report that was submitted by Marla |
| 12:43:14 | 9 | Scully, his associate. |
| 12:43:24 | 10 | BY MR. MCGOWAN: |
| 12:43:24 | 11 | Q.   Does Susan Oakes spell her last name |
| 12:43:27 | 12 | O-A-K-E-S, do you know? |
| 12:43:29 | 13 | A.   I don't know. |
| 12:43:35 | 14 | Q.   Who's Mike Brockman, Deputy Brockman?  Is |
| 12:43:42 | 15 | there a Deputy Brockman? |
| 12:43:44 | 16 | A.   It used -- as far as I know of.  As far as |
| 12:43:47 | 17 | I know of. |
| 12:43:47 | 18 | Can I have a copy of that, too? |
| 12:43:49 | 19 | Q.   Who is that? |
| 12:43:50 | 20 | A.   He was a deputy.  That's a -- do you have |
| 12:43:53 | 21 | a statement from him? |
| 12:43:54 | 22 | Q.   No. |
| 12:43:55 | 23 | A.   May I have a copy of it? |
| 12:43:56 | 24 | Q.   Ma'am, these are all of the exhibits that |

243

12:43:58    1   Mr. Duckett provided to the EEOC in response to your

12:44:02    2   complaint.  And all of those, I believe you have.

12:44:04    3        A.   May I look through there?

12:44:14    4        Q.   No, you may not.

12:46:02    5                              (Deposition Exhibit U
12:46:02                                   was marked for identi-
12:46:02    6                              fication.)

12:46:03    7        Q.   Can you identify what has been marked as

12:46:07    8   Exhibit U for your deposition as one of the exhibits

12:46:11    9   that you submitted to me and has a "Plaintiff

12:46:14    10  Exhibit" on it?

12:46:15    11       A.    It says "Plaintiff Exhibit 7-B."  It's a

12:46:22    12  Damage Summary and Worksheet.

12:46:23    13       Q.    Yes.  How did you calculate your lost

12:46:27    14  wages on that?

12:46:31    15       A.    Just like how it has:  Future Disability

12:46:35    16  lost for 17 1/2 years, 188,736.00; Special Damages,

12:46:45    17  5,320; and General Damages, $88,932; and the

12:46:53    18  calculation is what it is right here.

12:47:00    19       Q.    How did you come up with your special

12:47:02    20  damages?

12:47:02    21       A.    By just calculating the figures like how

12:47:07    22  we got here.  The second page will show you:  Gross

12:47:13    23  wage loss, 431.  Right there.  Right here

12:47:18    24  (indicating).  That's the calculation, on page 2.

244

12:47:22  1      Q.    Yeah, but on page 1 -- was your wage at

12:47:33  2   the time you asked for disability $24,643.20?

12:47:39  3      A.    To the best of my ability, I would not be

12:47:41  4   able to answer that question unlessen I go home or

12:47:45  5   do some figuring and scrapping and making sure

12:47:47  6   myself.

12:47:48  7      Q.    Well, are all these figures that you put

12:47:50  8   in on this form?

12:47:51  9      A.    It's a possibility, but like I said too,

12:47:55  10  unlessen I go home and calculate myself, it's a

12:47:59  11  possibility I cannot say that this is the actual

12:48:01  12  document.  But that's my writing right there

12:48:04  13  (indicating).

12:48:04  14     Q.    Where it says "Plaintiff Exhibit 7-B"?

12:48:07  15     A.    Yeah.

12:48:07  16     Q.    Did you highlight that?

12:48:09  17     A.    Yes.  It's a possibility, if you got it.

12:48:37  18     Q.    Do you have any bills from Dr. Ir-- well,

12:48:41  19  yeah, Nurse Irwin I guess it is, Pat Irwin or

12:48:45  20  Dr. Ramirez?

12:48:47  21     A.    I pay bills when I go to them, yes.

12:48:53  22     Q.    Do you have any with you?

12:48:54  23     A.    No.

12:49:08  24     Q.    Do you see this figure of $280 here?

