FILED SEP 3 2003
SEP 02 2003
KENNETH J. MURPHY, Clerk
CINCINNATI, OHIO

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

BRENDA K. HURSTON : **CASE NO. C-1-01 313**

Plaintiff : (Judge Weber)

-vs- : **AMENDED NOTICE OF DEPOSITION OF BRENDA K. HURSTON**

BUTLER COUNTY DEPT. OF JOB AND FAMILY SERVICES, et al :

Defendants

::: ::: ::: :::

Now comes the defendant, by and through counsel, and hereby gives notice that the deposition of Brenda K. Hurston will be continued in the above matter on Tuesday, September 9, 2003 beginning at 10:00 a.m. at the Middletown City Law Department, 3rd Floor, 1 Donham Plaza, Middletown, Ohio 45042, and will continue from day to day until completed. Defendants will provide a court reporter.

JACK C. McGOWAN & ASSOCIATES

Jack C. McGowan (0005619)
Attorney for Defendants
Butler County Department of Job and Family Services
246 High Street
Hamilton, Ohio 45011
(513) 844-2000

DEPOSITION
A
9-9-03 Wendy Welsh

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the within has been sent by certified mail to Brenda K. Hurston, 1812 Grand Avenue, Middletown, Ohio 45044 this 29th day of August, 2003.

Jack C. McGowan

THE BUTLER COUNTY WORK PLACE

Butler County's Department of Job & Family Services

# THE BUTLER COUNTY WORK PLACE

Butler County's Department of Job & Family Services
315 High Street, P.O. Box 4000
Hamilton, Ohio 45012-4000
(513) 887-4000

June 13, 2001

Brenda Hurston
1812 Grand Avenue
Middletown, Ohio 45044

Dear Brenda:

The department's records indicate that you have exhausted all available leave, including both Family Medical Leave and the additional unpaid sick leave provided for in the collective bargaining agreement. The medical information we've received from your treating physician indicates that you are unable to perform the essential duties of your position.

Article XXX, Section 8. (b) of the collective bargaining agreement provides that:

> ("....if the Employee remains unable to return to work after the expiration of the six month leave, the Employee shall be placed on disability separation.")

Pursuant to this article, you will be placed on disability separation effective October 16, 2001.

I have included a copy of Article XXX, of the collective bargaining agreement, for your review. Please note your reinstatement rights and what you have to do to invoke them if you recover from your disability.

If you have any questions, please contact Betty Proctor at 887-4198. We wish you the best for your recovery.

Sincerely,

Margie Laut

Margie Laut
Human Resources Director

cc: Linda Day, Supv.

DEPOSITION
9-9-03 Wendy Welsh

## ARTICLE XXX

**Sick Leave**

1. Employees will earn sick leave at the rate of four and six tenths (4.6) hours per each completed eighty (80) hours in active pay status. Active pay status shall be defined as hours worked, hours on vacation, hours on holiday leave, hours on paid sick leave, hours of compensatory time off, and other hours of authorized, paid leave. Sick leave shall be cumulative without limit.

2. Pay for any sick leave shall be at the Employee's regular rate of pay; except as otherwise provided in this Section:

(a) If within the period of twelve (12) calendar months following the ratification of this Agreement, the average rate of the use of sick leave does not fall to ten (10) days or fewer per year for bargaining-unit Employees, then for the next succeeding period of twelve (12) months, all Employees who do not have at least two hundred fifty-six (256) hours of accrued sick leave at the time the sick leave is used shall be paid for sick leave as follows:

(1) For the first twenty-four (24) hours of sick leave used during the succeeding period of one (1) year, sick leave will be paid at one hundred percent (100%) of the Employee's regular pay.

(2) For the second twenty-four (24) hours of sick leave used during that year-period, sick leave will be paid at seventy-five percent (75%) of the Employee's regular pay.

(3) For all other sick leave beyond forty-eight (48) hours used during that year-period, sick leave will be paid at fifty percent (50%) of the Employee's regular pay.

(b) Employees who have two hundred fifty-six (256) hours or more of accumulated sick leave at the time the sick leave is used shall not have the payment of sick leave reduced under this Section. For Employees who do fall below the two hundred fifty-six (256) hour limit, the payment limitations set forth in Section 2(a)(1)-(3) will be calculated based on the number of total sick leave days used during that calendar year while under the two-hundred fifty-six (256) hour threshold. In all cases, the Employee must have enough accrued sick leave to cover the amount of time used or the Employee will not be paid at all.

(c) At the end of the period measured from the thirteenth (13th) through the end of the twenty-fourth (24th) month following the ratification, the overall average rate of the use of sick leave for bargaining-unit Employees must have fallen to eight (8) or fewer days per year for bargaining-unit Employees, or the restrictions set forth in Section 2(a)(1), (2), and (3) shall be imposed on all Employees who do not have at least three hundred (300) hours of accumulated sick leave. Such restrictions shall thereafter remain in place for each calendar year thereafter unless the average use of sick leave by bargaining-unit Employees, as measured over preceding calendar year from January to December, has not exceeded eight (8) days per year.

(d) Notwithstanding the other provisions of this Section, Employees are eligible to use sick leave they have accrued, paid at their full, regular rate of pay, for:

(1) In-patient hospitalization of an Employee or a member of the Employee's immediate family, as defined in Section 7, and the continuous period of recovery therefrom; or

(2) Sick leave used for funeral purposes, as provided in Sections 13, 14, and 15 of this Article; or

(3) Any sick leave scheduled and approved in advance.

(e) When measuring the amount of sick leave used by bargaining-unit Employees, all paid and unpaid sick leave shall be counted, including leave for the serious health condition of the Employee or a member of the Employee's immediate family, but sick leave that has been converted to vacation leave under this Agreement shall not be counted as "sick leave used." Throughout this Section, a "day" for purposes of measuring average sick leave use ~~will be the equivalent of eight (8) hours, rounded to the nearest tenth of an hour.~~

(f) The Employer shall prepare and distribute monthly reports to all Employees showing the average number of days of sick leave used for the bargaining unit for the year to date, converted to an annualized rate, and shall show the sick leave usage rate for each unit as well. Each Employee will also receive an individual report showing the amount of sick leave earned and used to date.

3. Sick leave may be requested for the following purposes, provided that the Employee has notified his or her supervisor or the Personnel Office within one-half (½) hour of the scheduled starting time for each day of the Employee's absence:

(a) Illness or injury of the Employee;

(b) Serious illness or injury of immediate family members, pursuant to Section 7;

(c) Medical, dental, or optical examinations that cannot be scheduled outside normal working hours;

(d) Exposure of the Employee to a contagious disease if, by reason of such exposure, the Employee's presence at work would pose a substantial risk of contagion and serious illness to co-workers;

(e) Pregnancy, childbirth, and related medical conditions, but only to the extent

the Employee is rendered unable to work by reason of such condition; and

(f) Death of a member of the Employee's family, pursuant to Section 12 or 13.

4. An Employee who is hospitalized or who has provided a medical statement indicating the expected date of return shall not be required to call in daily.

5. Upon the request of the Employer, in the Employer's discretion, an Employee must furnish satisfactory proof of his or her sickness, illness, or disability, or of the illness or injury of an immediate family member requiring the Employee's presence, before any sick leave is paid. Any such request must be made before the Employee's return to the office. Further, in the case of an illness or injury resulting in absence for more than three (3) consecutive days, an Employee may not return for duty or be paid sick leave without a statement from the Employee's physician verifying that the Employee was unable to work.

6. Employees are prohibited from engaging in either of the following during a paid or unpaid sick leave, including leave for the serious health condition of the Employee or a member of the Employee's immediate family under the Family and Medical Leave Act (FMLA):

(a) any paid employment of any kind, or

(b) other activities, whether or not paid, that are inconsistent with the claimed inability to work or the claimed need to care for a seriously ill member of the immediate family.

7. Sick leave may be granted when an immediate family member suffers serious illness or injury requiring the Employee's presence. The amount of the sick leave granted under this section shall lie in the discretion of the Employer. "Immediate family member" shall be defined, for purposes of this section, as the spouse, child, stepchild, grandchild, parent, legal guardian, or other relative or dependent, provided such other relative or dependent regularly resides in the Employee's home.

8. (a) Upon exhaustion of accrued sick leave, the Employee may be permitted to use accrued vacation leave. If the Employee presents a physician's statement that the disability is not likely to exceed six (6) months, sick leave without pay or benefits up to a period of six (6) months may be granted when an Employee is sick or injured and is without any accumulated sick leave.

(b) If the Employee's physician cannot certify likely recovery within six (6) months, or if the Employee remains unable to return to work after the expiration of the six-month leave, the Employee shall be placed on disability separation. The Employee may request reinstatement to his or her prior classification or any lower classification in the same classification series within a period of two (2) years from the date the Employee was placed on disability separation or unpaid sick leave, whichever was earlier.

(c) An Employee requesting reinstatement from a disability separation may be required to submit to an examination by a physician selected by the Employer, with the consent of the Employee or the Union. The examination must show that the Employee has recovered from the disability and is able to perform all of the material duties of the position to which reinstatement is sought. The Employer shall pay the cost of the examination.