| | | |
|---|---|---|
| 12:49:11 | 1 | A.    Yes. |
| 12:49:11 | 2 | Q.    Do you know how you came up with that |
| 12:49:13 | 3 | number? |
| 12:49:13 | 4 | A.    No, I do not.  It may even been an error. |
| 12:49:18 | 5 | I don't know.  At this time, to the best of my |
| 12:49:24 | 6 | knowledge, I couldn't tell you. |
| 12:49:26 | 7 | Q.    Do you see this $120 here under amount? |
| 12:49:28 | 8 | A.    Uh-huh.  Yeah. |
| 12:49:29 | 9 | Q.    Is that for Dr. Ramirez's services or is |
| 12:49:33 | 10 | that a combination of Dr. Ramirez and Nurse Irwin? |
| 12:49:39 | 11 | A.    To the best of my ability, I could not |
| 12:49:40 | 12 | tell you.  I would have to go home, see my paperwork |
| 12:49:43 | 13 | and then compare. |
| 12:50:07 | 14 | Q.    Where does the $450 for attorney fees come |
| 12:50:11 | 15 | from? |
| 12:50:13 | 16 | A.    To the best of my ability, like I said, I |
| 12:50:15 | 17 | would have to go home, calculate my paperwork and |
| 12:50:18 | 18 | then see and then compare. |
| 12:50:20 | 19 | Q.    Do you have a bill from an attorney? |
| 12:50:23 | 20 | A.    To the best of -- no, I don't have one at |
| 12:50:26 | 21 | present. |
| 12:50:26 | 22 | Q.    Do you have one that you've paid in the |
| 12:50:30 | 23 | past? |
| 12:50:30 | 24 | A.    It's a possibility. |

246

| | | |
|---|---|---|
| 12:50:35 | 1 | Q. It's a possibility that you have a bill |

12:50:37 2 from an attorney that you paid in the past in the

12:50:39 3 amount of $450?

12:50:41 4    A.  It's a possibility that it could be

12:50:44 5 attorneys.  I don't know.  Like I said, I would have

12:50:47 6 to get my paperwork and then compare.  But it got

12:50:54 7 "attorney's" with an apostrophe S, so...

12:50:57 8    Q.  How did you calculate the $80 for gas and

12:51:00 9 parking?

12:51:01 10    A.  How I told you before, I would have to

12:51:03 11 get -- compare.

12:51:04 12    Q.  What would you compare to find out how you

12:51:06 13 figured that out?

12:51:08 14    A.  Well, like I said, I would have to go

12:51:10 15 home, take my paperwork and compare.

12:51:14 16    Q.  Did you get a parking ticket?

12:51:16 17    A.  Like I said, sir, no, I didn't get a

12:51:18 18 parking ticket.

12:51:22 19    Q.  Okay.

12:51:51 20       MR. MCGOWAN:  Would you mark that, please.

12:51:52 21                (Deposition Exhibit V
12:51:52                  was marked for identi-
12:51:52 22               fication.)

12:52:06 23    Q.  Would you look at Exhibit V, and tell me

12:52:08 24 if that shows the cart that you wanted to have.

247

12:52:12  1      A.   Exhibit V?  Yes, it does, Item F, Eldon

12:52:19  2   Utility Cart.

12:52:20  3      Q.   Is there a picture shown there of the cart

12:52:22  4   that you would have liked?

12:52:26  5      A.   Yes, what I requested.  And it's item

12:52:30  6   Number 948-323.

12:52:32  7      Q.   Would you circle that on the document,

12:52:33  8   please, for me, the picture.

12:52:36  9      A.   (Witness complies.)

12:52:39  10     Q.   Thank you.  And is that the cart that you

12:52:45  11  eventually received in October or November?

12:52:51  12     A.   To the best of -- yes, to the best of my

12:52:53  13  ability, that's the same cart Dawn has.

12:52:56  14                         (Deposition Exhibit W
12:52:56                            was marked for identi-
12:52:56  15                         fication.)

12:53:02  16     A.   Of 2001, right.  Of 2001 -- I mean, of

12:53:07  17  2000.

12:53:27  18     Q.   Could you tell me if Deposition Exhibit W

12:53:30  19  illustrates a chair that was ever provided for you

12:53:33  20  at work?

12:54:05  21     A.   To the best of my ability, I cannot point

12:54:07  22  out the chair.

12:54:10  23     Q.   Did you ask for an adjustable chair?

12:54:13  24     A.   I asked for an adjustable chair, but I

12:54:15   1   didn't get an adjustable chair.

12:54:29   2       Q.   Were any of the chairs provided on this

12:54:33   3   exhibit provided to you for work purposes?

12:54:36   4       A.   To the best of my ability, I can't point

12:54:37   5   out the chair in this -- in your Deposition Exhibit

12:54:41   6   W, I can't point out the chair.

12:54:45   7       Q.   Was any kind of adjustable chair provided

12:54:47   8   to you in the period between August and the end of

12:54:56   9   November of 2000?

12:55:07  10       A.   To the best of my ability, I don't know if

12:55:07  11   the chair adjusted.

12:55:07  12       Q.   What kind of a chair was provided for you?

12:55:07  13       A.   It's similar, but I cannot tell you,

12:55:08  14   according by looking at this, I could not tell you

12:55:10  15   that these are one of the chairs.