(d) In the event there is no vacancy in the Employee's prior classification or a lower classification in the same classification series, the Employee may displace only an Employee with less seniority. If no Employee has less seniority, the Employee requesting reinstatement shall be laid off. Any Employee displaced by an Employee returning from disability separation shall be subject to the layoff and recall provisions of Article XIX, herein.

9. Sick leave shall be charged in minimum amounts of one-quarter (¼) hour. An Employee requesting sick leave shall inform his or her supervisor directly of such request and the

reason therefor within one-half hour of his or her scheduled starting time. If the supervisor is not available at the time of the call, then the Employee must speak with the Administrator for the division, or another supervisor in the division. If none of these individuals are available, then the Employee must call either the Personnel Officer, the Human Resources Manager, the Assistant Director, or the secretary to the Director. It is not permitted for the Employee to leave messages with a co-worker or on the voice-mail system in lieu of contacting the supervisor directly. It is also not permitted for family members or friends to call in for the Employee unless the Employee is hospitalized or totally incapacitated and unable to make the call. If neither the supervisor nor the other named individuals are available at the time the Employee calls in, the Employee shall leave a message with a telephone number at which the Employee may be reached. Failure to do so may result in denial of sick leave for the period of absence and/or disciplinary action. Employees are responsible for contacting the Employer for each day of absence in accordance with this Section, unless the Employee is hospitalized or has provided a written doctor's statement specifying the anticipated date of return. Failure to do so may result in denial of sick leave for the period of absence and/or disciplinary action.

10. The Employer may require the Employee to submit to a medical examination to verify the proper use of sick leave or the Employee's ability to perform the substantial and material duties of his or her position. The Employer's determination following such an examination that an Employee is unable to perform his or her duties is subject to the grievance and arbitration procedure. The Employer shall select the physician with the approval of the Employee or the Union, and shall pay for the examination.

11. The Employer and the Union understand that sick leave is intended as a form of income insurance in the case of the illness of the Employee, or illness or death of a family member, as provided in this Article, for those listed purposes only, and not as a form of additional time off.

Fraudulent use of sick leave is a very serious offense that will be treated as a form of theft, and may result not only in the discipline or discharge of an Employee but possible criminal investigation and prosecution as well. The abuse of sick leave damages not only the agency and the public we serve, but also those co-workers who must carry the burden of employees who fail to attend work on a regular basis. To ensure that all Employees understand the seriousness of this problem, the Employer and the Union agree to offer in-service training programs for all agency staff on the importance of ~~controlling sick leave abuse, and the Union agrees to cooperate with the development and~~ implementation of this training.

12. If an Employee transfers to the service of the Employer from another County department or from another Ohio public agency, the Employer shall credit the Employee, upon written request and verification, with the sick-leave balance held by the Employee with the Ohio public agency.

13. An Employee shall be paid sick leave pay for up to five (5) working days' absence in the event of the death of the Employee's spouse, child, grandchild, stepchild (living with or raised by the Employee), parent, grandparent, brother or sister. An Employee shall be paid sick leave pay for up to three (3) working days' absence for the death of the Employee's stepparent, mother-in-law, father-in-law, sister-in-law, brother-in-law, daughter-in-law, or son-in-law. Days of sick leave-funeral leave taken must coincide with the day of death or the day of funeral.

14. In the event of a death of a relative other than those in the immediate family as described in Section 12, above, the Employer may, at its sole discretion, grant one (1) day of sick leave in order that the Employee may attend the funeral.

15. In circumstances of unusual distances of travel or extreme weather conditions the Employer may, upon the request of the Employee, at its sole discretion, grant up to an additional two

(2) days of unpaid leave for the Employee to travel to the funeral of a relative in the family as described in Section 12 above.

16. An Employee must complete and sign an Application for Usage of Sick Leave immediately upon return to work to qualify for use of sick leave.

17. An Employee who is absent from duty without leave or without notice to his or her supervisor of the reason for such absence will be subject to discipline up to and including discharge.

---

# Memo

**To:** Brenda Hurston

**cc:** Roy Dawson, Linda Day, Douglas Duckett and Bruce Jewett

**From:** Heath MacAlpine, Assistant Director

**Re:** Your recent e-mails

**Date:** January 16, 2001

I want to follow up on your recent e-mails to both Bruce Jewett and myself, as well as our telephone conversation of yesterday. There are three issues that I would like to address:

1 - In your e-mail to Bruce dated January 8, and again in your e-mail to me yesterday, you indicated that you were to meet with Bruce, Roy Dawson, and me on January 8 to follow up on our meeting of December 20. You are mistaken. The January 8 date we had discussed was the date by which Bruce had promised you a written response to the issues you expressed in the meeting, not the date for another meeting. I would note that Bruce honored the agreed upon commitment, forwarding his response to you on December 28.

2 - During the December 20 meeting, Roy suggested that we arrange for a referral to the Employee Assistance Program for both you and Linda Day in order to try and resolve some of the issues that are apparently damaging your working relationship. Bruce agreed, and asked me in his December 28 memo to make the referral.

In your e-mail of yesterday and our subsequent telephone conversation, you told me that you were no longer interested in participating in the referral and will seek counseling from other sources if you see a need. Since the point of the referral was to give you and Linda a chance to work out your issues together with a third party, it no longer makes any sense to make the referral. If you change your mind and want to participate, Linda has indicated that she's willing to do so.

3 - In your e-mail to Bruce of January 8, you requested copies of the written statements provided by Deputy Compton, Linda, and any other supervisors in regard to your confrontation with Deputy Compton on October 12 and Linda's subsequent disciplinary actions against you. Enclosed are copies of Deputy Compton's memorandum to me dated October 12; her summary of the confrontation dated October 23; and June Hom's memorandum of October 27 describing your meeting with Linda on October 17.

As I instructed you in our telephone conversation, you are not to confront Deputy Compton or Ms. Hom regarding their statements. You are to conduct yourself in a professional manner.

T:\Management\WPWIN60\Heath\hurston.Jan01.wpd






Butler County's Department of Job & Family Services

**THE BUTLER COUNTY WORK PLACE**
**Butler County's Department of Job & Family Services**
**315 High Street, P.O. Box 4000**
**Hamilton, Ohio 45012-4000**
**(513) 887-4000**

February 16, 2001

Brenda Hurston
1812 Grand Avenue
Middletown, Ohio 45044

Subject: Family Medical Leave Request

Dear Brenda:

Thank you for your recent request for Family Medical Leave. Your Request has been approved beginning February 28, 2001 and ending March 30, 2001.

If you are unable to return to work on April 2, 2001 and require additional Family Medical Leave, you will be required to complete a new request for Family Medical Leave and have your physician or practitioner provide a new certification of your medical condition. Request for Family Medical Leave and Physician or Practitioner Certification - Serious Health Condition forms are enclosed.

If you have any questions, please contact Betty Proctor at 887-4198. We look forward to your return.

Very truly yours,

[signature]

Heath MacAlpine
Assistant Director

Enclosure

cc: Linda Day, Supv

Attn: Margie Laut
513-887-4334

DEPOSITION
I
9-9-03 Wendy Welsh

HR 11 JUN '01 PM 4:19

# PHYSICIAN OR PRACTITIONER CERTIFICATION
## EMPLOYEE - SERIOUS HEALTH CONDITION
## (Family and Medical Leave Act of 1993)

1. Employee's Name: Brenda Hurston

2. Diagnosis: Status Post Bunionectomy c̄ Hemi Implant L/F; Excision Neuroma 3rd L/F; Resection Metatarsal Cuneiform Exostosis L/F; Condylectomy 3rd & 4th Metatarsal Heads L/F; Resection Intermediate Dorsal Cutaneous Nerve L/F; DJD L/F

735.0
355.6
726.91
715.37
Primary

3. Date Condition Commenced: Surgery 2/28/01

4. Probable Duration of condition: Disability Permanent As of 5-17- Patient Is Unable to RTW

5. Regimen of treatment to be prescribed (*Indicate number of visits, general nature and duration of treatment, including referral to other provider of health services. Include schedule of visits or treatment if it is medically necessary for the employee to be off work on an intermittent basis or to work less than the employee's normal schedule of hours per day or days per week*):

A. By Physician or Practitioner: ______

B. By other provider of health services, if referred by Physician or Practitioner:

(*Over*)

DEPOSITION
9-9-03 Wendy Welsh

IR 11 JUN '01 PM 4:19

Check **Yes** or **No** in the space below, as appropriate.

6. *Yes* ____ **No** X Is inpatient hospitalization of the employee required?

7. **Yes** ____ **No** X Is employee able to perform work of any kind (*If "No" skip Item 8.*)

8. **Yes** ____ **No** ____ Is employee able to perform the essential functions of employee's position? (*Answer after reviewing job description from employer describing essential functions of employee's position, or, if none provided, after discussing with employee.*) If answer is "*No*", would some accommodation allow the employee to perform the essential functions of the position?

Permanent Disability 5-17-01
PERS Disability Filed
Copy of filing Attached.