12:55:12  16       Q.   I understand.  My question is to describe

12:55:15  17   for me as best you can the chair that was provided

12:55:18  18   to you, regardless of whether it's shown in this

12:55:21  19   exhibit or not.

12:55:22  20       A.   It appears to look like one of these

12:55:24  21   chairs.  They all are similar, especially if you see

12:55:28  22   the pictures where the arms is.  They -- it was --

12:55:32  23   it's similar, but I cannot say, to the best of my

12:55:36  24   knowledge, I cannot say.

249

12:55:44  1      Q.    So the chair that was provided to you had

12:55:47  2  arms on it?

12:55:51  3      A.    To the best of my ability and my

12:55:54  4  knowledge, I cannot really tell you.

12:55:59  5      Q.    Did it have wheels on it?

12:56:01  6      A.    Pardon?

12:56:01  7      Q.    Did it have wheels on it?

12:56:03  8      A.    I believe it did, but I cannot actually

12:56:05  9  tell you.

12:56:07 10      Q.    Was it --

12:56:08 11      A.    I believe that it could have been --

12:56:10 12  because they favored these chairs, but I cannot tell

12:56:12 13  you, by looking at this, I could not tell you.   But

12:56:15 14  I -- I cannot say that the chair adjusts.   I

12:56:19 15  definitely can't tell you that.

12:56:21 16      Q.    It may or may not have been adjustable?

12:56:25 17      A.    Well, I was told that the chair I had did

12:56:27 18  not adjust.

12:56:28 19      Q.    Who told you that?

12:56:30 20      A.    Benny Goins.

12:56:32 21      Q.    And how do you spell his last name?

12:56:34 22      A.    G-O-I-N-S.

12:56:36 23      Q.    And what's his position with the County?

12:56:45 24      A.    I don't know the name of his position, but

250

| 12:56:48 | 1 | he's like maybe a custodian, maybe. |
| 12:56:56 | 2 | Q.    When did he tell you your chair was not |
| 12:56:58 | 3 | adjustable? |
| 12:56:59 | 4 | A.    When I received it, I believe, or during |
| 12:57:03 | 5 | that period of time, I guess, when I received the |
| 12:57:10 | 6 | chair it did not adjust. |
| 12:57:11 | 7 | Q.    When was that? |
| 12:57:17 | 8 | A.    To the best of my knowledge, I can't |
| 12:57:17 | 9 | recall, but I believe it was in year 2000, maybe |
| 12:57:22 | 10 | October, November, to the best of my knowledge. |
| 12:59:11 | 11 | MR. MCGOWAN:  Those are all the questions |
| 12:59:12 | 12 | I have today, ma'am.  I would appreciate your |
| 12:59:14 | 13 | reviewing this deposition, make sure that it's |
| 12:59:17 | 14 | typed up accurately.  And if you have any |
| 12:59:20 | 15 | corrections, follow the instructions from the |
| 12:59:22 | 16 | court reporter to see that it is corrected and |
| 12:59:26 | 17 | sign the deposition.  You can arrange with the |
| 12:59:30 | 18 | court reporter, as I told you earlier, to make |
| 12:59:32 | 19 | copies of whatever Exhibits we've marked here |
| 12:59:37 | 20 | today. |
| 12:59:46 | 21 | I would like the original of your |
| 12:59:47 | 22 | deposition and a copy of the exhibits.  And I |
| 12:59:52 | 23 | would like you to let me know who it is you |
| 12:59:56 | 24 | select to make copies of these tapes so that I |

251

12:59:59  1    can find out what it will cost so that I can

13:00:04  2    take care of that and get those duplicated.

13:00:09  3         THE WITNESS:  May I have copies of these

13:00:13  4    exhibits now?  Could I get copies of these now?

13:00:16  5         MR. MCGOWAN:  The court reporter will make

13:00:17  6    copies for you.

13:00:18  7         THE WITNESS:  Well, could I get copies of

13:00:20  8    these today or now, of these exhibits that is

13:00:25  9    right here?

13:00:27  10        THE REPORTER:  I'm going off the record.

13:00:28  11             (Discussion off the record.)

13:00:52  12        THE WITNESS:  If I go somewhere to get

13:01:00  13   these copies made and pay for them, would you

13:01:02  14   then just let me -- follow me and I'll make the

13:01:06  15   copy of these now?

13:01:09  16        THE REPORTER:  I would really not like to

13:01:14  17   do that.

13:01:19  18        THE WITNESS:  I could get these copied.

13:01:20  19   We may even be able -- well, I could -- it

13:01:22  20   would be just really down the street that I

13:01:25  21   could get these copied.