9. Signature of Physician or Practitioner: [signature] DPM

10. Printed name of Physician or Practitioner: Leonard R. Janis, DPM

11. Date: 6-01-01

12. Type of Practice (*Field of Specialization, if any*): Podiatry

T:\Personnel\fammedlv\employee.wpd




Butler County's Department of Job & Family Services

# THE BUTLER COUNTY WORK PLACE

Butler County's Department of Job & Family Services
315 High Street, P.O. Box 4000
Hamilton, Ohio 45012-4000
(513) 887-4000

May 7, 2001

Brenda Hurston
1812 Grand Avenue
Middletown, Ohio 45044

Dear Brenda:

Thank you for your recent request for continued Family Medical Leave. Your request has been approved beginning on Tuesday, May 1, 2001 and ending Tuesday, May 22, 2001. Pursuant to both the Family Medical Leave Act and the collective bargaining agreement between Butler County Department of Job and Family Services and AFSCME, this exhausts the maximum amount of leave allowed by the Family Medical Leave Act.

Pursuant to Article XXX, Section 8 (a), of the collective bargaining agreement, you may request additional unpaid sick leave for a period of up to six months from your initial date of unpaid leave, April 16, 2001. This requires a statement from your physician that your disability is not likely to exceed the six month period, October 16, 2001.

If you wish to use this additional leave, you must provide Betty Proctor with your request and physician statement by June 12, 2001. Failure to specifically request this additional leave, or report to Butler County Department of Job and Family Services for work on June 12, 2001 will result in denial of reinstatement and could result in termination.

If you have any questions, please contact Betty Proctor at 887-4198. We look forward to your return.

Very truly yours,

Margie Laut

Margie Laut
Human Resources Director

cc: Linda Day, Supv

DEPOSITION
K
9-9-03 Wendy Welsh

Revised 3/96

# REQUEST FOR FAMILY/MEDICAL LEAVE

Employee Name: Brenda Hurston Date of Request: ______

Department: Butler County of Job and Family Services Position Title: Office Machine Opr 2

Hire Date: 6/6/88

I request a Family/Medical Leave for the following reason (check one):

______ A. ~~The birth of a child and in order to care for such child or the placement of a child for adoption or~~ foster care.

______ B. In order to care for an immediate family member if such family member has a serious health condition. Circle one: CHILD - SPOUSE - PARENT (Must submit "Physician or Practitioner Certification" within 15 days)

______ C. Employee's own serious health condition that makes the employee unable to perform the functions of his/her position. (Must submit "Physician or Practitioner Certification" within 15 days)

Method of Leave Requested

X A. Consecutive Leave For Surgery - Left Foot

______ B. Intermittent or Reduced Leave Schedule (Specify Schedule Below)

Date leave is to begin: 2-28-01 Expected duration of leave: 8-12 WKS -

The Family and Medical Leave Act guarantees up to 12 weeks of unpaid leave in a 12-month period for purposes covered by the FMLA. Paid or unpaid sick leave taken under the collective bargaining agreement (or civil-service regulations, for non-bargaining unit staff) may count toward the 12-week FMLA allotment. If an employee is disabled by personal illness or injury and has exhausted all available paid leave, and the employee's physician has certified that the employee is likely to be able to return to work within six months, then the employee is entitled to an unpaid sick leave for up to six months. This six month unpaid sick leave includes the 12-week FMLA leave allotment under federal law and is not in addition to it. If the employee's physician cannot certify that the employee will likely recover within a six-month period, then the employee will be placed upon disability separation immediately upon the employee's exhaustion of the 12-week FMLA leave allotment.

4-30-01
(Date)

Brenda K Hurston
Employee's Signature

T:\Personnel\FAMMEDLV.emp request.wpd

DEPOSITION
2
9-9-03 Wendy Welsh

# POSITION DESCRIPTION

OHIO DEPARTMENT OF ADMINISTRATIVE SERVICES

PERSONNEL DIVISION

AGENCY: Butler County Human Services

DIVISION OR INSTITUTION:

UNIT OR OFFICE: Communications

*Do not write in shaded area*

[ ] State Agency [X] County Agency [ ] New Position [X] Change

COUNTY OF EMPLOYMENT: Butler

USUAL WORKING TITLE OF POSITION: Office Machine Operator

POSITION NO. AND TITLE OF IMMEDIATE SUPERVISOR: 11100.0 Soc Prog Admin 1

NORMAL WORKING HOURS: (Explain unusual or rotating shift.) FROM: TO: 8 hrs. varied

JOB DESCRIPTION AND WORKER CHARACTERISTICS

| % | Job Duties in order of Importance | Minimum Acceptable Characteristics |
|---|---|---|
| 40 | Handles most of the Department's printing needs, reproducing both forms and office memos and reports. This requires operating knowledge of the Roneo duplicating machine. Receives request for printing needs from various units and fills these requests on a timely basis. Be familiar with the different forms used by the Department, keeping a loose-leaf record of numbered BCDHS forms, and masters. Keeps equipment clean and makes minor adjustments. Order State printed forms. Maintains State forms log and Directory. | 13b, 29 duplicator, 30 c, 32f, 32n, 33a, 33b, 34b, 35c - 50lbs |
| 55 | Have responsibility for the agency's supply room; maintain a perpetual inventory of all office supply items showing quantities in , quantities out, and balance on hand. Check in all orders comparing the packing slip with the invoice to verify proper order and amount received. Note any discrepancies and/or back orders. Receive requests for supply items from unit supervisors and fill said requests from stockroom inventory or send requisition to the County supplies as required. If item is not included in the supplies catalog, forward request to the administrator who has procurement responsibilities. | 3, 13a, 30f, 30c, 31c, 32f, 32i, 32j, 33b, 34c, 35c - 50lbs |
| 5 | Perform other duties as assigned by administrator. | 13b, 30d, 31b, 32f, 32i, 33b |

DEPOSITION
9-9-03 Wendy Welsh

List Position Numbers and Class Titles of positions supervised. If more than eight, list totals only.

SIGNATURE OF AGENCY REPRESENTATIVE: Dianne Loydon (signature)

DATE: 7-6-90

11101.0



Butler County's Department of Job & Family Services

# THE BUTLER COUNTY WORK PLACE

Butler County's Department of Job & Family Services
315 High Street, P.O. Box 4000
Hamilton, Ohio 45012-4000
(513) 887-4000

March 26, 2001

Brenda Hurston
1812 Grand Avenue
Middletown, Ohio 45044

Subject: Family Medical Leave Request

Dear Brenda:

Thank you for your recent request for Family Medical Leave. Your Request has been approved beginning April 1, 2001 and ending April 30, 2001.

If you are unable to return to work on May 1, 2001 and require additional Family Medical Leave, you will be required to complete a new request for Family Medical Leave and have your physician or practitioner provide a new certification of your medical condition. Request for Family Medical Leave and Physician or Practitioner Certification - Serious Health Condition forms are enclosed.

If you have any questions, please contact Betty Proctor at 887-4198. We look forward to your return.

Very truly yours,

Heath MacAlpine
Assistant Director

Enclosure

cc: Linda Day, Supv

3-21-01

Heath, Please sign and return to me. Thanks, Betty

RECEIVED
APR 2 2001
BUTLER COUNTY WORK PLACE

DEPOSITION
N
9-9-03 Wendy Welsh

Revised 3/9(

# REQUEST FOR FAMILY/MEDICAL LEAVE

Employee Name: Brenda Hurston    Date of Request: ___

Butler County
Department: of Job and Family Services    Position Title: Office Machine Opr 2

Hire Date: 6/6/88

I request a Family/Medical Leave for the following reason (check one):

____ A. The birth of a child and in order to care for such child or the placement of a child for adoption o: foster care.

____ B. In order to care for an immediate family member if such family member has a serious healtl condition. Circle one: CHILD - SPOUSE - PARENT (Must submit "Physician or Practitioner Certification" within 15 days)

_X_ C. Employee's own serious health condition that makes the employee unable to perform the functior of his/her position. (Must submit "Physician or Practitioner Certification" within 15 days)

RECEIVED
MAR 20 2001
BUTLER COUNTY WORK PLACE

Method of Leave Requested

_X_ A. Consecutive Leave

____ B. Intermittent or Reduced Leave Schedule (Specify Schedule Below)

Date leave is to begin: 2-28-01    Expected duration of leave: 5·01·01

The Family and Medical Leave Act guarantees up to 12 weeks of unpaid leave in a 12-month period for purposes covered by the FMLA Paid or unpaid sick leave taken under the collective bargaining agreement (or civil-service regulations, for non-bargaining unit staff) ma; count toward the 12-week FMLA allotment. If an employee is disabled by personal illness or injury and has exhausted all available paic leave, and the employee's physician has certified that the employee is likely to be able to return to work within six months, then th employee is entitled to an unpaid sick leave for up to six months. This six month unpaid sick leave includes the 12-week FMLA leave allotment under federal law and is not in addition to it. If the employee's physician cannot certify that the employee will likely recove within a six-month period, then the employee will be placed upon disability separation immediately upon the employee's exhaustion o the 12-week FMLA leave allotment.