13:01:29  22        MR. MCGOWAN:  Let me see if somebody out

13:01:31  23   here can help you.  I don't work here.  If this

13:01:34  24   were my office I'd be happy to make a copy for

252

13:01:37    1          you.

13:01:38    2                  THE REPORTER:   I'm going off the record.

13:23:28    3
13:23:28
13:23:28    4
13:23:28
13:23:28    5                                  _____
13:23:28
13:23:28    6                                  BRENDA  K.  HURSTON
13:23:28
13:23:28    7                          -   -   -
13:23:28
13:23:28    8
13:23:28                     (Deposition concluded at 1:01 PM.)
13:23:28    9

           10
                                    -   -   -
           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

**ERRATA SHEET**

TO THE REPORTER: I, *Brenda K Huwston*, have read the entire
transcript of my deposition taken on the __9__ day of *September*,
200**3**, or the same has been read to me. I request the following
changes be entered upon the record for the reason(s) indicated. I
have signed my name to the signature page and authorize you to
attach the following changes to the original transcript:

**\*PLEASE DO NOT WRITE IN THE TRANSCRIPT\***

PAGE    LINE                    CORRECTION (and reason)

| PAGE - LINE | CORRECTION | (and reason) |
|---|---|---|
| 136 - 18 | Grand | I do not live on Grant |
| 157 - 4 | WAS on 12-16-97 | Is the date I typed order for utility cart. |
| 157 - 9 | of 1998 | Approx. Jan. 1998, was when utility cart delivered |
| 158 - 1 | Cart did not arrive | , SAME REASON AS |
|  | In 1999, but In 1998 | 157, line 9 |
| 160 - 17 | , No, but my hands, | It is the truth. |
|  | { feet, + back hurt |  |
|  | { from trying to push/pull cart |  |
| 169 - 10 | Yes, through Gail Weigel | Gail was Linda's supervisor too. |
| 176 - 17 | Ham. Active files | It is the truth. |
| 179 - 20 | It came in the year 1997, when I typed requisition for Dawn + in 1998 upon my return from feet sugeries. | It is the truth. |
| 180 - 12 | Rec'd the co-workers and Linda Day. |  |
| 182 - 13 | No | { I missed/understood Jack's question |
| 182 - 15 | No |  |

**ERRATA SHEET**

TO THE REPORTER:  I, *Brenda K Hurston*  , have read the entire
transcript of my deposition taken on the _9_ day of _September_
200_3_, or the same has been read to me.  I request the following
changes be entered upon the record for the reason(s) indicated.  I
have signed my name to the signature page and authorize you to
attach the following changes to the original transcript:

**\*PLEASE DO NOT WRITE IN THE TRANSCRIPT\***

PAGE    LINE                    CORRECTION (and reason)

| PAGE - LINE | CORRECTION | (and reason) |
|---|---|---|
| 183 - 11 | YES | I have problems/bunions |
| 183 - 14 | YES | I have problems/neuroma |
| 184 - 2 | In Kettering | Is. Dr. Walker location. |
| 186 - 11 | YES | SAME as reason 183, line 11. |
| 186 - 12 | YES | " " |
| 193 - 3 | YES, there may be- | I'm not fairly confident |
| 193 - 14 | YES, there may be- | I'm not fairly confident. |
| 195 - 10 | YES | Jack already have |
| 205 - 19 | His name? But he came into office where I was located. | It is the truth. |
| 206 - 3 | No | Sherry did not discuss with me regarding her written statement. |
| 209 - 21 | I received a verbal and a written reprimand at the same time. | It is the truth |
| 254 - 4 | 1812 Grand Ave. | There is no Grant Ave. |

253

C E R T I F I C A T E

STATE    OF    OHIO    :
                          SS:
COUNTY OF HAMILTON    :

I, Wendy Davies Welsh, a duly qualified and commissioned notary public in and for the State of Ohio, do hereby certify that prior to the giving of her deposition, the within named BRENDA K. HURSTON was by me first duly sworn to testify the truth; that the foregoing pages constitute a true and correct transcript of testimony given at said time and place by said deponent; that said deposition was taken by me in stenotypy and transcribed under my supervision; that I am neither a relative of nor attorney for any of the parties to this litigation, nor relative of nor employee of any of their counsel, and have no interest whatsoever in the result of this litigation. I further certify that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28 (D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office, at Cincinnati, Ohio, this 29th day of September, 2003.

MY COMMISSION EXPIRES:    WENDY L. WELSH, RDR-CRR
NOVEMBER 20, 2005.       NOTARY PUBLIC, STATE OF OHIO