3·19·01
(Date)

Brenda K Hurston
Employee's Signature

T:\Personnel\FAMMEDLV.emp request.wpd



Revised 3/96

## REQUEST FOR FAMILY/MEDICAL LEAVE

Employee Name: Brenda Hurston  Date of Request: February 6, 2001

Department: Butler County of Job and Family Services  Position Title: Office Machine Opr 2

Hire Date: 6/6/88

I request a Family/Medical Leave for the following reason (check one):

_____ A. The birth of a child and in order to care for such child or the placement of a child for adoption or foster care.

_____ B. In order to care for an immediate family member if such family member has a serious health condition. Circle one: CHILD - SPOUSE - PARENT (Must submit "Physician or Practitioner Certification" within 15 days)

✓ C. Employee's own serious health condition that makes the employee unable to perform the functions of his/her position. (Must submit "Physician or Practitioner Certification" within 15 days)

### Method of Leave Requested

_____ A. Consecutive Leave

_____ B. Intermittent or Reduced Leave Schedule (Specify Schedule Below)

Date leave is to begin: February 28th 2001 Expected duration of leave: _____

The Family and Medical Leave Act guarantees up to 12 weeks of unpaid leave in a 12-month period for purposes covered by the FMLA. Paid or unpaid sick leave taken under the collective bargaining agreement (or civil-service regulations, for non-bargaining unit staff) may count toward the 12-week FMLA allotment. If an employee is disabled by personal illness or injury and has exhausted all available paid leave, and the employee's physician has certified that the employee is likely to be able to return to work within six months, then the employee is entitled to an unpaid sick leave for up to six months. This six month unpaid sick leave includes the 12-week FMLA leave allotment under federal law and is not in addition to it. If the employee's physician cannot certify that the employee will likely recover within a six-month period, then the employee will be placed upon disability separation immediately upon the employee's exhaustion of the 12-week FMLA leave allotment.

2.6.01
(Date)

Brenda K Hurston
Employee's Signature

T:\Personnel\FAMMEDLV.emp request.wpd

DEPOSITION
P
9-9-03 Wendy Welsh

Revised 3/96

# REQUEST FOR FAMILY/MEDICAL LEAVE

Employee Name: Brenda Hurston

Date of Request: ___

Department: Butler County of Job and Family Services

Position Title: Office Machine Opr 2

Hire Date: 6/6/88

I request a Family/Medical Leave for the following reason (check one):

___ A. The birth of a child and in order to care for such child or the placement of a child for adoption or foster care.

___ B. In order to care for an immediate family member if such family member has a serious health condition. Circle one: CHILD - SPOUSE - PARENT (Must submit "Physician or Practitioner Certification" within 15 days)

X C. Employee's own serious health condition that makes the employee unable to perform the functions of his/her position. (Must submit "Physician or Practitioner Certification" within 15 days)

## Method of Leave Requested

X A. Consecutive Leave

___ B. Intermittent or Reduced Leave Schedule (Specify Schedule Below)

Date leave is to begin: 2-28-01 Expected duration of leave: 5·01·01

The Family and Medical Leave Act guarantees up to 12 weeks of unpaid leave in a 12-month period for purposes covered by the FMLA. Paid or unpaid sick leave taken under the collective bargaining agreement (or civil-service regulations, for non-bargaining unit staff) may count toward the 12-week FMLA allotment. If an employee is disabled by personal illness or injury and has exhausted all available paid leave, and the employee's physician has certified that the employee is likely to be able to return to work within six months, then the employee is entitled to an unpaid sick leave for up to six months. This six month unpaid sick leave includes the 12-week FMLA leave allotment under federal law and is not in addition to it. If the employee's physician cannot certify that the employee will likely recover within a six-month period, then the employee will be placed upon disability separation immediately upon the employee's exhaustion of the 12-week FMLA leave allotment.

3·19·01
(Date)

Brenda K Hurston
Employee's Signature

T:\Personnel\FAMMEDLV.emp request.wpd

DEPOSITION
Q
9-9-03 Wendy Welsh

Doug,

FEB 2 2 2001

In light of our current interactions with Brenda, I thought you might like a copy. Thanks, Heath

# Memo

**To:** Brenda Hurston

**From:** Heath MacAlpine, Assistant Director HM

**cc:** Linda Day, Douglas Duckett, Personnel File

**Re:** Job Audit

DJFS Brenda Hurston 2-22-2001

Pursuant to your request of January 19 for a job audit, I asked Betty Proctor to spend a day with you to observe and record your activities. Betty met with you on January 29, and has provided me with her report. I've also selected fourteen of the daily work logs you completed between July of last year and this January in order to review their contents.

The position description for your job, Office Machine Operator 2, indicates that you will spend approximately 40% of your time reproducing forms, approximately 55% of your time ordering and maintaining supplies, and approximately 5% of your time performing other duties. A review of the information discussed in the first paragraph indicates that, while your main functions continue to center on forms and supplies, the percentage of time spent on each has significantly changed. The following table illustrates my findings:

| Activity | Number of hours | Percentage |
|---|---|---|
| Printing forms, etc | 81.23 hours | 75.6% |
| Ordering and maintaining supplies | 13.23 hours | 12.3% |
| Other duties | 13.00 hours | 12.1% |

You spend three-quarters of your time working on printing, collating, storing, distributing, or otherwise dealing with forms. Your remaining time is split between ordering supplies and other duties.

Since you're still carrying out the functions described in your position description, your classification as an Office Machine Operator 2 is still valid, and will not be changed. We will, however, revise the percentages of time spent on those functions to more accurately reflect your current workload. The revised position description will be forwarded to you upon completion.

If you have any questions, please get in touch with me. Thank you.

T:\Management\WPWIN60\Heath\hurston memo.Feb01.wpd





STATE OF OHIO
STATE EMPLOYMENT RELATIONS BOARD
65 East State Street, 12th Floor
Columbus, Ohio 43215-4213
(614) 644-8573

DO NOT W... E IN THIS SPACE

Case No. 01-ULP-01-0006

Amended

SERB Official Time Stamp

# UNFAIR LABOR PRACTICE CHARGE

INSTRUCTIONS: File *one original and one copy* of this form with the State Employment Relations Board at the above address. Serve *one copy* on the party against whom the charge is brought. See Ohio Administrative Code Rule 4117-1-02. If more space is required for any item, attach additional sheets, numbering items accordingly.

1. PARTY FILING CHARGE: *(check one)*

☐ Employee Organization/Union ☑ Employee ☐ Employer ☐ Other ______

Name: Brenda Hurston | Telephone: work (513) 425-8696; home (513) 420-9692

Address: 1812 Grand Ave. | Fax: ( )

City, County, State, Zip: Middletown, Butler, Ohio, 45044

2. NAME OF PERSON REPRESENTING THE PARTY FILING CHARGE: (Representative must file a Notice of Appearance form.)
NONE | Telephone: ( ) NONE

Address: NONE | Fax: ( ) NONE

City, County, State, Zip: NONE

3. PARTY AGAINST WHOM THIS CHARGE IS BROUGHT: *(check only one)*

☐ Employee Organization/Union ☐ Employee ☑ Employer ☐ Other ______

Name: Butler Co. Department of Job & Family Services, The Government Services Center | Telephone: (513) 887-4000

Address: 315 High St., P.O. Box 4000 | Fax: (513) 887-4334

City, County, State, Zip: Hamilton, Butler, Ohio 45012

4. EMPLOYER: *(if different from item 1 or 3)*
Name: | Telephone: ( )

Address: | Fax: ( )

City, County, State, Zip:

DEPOSITION
S
9-9-03 Wendy Welsh

5. BASIS OF CHARGE: The party against whom this charge is brought has engaged in or is engaged in unfair labor practices within the meaning of Ohio Revised Code Section 4117.11. (Check appropriate subsections only.)

Charges against employers: (A)(1) ☐ (A)(2) ☐ (A)(3) ☑ (A)(4) ☑ (A)(5) ☑ (A)(6) ☑ (A)(7) ☑ (A)(8) ☑

Charges against unions or employees: (B)(1) ☐ (B)(2) ☐ (B)(3) ☐ (B)(4) ☐ (B)(5) ☐ (B)(6) ☐ (B)(7) ☐ (B)(8) ☐

6. STATEMENT OF FACTS: Provide a clear and concise statement of the facts constituting the alleged unfair labor practice(s), including the names of individuals involved and the date and place of the occurrences giving rise to the charge. (*If more space is required, add additional sheets*).

On October 18, 2000, I received a verbal and a written reprimand from my supervisor, Linda Day. Only after I served Unfair Labor Practice Papers to the union and to my employer, that a meeting was scheduled two months later for December 20th, 2000. At the meeting, However, another meeting was scheduled for January 8th, 2001, because Bruce stated, "He want to talk to Linda Day and Heath MacAlpine together." Roy Dawson (union president) made a suggestion that Linda Day and I go to the EAP (Employee Assistance Program), because of personality conflicts. I received a final written response from Bruce Jewett that was placed on my desk on January 2, 2001. I still thought we were going to have our meeting, because it was scheduled, and I had not received any written statements from June Hom or "Kat" Sherry Compton that I had verbally requested. Even though Bruce was in the Middletown Office on January 8th, 2001,

*see pg. 2*

A failure to provide the above information could result in the charge being dismissed for failure to provide a clear and concise statement.

DECLARATION

I declare that I have read the contents of this Unfair Labor Practice Charge and that the statements it contains are true and correct to the best of my knowledge and belief.

To distinguish originals, please do not use black ink for signatures.

Brenda K Hurston
Signature of Person Attesting to Content of Form

Date January 23rd, 2001

Brenda K. Hurston
Print or Type Name

THIS UNFAIR LABOR PRACTICE CHARGE WILL NOT BE ACCEPTED FOR FILING UNLESS THE PROOF OF SERVICE IS FULLY COMPLETED AND BEARS AN ORIGINAL SIGNATURE OF A REPRESENTATIVE OF THE PARTY FILING CHARGE.

PROOF OF SERVICE

I certify that an exact copy of the foregoing Unfair Labor Practice Charge has been sent or delivered to:

Bruce Jewett/BCDJFS Director
(Name and complete address of party against whom this charge is brought)
315 High St., P.O. Box 4000, Hamilton, OHIO 45012-4000

by ☐ Regular U.S. Mail ☐ Certified U.S. Mail ☐ Hand Delivery ☒ Other Faxed

this 23rd day of January (month), 2001 (year).

Signature of Person Attesting to Service of Form

Brenda K. Hurston
Print or type name

## *Statement of Facts - Continued pg. 2*

## *(Employer)*

the scheduled meeting did not take place. I did not get the right to dispute the written reprimand (that was based on June Hom and "Kat" Sherry Compton written statement), prior to receiving discipline. I received the written statement and the complaint of "Kat" Sherry Compton and the written statement of June Hom on January 17th, 2001. Therefore, Bruce Jewett had already made up his mind and decided that both discipline actions were appropriate; he will not take any action to revoke them. Instead of having the meeting together, so that I would have the opportunity and right to dispute both discipline actions, that was based on the written statement of June Hom and "Kat" Sherry Compton; I was disciplined without due process, based on the written statements of Linda Day, "Kat" Sherry Compton, and June Hom, who are all white female conspirators. Madeline Burns, who is a black female supervisor, and who had also witnessed both discipline actions being issued to me by Linda Day, did not provide a false written response. I believe that I have been discriminated against, based on my race, black, in violation of Title VII of the Civil Right Act, and because of my disabilities, in violations of the Americans with Disabilities Act.

# INDEPENDENT MEDICAL EXAMINATION

**NAME: HURSTON, BRENDA K** **#36344**

HOME ADDRESS: 1812 GRAND AVE
MIDDLETOWN, OH 45044

PRIMARY CARE PHYSICIAN: ELIZABETH DORIOTT, MD
TELEPHONE NUMBER: 937-748-5454
OFFICE ADDRESS: 78 NORTH MAIN STREET
SPRINGBORO, OH 45066

---

**5/21/2003**

HISTORY OF PRESENT ILLNESS: The patient is a 43-year-old female with a history of working on an assembly line and sustaining an injury to the LEFT foot in 1990. She had removal of spurs. She does not recall where the spurs where.

REVIEW OF CORRESPONDENCE: The patient brings with her a letter dated March 28th 2002 directed to Ms. Hurston from Dr. Leonard Johnson. This letter outlined the course of her treatment. In this letter, Dr. Johnson states the patient should have comfortable shoes, sitting, no lifting, standing, walking or climbing stairs for an unlimited period of time as well as an adjustable chair and utilization of a utility cart. He also states that she is depressed. He also notes that he feels that she will need continuing medical care and that the condition is stable at this time.

Things that make her symptoms worse include stress, standing and walking and lifting. Things that improve the symptoms include elevation of the feet with ice. Treatment to date includes Celebrex, Bextra and ibuprofen. She has also had physical therapy and exercising her feet with towels. She has had no bracing and she has had 4 surgeries on the LEFT foot and 1 surgery on the RIGHT foot.

PAST MEDICAL HISTORY AND REVIEW OF MEDICAL SYSTEMS: Includes headaches, problems with hearing and eyes. Psychiatric problems and arthritis.

CURRENT MEDICATIONS: ICO-Bid caplet twice a day for sinus; Hi-C with cherems-M ____ 1, once a day vitamin. Bextra 20 mg twice a day for pain. Zoloft 1 ½ tablets for depression among other medications not included.

ALLERGIES: NO KNOWN DRUG ALLERGIES.

HEALTH HABITS: Negative for alcohol and tobacco. The patient is RIGHT handed.

FAMILY HISTORY: Negative for diabetes, heart disease and cancer.

PAST SURGICAL HISTORY: In 1980 removal of ovaries, Middletown Hospital.

DEPOSITION
T
9-9-03 Wendy Welsh

PHYSICAL EXAMINATION: Shows exquisite tenderness of the LEFT foot and ankle. There are 9 scars present over the foot, one anterior at the distal tibia approximately 4 cm in length, anterior at the ankle and dorsum of the foot and medial dorsal of the foot. Both wounds are 8 cm in length. The wound over the dorsal aspect of the LEFT first metatarsal and hallux, approximately 7 cm. Healed 2 scars between the third-fourth webspace longitudinal and parallel to one other. Scar over the fifth lateral toe on the RIGHT. An angled scar

over the lateral aspect below the ankle joint measuring approximately 8 cm in length and a lateral scar in the region of the fifth metatarsal base for a distance of 5 cm in length. The patient has exquisite tenderness of a socking-type sensation along the foot and ankle, dorsal, lateral and medial plantar. Circulatory aspect of the foot appears to be within normal limits. She uses a cane on the RIGHT side to support her LEFT grossly antalgic gait. Moving the foot at all causes exquisite pain in and about the mid tarsal ankle joint as well as directly over the forefoot.

Examination of the RIGHT foot shows that the neurocirculatory status is essentially within normal limits. The arch is depressed longitudinally on the RIGHT as well as on the LEFT. There is palpable bony mass noted at the intertarsal and tarsometatarsal joints on the RIGHT side.

X-RAYS: AP, lateral and oblique of the LEFT foot with AP and oblique of the LEFT ankle show that there is presence of a triple arthrodesis. The screw of the triple arthrodesis is through the articular surface and sits proud into the ankle joint. There is sclerosis of the anterior tibia present with osteophyte formation in the region of the head of the screw. The screw is a cannulated screw which passes into the calcaneus over a healed subtalar joint. The talonavicular joints and calcaneocuboid joints are healed. There is significant arthritis at the tarsometatarsal joints. In the forefoot there are 2 screws in the first metatarsal, obliquely placed in the distal shaft region. There is a hemiprosthesis of the hallux present. The metatarsal head on AP, on the LEFT foot, on the anterior posterior view sits somewhat medial and the articular surface is decreased to bone against prosthesis. There is some osteoporosis noted in the distal aspect of the LEFT foot.

On the RIGHT foot, AP, lateral and oblique shows that there is depressed longitudinal arch with osteophytes noted on the posterior superior calcaneal tuberosity in the region of insertion of the Achilles tendon. This is also an area where the patient has had an incision in the posterior aspect of her heel. There is also osteophyte formation in the intertarsal and tarsometatarsal regions. There is some osteopenia noted in the distal forefoot.

IMPRESSION:

1. LEFT multiply operated foot.
2. Chronic regional pain syndrome – RSD residual stage.
3. Arthritis of the ankle.
4. Painful prosthesis, first metatarsal phalangeal joint.
5. Tarsometatarsal arthritis, degenerative type.
6. On the RIGHT foot there is recurrence of insertional calcific Achilles tendonitis and arthritis of the midfoot.

::\::
G. James Sammarco, M.D.
190/457
D: 5/21/2003 5:37:00 PM T: 5/22/2003
FILE #190141171837



Plaintiff Exhibit 7-b

Damage Summary and Worksheet

Plaintiff Brenda K. Hurston Date December 10th, 2001

Case Brenda K Hurston v. Butler County Dept. of Job and Family Services Case No. C-01-313

Attorney ________________ Prepared by Brenda Hurston

Future Disability lost for17 ½ years $188,736.00

I. Damage Totals

Special Damages $5,326.20

General Damages $88,932.00

Other Special and Exemplary Damages 830.00

**Total Damages $ 283,884.20**

A. **Special Damages** (Economic Loss)

1. Current Wage $24,643.20 Date returned to work never

2. Units (hours, days, months, etc.) or percentage of annual income lost

$1828.80 - $1237.00 =$591.80 x 9 months = Total wages lost to date **$5,326.20**

3. Lost fringe benefits, bonuses, perquisites ________________

________________ Total benefits lost to date ________
(list if needed)

Total lost wages and benefits to date **$5,326.20**

4. Psychologists and Physical Therapists

Name Pat Irwin Address 3830 J Woodridge Blvd., Fairfield, Ohio 45014
Purpose Depression & Pain Date July,2000 to February 2001
Amount $160.00

Name Peter A. Ramirez, M.D Address 1045 Summit Drive, Middletown, Ohio 45042
Purpose Depression & Pain Date August 2001 and continue
Amount $120.00

TOTALS: **$ 280.00**

6. If the person's income is reduced by any disability, for example a need to change job with less



pay than that loss should also be added. $ ____________

7. Future Economic Loss

a. Future Wages (if complete disability or death):

Disability = $1,237.00 x 12 = $14,844 x 17 ½ years = ( **$ 259,770.00** )

Most recent normal year's wages $ 24,643.20 x 17 ½ years of work expectancy ** **$431,256.00** (including any remaining portion of current year) + that figure x compounded annual growth rate*** of 4 % = gross wage loss. $ **17,250.24**

Gross wage loss $ 431,256.00 less $259,770.00 Future wages from disability = $ **188,736.00**

**Years to age 65 or Dept. Of Labor Statistics for work life in specific occupations or may be set by law.

***Based on average % raise over same number of past years as work expectancy years for that person or industry standard. Consult Dept. Of Labor statistics but usually between 4-8%. Adjust figure upward if raises show marked increase in recent years.

B. **General Damages**

Pain and Suffering: fear, humiliation, inconvenience, anxiety, horror of injury, pain, discomfort; status, stimulation of job, enjoyment of life's experiences; and other subjective

factors caused by injury. Briefly summarize: Depression, loss of trust for others, nerves, fatigue, trouble sleeping at night, feeling of helpless & hopeless, have no self worth, low energy, isolate my self, plaintiff suffer from chronic pain in hands, arms, elbows, lower back, pelvic area, pain in legs & feet. Hurt more when dealing with my case, headaches, I cannot sit, stand or walk for a prolong periods of time.

Standard: as estimated by party or reasonable person as fair.

Value per day $ 20.00 x no. days/yr. 240 x yrs. = $4,800 of life expectancy 17 ½ = $ 84,000 x 4% = $ **4,992.00** inflation factor if allowed = TOTAL $ **88,992.00**

Total Pain and Suffering and General Damages $____________ $ **88,992.00**

C. **Other special and Exemplary Damage**

1. Exemplary:

Punitive $____________

Attorney's $ 450.00

Fees $ 300.00

2. Miscellaneous Damages $ 80.00 gas & parking tickets

Total of other Special and Exemplary Damages$____________ $____________

**TOTAL DAMAGES $ 830.00**

DEPOSITION
V
9-9-03 Wendy Welsh

# FELLOWES®

## A. STEEL MAIL CART

- Holds 150 legal-size hanging files.
- Bottom shelf for bulk mail or parcels.
- Rolls on 10" rear wheels and 4" twin wheel front casters.
- Heavy-duty chrome plated 1" tubing frame.
- Dove gray finish.
- Upper shelf 10" H x 16" W x 30" D.
- Lower shelf 5" H x 16" W x 30" D.
- Unit 39-¼" H x 16-¼" W x 38" D.
- 200 lb. capacity.

| Item # | In Stock | Mfr. # | Description | Sold By | List |
|---|---|---|---|---|---|
| 332-518 | Yes | 40922 | Steel Mail Cart | EA | 322.00 |

## B. STEEL MINI MAIL CART

- Perfect for use in smaller offices or for departmental mail.
- Holds 75 legal-size hanging files.
- Bottom shelf for bulk mail or parcels.
- Rolls on 10" rear wheels and 4" twin wheel front casters.
- Heavy-duty chrome plated 1" tubing frame.
- Dove gray finish.
- Upper shelf 10" H x 16" W x 18" D.
- Lower shelf 5" H x 16" W x 18" D.
- Unit 39-¼" H x 16-¼" W x 26" D.
- 200 lb. capacity.

| Item # | In Stock | Mfr. # | Description | Sold By | List |
|---|---|---|---|---|---|
| 331-270 | Yes | 40924 | Steel Mini Mail Cart | EA | 260.00 |

## C. MAIL CART

- Holds 150 letter- or legal-size hanging files.
- Bottom shelf for bulk mail or parcels.
- Rolls on 10" rear wheels and 4" twin wheel front casters.
- Heavy-duty chrome plated 1" tubing frame.
- Chrome plated finish.
- Upper shelf 10" H x 17" W x 30" D.
- Lower shelf 7" H x 17" W x 30" D.
- Unit 39-¼" H x 18" W x 38-½" D.
- 200 lb. capacity.

| Item # | In Stock | Mfr. # | Description | Sold By | List |
|---|---|---|---|---|---|
| 952-804 | Yes | 40912 | Mail Cart | EA | 350.20 |

## D. MINI MAIL CART

- Perfect for use in smaller offices or for departmental mail.
- Holds 75 letter- or legal-size hanging files.
- Bottom shelf for bulk mail or parcels.
- Rolls on 10" rear wheels and 4" twin wheel front casters.
- Heavy-duty chrome plated 1" tubing frame.
- Chrome plated finish.
- Upper shelf: 10" H x 17" W x 18" D.
- Lower shelf: 7" H x 17" W x 18" D.
- Unit 39-¼" H x 18" W x 26-½" D.
- 200 lb. capacity.

| Item # | In Stock | Mfr. # | Description | Sold By | List |
|---|---|---|---|---|---|
| 521-146 | Yes | 40914 | Mini Mail Cart | EA | 247.20 |

## E. ELDON® MAIL CART

- Upper carrier filing bin holds up to 125 legal hanging folders.
- Holds letter- and legal-size materials.
- Lower storage bin accommodates parcels and bulky items.
- Platinum color.
- 42" H x 21-⅓" W x 38-½" D. Some assembly required.

| Item # | In Stock | Mfr. # | Description | Sold By | List |
|---|---|---|---|---|---|
| 521-054 | Yes | ELD45053 | Mail Cart | EA | 349.95 |

## F. ELDON® UTILITY CART

- Stores paper, holds reference manuals, and serves as a printer stand all at one time.
- 300 lb. capacity.
- 2 handles and full swivel casters for easy mobility.
- Duramold construction won't rust, chip, or dent.
- Sandalwood color.
- Some assembly required. Parts snap together.

| Item # | In Stock | Mfr. # | Description | Sold By | List |
|---|---|---|---|---|---|
| 948-323 | Yes | 3355-00BEI | Utility Cart | EA | 272.38 |


A


B


C


D


E


F

*Contact your Customer Service Representative for your discounted price.*




## ADJUSTABLE TASK CHAIR

***Features Include:*** B, C, D, F, G, H, I
***Dimensions:*** 36" H x 24-½" W x 23" D
***Warranty:*** Limited Lifetime Warranty

| Item # | In Stock | Mfr. # | Description | List |
|---|---|---|---|---|
| 332-457 | Yes | 8881BK-AL01 | Pewter | 298.00 |
| 382-090 | Yes | 8881BK-AL02 | Black | 298.00 |




## OFFICE DEPOT® SUPER ERGONOMIC CHAIR

***Features Include:*** C, D, F, G, H
***Dimensions:*** 36" H x 24" W x 23" D
***Warranty:*** Limited Lifetime Warranty

| Item # | In Stock | Mfr. # | Description | List |
|---|---|---|---|---|
| 588-343 | Yes | 1934BLK-KT60 | Gray | 308.00 |
| 674-366 | Yes | 1934BLK-KT62 | Burgundy | 308.00 |
| 588-350 | Yes | 1934BLK-KT63 | Blue | 308.00 |




## HON® COMFORTASK® CHAIR

***Features Include:*** C, F, G
***Dimensions:*** 40-½" H x 20" W x 18" D
***Warranty:*** Limited Lifetime Warranty

| Item # | In Stock | Mfr. # | Description | List |
|---|---|---|---|---|
| 339-897 | Yes | 5903AB90T | Navy Blue | 239.00 |
| 339-904 | Yes | 5903AB72T | Teal | 239.00 |
| 340-019 | Yes | 5903AB12T | Gray | 239.00 |




## UNITED CHAIR® 90S SERIES OPERATIONAL CHAIR

***Features Include:*** C, D, E
***Dimensions:*** 31-½" - 39-¼" H x 23-½" W x 25" D
***Warranty:*** Limited Lifetime Warranty

| Item # | In Stock | Mfr. # | Description | List |
|---|---|---|---|---|
| 902-221 | Yes | NS1-E3-3734 | Navy | 155.00 |
| 902-239 | Yes | NS1-E3-3701 | Gray | 155.00 |
| 332-091 | Yes | NS-1-PA | Fixed Arm | 54.00 |

























*Contact your Customer Service Representative for your discounted price.*

CIVIL ACTION NO: C-1-01-313

PLAINTIFF'S EXHIBIT 01-B

UTILITY CART

From: Brenda Hurston
Subject: Written transcription of the conversation with Brenda Hurston and Dawn Sullivan regarding utility cart on 8-21-00.

Brenda: Hey Dawn, How do you like it so far, OK? When you asked for that utility cart that you got over in close file, all you did was asked them for it and she ordered it for you, right?
Dawn: In closed file?
Brenda: I mean active file, the one that you got in active file, that plastic one.
Dawn: She asked me, if I wanted one.
Brenda: Oh she asked you did you want one?
Dawn: Yell, why?
Brenda: Because, I asked for one. Because see they going to be having me doing lots of Collating and stuff. So I figure I can pull it by the handle and put it by my desk, then that way, it would be easier for me, so they went and got a metal cabinet from out Of the basement, but it doesn't have handle on it, and it is sharp up under the edge, so I won't be able to pull it, like the one you got. So I was telling her, because of the height, I preferred to have the one that you have, because it will be so much better for me.
Dawn: Are you going to get it?
Brenda: I'm thinking no, I don't think so.
Dawn: She asked me if I wanted one because they got one in Hamilton in their file department, so.
Brenda: I'm hoping that I get one because it will help me. Because it is higher, you can pull it this way, instead of going underhanded this way. Well all my joints is sore, so therefore, I don't want to be going like this here. I rather be going like this here and pull it will be higher, so I can pull it. So hopefully, she might get me one Thank goodness you out there.
Dawn: I know.
Brenda: I hope you really enjoy being out here. You probably will, won't you?
Dawn: I think I will.
Brenda: And if you be doing an order or whatever, I hope you know that it's no problem about the ordering or whatever.
Dawn: OK



(m-1)

Brenda: Whatever you need.
Dawn: I'm gonna have to order a lots of forms for my unit.
Brenda: But you know, that was never a problem. So, so you know what I mean.
Dawn: Yeah I know, I know how to fill out a form.
Brenda: Just have Vicki to sign it and Vicki always give it to me.
Dawn: Alright.
Brenda: And Monday is the day of ordering.
Dawn: Yeah, I got to write that down. I got to remember that.
Brenda: Monday is the day for supplies and Wednesday is usually the day for forms.
Dawn: They have to be in about what time?
Brenda: 12:00 o'clock noon. If you need the forms of or whatever. If I have the time, I will pull the forms sooner.

Respectfully submitted,

Brenda K. Hurston



(M-2)

CIVIL ACTION NO: C-1-01-313

PLAINTIFF'S EXHIBIT 01-C

UTILITY CART

From: Brenda Hurston
Subject: Written transcription of the conversation with Brenda Hurston and Linda Day regarding utility cart on 8-21-00.

Brenda: Hey Linda.
Linda: Yell.
Brenda: Thank you, for bringing me that cart over.
Linda: You're welcome.
Brenda: But, Linda is there anyway that I still could use this one. Though, because how it got the handles, and height on it. It's easy for me to pull, just like it say, easy mobility. It's easy for me to pull and plus it's more high in height, so, I can pull it. And I don't have to worry about grabbing the edge, because the metal part of the bottom of the cart you gave me, that's metal and is more sharper to pull under handed, instead of top handed.
Linda: Have you tried to use that one yet (metal one)?
Brenda: Un hun, yeah, yeah and I wind up. Also, going over there to close file and looking at their to, and that was my purpose, because of the handles. (pause) Or could I just leave that over their by the copier.?
Linda: The metal cart?
Brenda: Right.
Linda: To work from, rather than roll it?
Brenda: Right.
Linda: Where at?
Brenda: I don't.
Linda: Because we can't have anything by the copier, that might block the isle way. Do you need the table to work off it or something?
Brenda: Well, or even pull it when/as I collate it, because see, I should collate it from the copier. But then maybe, I could pull it by my desk to as well. But as I get more items on it, and the heavier it get, I'm gonna keep pulling underhand where the metal will be sharp up under that, instead of top handed, with the other cart it's easier to pull a and it's higher in height, so it makes it easier mobility to pull it, um hum. So since they can't block the isle way, it might be easier for me to do it at my desk, probably compared to that cart right there. (pause) Yes, I did try both of the cart. (pause)



(N-1)

(Looking at the discussed look on her face) You just want me to wait?

Linda: Why not you just try out that one (pointing to the metal one) and see how it work, and see how it work, and I will check out that one.

Brenda: Ok.

Respectfully submitted,

Brenda K. Hurston



(N-2)

CIVIL ACTION NO: C-1-01-313

**PLAINTIFF'S EXHIBIT 01-D**

ARE YOU WATCHING ME?

From: Brenda Hurston
Subject: Written transcription of Brenda Hurston and Deputy Sherry Compton, #1188 on October 12, 2000.

Brenda: Hey Kat, could I talk to you for a minute?
Sherry: Yes.
Brenda: I want to ask you something, and umm, and if I hurt your feeling or whatever, please forgive me, cause that is what I'm not trying to do. I am in a position here at work that I feel, (pause) I'm very uncomfortable here at work for lot of reasons, but I wanted to ask you, Are you watching me?
Sherry: Am I'm watching you?
Brenda: Right, I had nothing to do with that.
Sherry: No, why would I be watching you?
Brenda: OK, my question, well, one of my reason is, One of my reason is because I noticed you, like Tues., you were back here from 10 o'clock to 4 o'clock and I noticed that you are spending more time in the back.
Sherry: Do you? It's not you
Brenda: Due to the reason, I'm having problems, like with administration (pause)
Sherry: Claim down, you don't have nothing to worry about.
Brenda: OK, I'm just
Sherry: I can understand what you are saying.
Brenda: I have been looking at you
Sherry: un hum, your mind going
Brenda: Right and I don't know if you know why I am looking at you, but, I have look at you and I don't know what you may have thought or whatever, but I have wonder about that for quiet sometime because like, my friend was fired.
Sherry: Right
Brenda: There is a lot of things that has been going on OK, well see, I know that in the past, Linda Day asked Mike Brockman to watch me.
Sherry: Oh
Brenda: And Mike refused, so I don't know, I start seeing you back here.
Sherry:
Brenda: You know what I mean. I am just telling you.
Sherry: No, it's not you.



(0-1)

Brenda: I did asked, is your post here? And see, my family, most of them are in security and they take their college work to work, and do their work and so on, and I mentioned it to Tammy. But it wasn't, I don't have a problem with you doing your homework or whatever. I have a problem, I felt like that you were watching me.

Sherry: Un hum.

Brenda: So I wanted you to know, because I asked Tammy, where is your post at, are you supposed to be watching people in the back or are you supposed to be watching people in the front.

Sherry: Why did you asked Tammy that?

Brenda: Because of the fact that I have been seeing you back here for quiet sometime.

Sherry: Well it wasn't you.

Brenda: OK, well.

Sherry: First of all, you have no reason to be talking to Tammy about that. You should say it face to face. I don't appreciate you talking to Tammy about that, and now, she's going to go straight, and she is going to say they are asking me this and that.

Brenda: No, she defended you.

Sherry: Well that's fine, we are everywhere, I can go anywhere I want.

Brenda: Yes, well that is what she was telling me too.

Sherry: If we want to sit back here, we can sit back here. But that's not why I am sitting back here. I am not watching you.

Brenda: Well, well Tammy, I mean Sherry, that is why I came to you, because I feel like, I am not.

Sherry: You should have came to me a long time ago, if you were worry about that.

Brenda: Well, I was watching to see how they do. I noticed that the other security, they stay up in the front.

Sherry: The guys do.

Brenda: Tammy don't come back here even hardly.

Sherry: Tammy don't know anybody.

Brenda: If you see what I am saying, she don't even come back here, that's my reason for asking, because I try to make sure of the thing that I say, and who I approach.

Sherry: Un hum.

Brenda: And that's why I waited to see how was the pattern. What is going on. I never, like I say you see. I hope you would understand my position to, because I am in a.

Sherry: You should have came to me weeks ago.

Brenda: Well, well I am. I am doing it now. This week has really bother me, this week has really bother me. It didn't have nothing to do with the rest of the week or what-ever, this week did. That's why I said, well, when you come in, I am going to ask you and talk to you about it. Because like I said, I don't go behind nobody back.

Sherry: No, I don't either.

Brenda: I rather talk to you face to face and see, I have every reason to feel the way I feel, because of the circumstances that is in this office. Otherwise than that, I would not have said nothing to you. If I had not even known about Linda asking about Mike, I would have waited, then I wouldn't have said nothing to you.



(O-2)

Sherry: It's not you.
Brenda: But do you see what I am saying.
Sherry: It's not you, I understand what you are saying.
Brenda: I hope you understand my position, as well, so Ok well.
Sherry: I hope you understand, take it for what I am saying, trust me, it's not you, OK.
Brenda: But I hope you understand my position and forgive me, if you feel like I have done something to you.

Sherry: I have to clear it up with Tammy, she is not going to a thing, but Tammy is not going to do anything anyway. I ain't worry about that.
Brenda: Yell, but.
Sherry: Tammy don't know what goes on here in the first place. She is here one day a week.
Brenda: Right, right.
Sherry: So, she just comes in here out of the cold and whatever is happening is happening, and she just get the end of the jiff.
Brenda: Right, right, OK, But I am just letting you know and I don't know how you may feel about me, after this or whatever, but.
Sherry: This doesn't affect how I feel about you, actually, but matter of fact none.
Brenda: OK, but like I was saying, I am very uncomfortable here. I have every reason to be very uncomfortable here. Every reason, every, every, reason and see I have a grandkidd.
Sherry: I am with you on what you're thinking about.
Brenda: I got house payment, I got things that I have to pay for. I don't want to be scooped out like Sadie did. I don't want to be that way. It's a lot of things. Do you understand what I am saying? Where I am coming from? ***I need my job***.
Sherry: You know, I am in there with ya.
Brenda: So therefore, I don't want to be backbiting or none of those things. But I am under a lot of stuff and I don't, I rather come out and say something to you.
Sherry: I seen you looking at me a couple of times, and I'm remembering . I've been scoping and it's not you.
Brenda: Ok, yes right. and so, who is next? Me. And then, since I know about Mike, Linda asking Mike, because Mike specifically told me himself, that's why Linda didn't want him here. So do you see why I would feel the way I would feel.
Sherry: It's not that.
Brenda: OK
Sherry: Chill out, chill out.
Brenda: OK, OK Thanks.

Respectfully submitted,
Brenda K. Hurston



(O-3)

CIVIL ACTION NO: C-1-01-313

PLAINTIFF'S EXHIBIT 01-A

SEVERAL COMPLAINTS

From: Brenda Hurston
Subject: Written transcription of Meeting with Linda Day at 3:15 p.m. on August 18, 2000. Linda Day came to my desk and told me that she needs to see me in the large conference room **now**.

Linda: The reason I asked you here is I just want to talk to you about conducting yourself in an unbusinesslike, unprofessional manner, in which you have approached your co-workers.
Brenda: What do you mean?
Linda: Well, I have people that have come to me and said that your tone, your threatening

Brenda: I'm doing what? What are you? I didn't really understand what you've just said.
Linda: OK, What I'm talking about is the concern that people have made to me, about the way you have approached and talked to your co-workers. Their feeling is that you approached them in an unprofessional manner.
Brenda: Who is that?
Linda: Some of the people that you work with. This is several people.
Brenda: I haven't talked to many people, I don't, When? This week? I haven't talked to many people. Plus I do not talk rude to anybody.
Linda: Well, being what with the complaint were, OK, you've been talking rude, loud, in an unprofessional manner. I want to talk to you about being and conducting yourself professionally, and in a businesslike manner. OK? I don't know if perhaps, you've been stopping people or approaching people or your tone to people. Perhaps, maybe think about the wording your using to make them feel this way. But I have had several people approached me and made complaints about it.
Brenda: I haven't talked to several people this week and whatever alleged complaints that you have is very much untrue. So, therefore, who are the people? And I would like to file grievance, because I have not talked in an unprofessional manner with no one.
Linda: Well, all new supervisor, as well as with everyone, when someone bring something to our attention or perhaps the approach when you talk to different one about that. So I do want to remind you that you are not to approach anyone in an unbusiness-like manner.

(L-1)

Brenda: You couldn't tell me who they are? Well do you believe I talked in an unprofessional businesslike manner?

Linda: It's not whether I believe you or not, it was, is not just that I had several complaints, And not just one complaint, I had individual come to me, not just one, but several.

Brenda: Well that is false, that's very much false. And very much untrue.

Linda: But, I will warn you that

Brenda: I always do.

Linda: And a choice of wording and our approach.

Brenda: I always do, I always do.

Linda: The other thing I just needed to talk to you about is having agency material and

Linda: taking them out of the building. I just need to remind you again. Please be sure not to take agency material out of the building. And if you have any other material that belongs to the agency, please return the material into the building.

Brenda: I do not have.

Linda: Then again, another thing I want to talk to you about is, I want to remind you to make sure that your breaks are 15 minutes.

Brenda: May I ask you a question about that?

Linda: Yes.

Brenda: OK, yesterday when you called me over, it was not even 3:30 yet, when you called me over. Do you know what time that I took my break?

Linda: Yes I do. I know what time you told me that you took your break, and I know what time you were talking, and I know that it was more than 15 minutes.

Brenda: Well since you know what time I took my break, is it correct that I did take my break at 3:09?

Linda: I don't believe so.

Brenda: Well, that is the time I took my break.

Linda: OK, what you told me that you put up your break sign up at 3:09.

Brenda: Right.

Linda: What was you doing prior to the time you put you sign up? Was you working?

Brenda: Well yes, I was shredding the paper, Tina and the baby was here as you know of. And I was at my desk.

Linda: Was you working?

Brenda: I was, I did do some shredding at the shredder.

Linda: OK, when you were at the shredder or at your desk, were you working?

Brenda: At my desk, I was just sitting there, but I was still working. I was getting ready to take my break.

Linda: Was you working on something.

Brenda: Yes, yes I was. I was going to my desk to up my sign.

Linda: OK, well, 12 to 15 minutes? What time did you tell me you took your break? 3:09 What time did you tell me you return.

Brenda: 3:24.

Linda: 3: 28.

Brenda: 3:28?



(L-2)

Linda: Yes mam, yes mam, so what I'm saying is, I want you to keep an eye on your break time. You get a 15 minutes break in the morning, and you get a 15 minutes break in the afternoon. You need to keep a close eye that you don't step over. When you are on your break. I am not the only one tell you that you cannot have people coming into the office. But you have to realize that if someone is in the office and you are not working and you have taken a break on top of that time. Are you working an eight hour day?

Brenda: Yes I am, Just like you allow Renee's son to come in here. He stayed 45 minutes this week.

Linda: Renee is not under me.

Brenda: Yes, but still Linda, what I am saying people come in here on a regular basis. Tina doesn't come in her only except, when she have her appointment. And you know how everybody stands around.

Linda: But, were not talking about everybody else. I am talking about the people who are in my unit. And I am talking about you and your breaks. If someone else was to come into the building, it is not my Jurdis, It is there supervisor to watch and see what they were doing. OK? You are in my unit, and others are in my unit. Those are the people that I supervise and I'm saying look, 15 minutes in the mornings and 15 minutes in the afternoons.

Brenda: That's what I do, and I still came in at 3:24. That clock is different from that clock out there (meaning the front desk). I know it is a difference in these clocks. But I do know that I came back on time. I do know that, even though you alleged that I came in at 3:28.

Linda: Well, what I am asking is just keep an eye on your break.

Brenda: OK.

- - - Someone is at the door and in a deep tone, Linda said, "I just put them up-don't bother, I just getting ready to walk them up, OK, you're welcome".

Linda: But, I just wanted to go over these things, so we can talk about it. This is no way is a verbal reprimand. I'm just reminding you OK.

Brenda: Linda, may I ask you something?

Linda: OK.

Brenda: Why is it that you want to give me a hard time. And you want to harass me. Compare to others in our unit. You and Malissa have taken long breaks. You allow her to go and get your food, and she is in our unit. She come back and sit at your desk for hours. And all you doing is talking. Now she is in our unit, and you do not say nothing to her. But yet, she can run back & forth, back & forth, sit at your desk, stare at me and go back & forth all day long. But you want to pressurize me and you see that I am busy all the time. You know I am not trying to mess up. I am not trying to do nothing to jeopardize my job. I told you once, I told you when? Yesterday, that I am planning on being here forever. I'm planning on doing my job, and being here forever. And that I will follow instructions and obey the rules. I will listen carefully to what you say. But Linda, I think you ought to be fair too.

Linda: OK, I it seems like you may see things that way, OK, but my dealing with others in



(L-3)

my unit. Our unit is slightly different. OK. And as far as I know, people are, that I am aware of, people are taking their 15 minutes breaks and their not going over 15 minutes.

Brenda: You and Malissa aren't, you are going overly extended yourself.

Linda: Is something that I have not observe, but when I observe her, I do approach others in the same manner that I approach you.

Brenda: But if it's you and Malissa though, then it can be overlooked.

Linda: I'm not talking about Malissa.

Brenda: She is in our unit and you are in our unit.

Linda: Well, I'm telling you that this person, Is really none of your business.

Brenda: But Linda, I haven't

Linda: I have not discuss that with someone else. I discuss that with them. But if and when I do, I don't go tell everybody. If I want everybody to know that I talk to you. Why would I come in here.

Brenda: Linda you know that you have been treating me unfair for a long time. And it's not right. But I do believe that you will reap what you sow. Because I am trying to go according to standard rules and regulations. And you keep pressurizing me and I just don't think it's fair. And you outta, I hope and pray that you really, really, come to the conclusion that maybe you also, need to change. And this will help our relationship too.

Linda: Well, I assumed that all I asked of you to do, is to follow the rules that are already in place. Talking and dealing in your use in speech. OK.

Brenda: OK, could you run that by me one more time. Just it was um, somebody complainting that I approached them.

Linda: In an unprofessional manner.

Brenda: And that is not true.

Linda: And taking agency material out of the office.

Brenda: OH, All I did was questioned the materials.

Linda: Ok

Brenda: OK.

Linda: OK.

Brenda: Well you'll probably be gone pretty soon, right.

Linda: Right.

Brenda: Well, you have a good weekend and I hope you really ponder over what I said.

Respectfully submitted,

Brenda K. Hurston



(L-4)