

## IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

BRENDA K. HURSTON　　　　　　　:　　**CASE NO. C-1-01-313**

　　　Plaintiff　　　　　　　　　　:　　(Judge Weber), Timothy S. Black, M.J.

-vs.-

BUTLER COUNTY DEPT. OF　　　　　　**MOTION OF PLAINTIFF, BRENDA**
JOB AND FAMILY SERVICES　　　　:　　**HURSTON, IN OPPOSITION TO THE**
　　　Defendants　　　　　　　　　　　**THE DEFENDANT'S MOTION FOR**
　　　　　　　　　　　　　　　　　　　**LEAVE TO FILE MOTION FOR**
　　　　　　　　　　　　　　　　　　　**SUMMARY JUDMENT**

---

COMES NOW Brenda K. Hurston's motion in opposition to the defendant,

Butler County Department of Job and Family Services' motion for leave to file motion for

summary judgment, that was filed on May 6, 2004. This motion is supported by the attached

**revised** memorandum. The exhibits that was filed on 6-14-04 remains the same for both

motions in opposition to defendant's motion to file leave to file motion for summary judgment.


Respectfully submitted,

*Brenda K Hurston*

Brenda K. Hurston, Pro Se
1812 Grand Avenue
Middletown, OH 45044
(513) 420-9692

## CERTIFICATE OF SERVICE

I, Brenda K. Hurston, hereby certify that a true and correct copy of PLAINTIFF'S MOTION IN OPPOSITION TO THE DEFENDANT'S MOTION FOR LEAVE FOR SUMMARY JUDGMENT has been sent by regular metered mail to Jack C. McGowan, Attorney for Defendant, Butler County Department of Job and Family Services, 246 High Street, Hamilton, Ohio 45011 by the  18 th day of June, 2004.

*Brenda K Hurston*
_____

Brenda K. Hurston, Plaintiff, Pro Se

Attachment:

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S MOTION FOR LEAVE TO FILE FOR SUMMARY JUDGMENT

In support of plaintiff's response, Brenda K. Hurston offers the following:

Pursuant to Local Civil Rule 7.2 Motions and Other Papers, (A), (2) Opposing and Reply Memoranda. Any memorandum in opposition shall be served and filed within twenty-one (21) days from the date of service set forth in the certificate of service attached to the Motion. Failure to file a memorandum in opposition may be cause for the Court to grant any Motion as filed, other than one which would result directly in entry of final judgment or an award of attorney fees. A reply memorandum may be served and filed within eleven (11) days after the date of service of the memorandum in opposition. Pursuant to Rule 6(e), Fed. R. Civ. P., three (3) days shall be added to these periods when memoranda are served by mail. No additional memoranda beyond those enumerated will be permitted, except upon leave of court for good cause shown. Plaintiff was not aware and did not prepare for a bench trail, as Jack McGowan stated, in his motion for leave to file motion for summary judgment/ or revised scheduling order, and continuance of trail that he filed on May 4 and 6 2004. On Monday, September 29, 2003, plaintiff was notified by phone from Judge Weber's Chamber that a 3-day benches trail will be held in front of Judge Weber. Immediately on September 29, 2003, Hurston filed her motion requesting a jury trail. Jack C. McGowan did not respond. Based upon these facts, there will not be substantial prejudice to the defendant as Jack McGowan stated, in granting plaintiff's request for a jury trail in the case after defendant's time to move for summary judgment has passed and it can no longer narrow the issues to be presented to a jury. Therefore, the defendant's request for leave to file summary judgment should be denied.

The Plaintiff has done everything physically possible to ensure that Jack C. McGowan received the audiotapes that he requested. His request did not go unanswered; Hurston told him that she had misplaced the tapes. Once the plaintiff found some of the tapes, she also voluntary submitted (466) pages of documents on 10-1-02 at his office, which included (4) written transcripts by Hurston **(see exhibits 1–(1-3).** Mr. McGowan secretary signed for those documents. At the second deposition, the plaintiff brought audiotapes, as well as, (2) tape recorder so that Jack will be able to see and hear the tapes. Jack did not request to hear the tapes, but he marked her audiotapes as his exhibits C, D, E, and F **(see exhibit 2-1)** on 9-9-03.

1

Following the deposition, Hurston again took more audio tapes to his offices, Jack C. McGowan's secretary again received and signed for audio tapes on 10-14-03 pertaining to this case, **(see exhibit 3-1 ).** Due to plaintiff's physical condition beyond her control, she may have moved slower than he like. Every time that plaintiff has found audiotapes, she has made an effort to respond.

Hurston has also served requested production of documents directed to the defendant requesting numerous documents on March 12, 2002 and August 27, 2002. Instead of providing documents that Hurston requested, he have made objection, over objection, and have submitted very little and duplicate- partial documents that are irrelevant to the case **(see exhibits 1-(4-5)**. Hurston has filed motion to compel production of documents (Doc. No. 47, and 49, also for contempt of court), with no relief. Therefore, Jack McGowan is not the only one that feels that their requests for production of documents, things, and business records have gone unanswered.

Jack McGowan also stated, that as a result of the discovery which was obtained, it has become apparent plaintiff based her claims for discrimination upon her race, disability, and **\*retaliatory firing,** (Doc. No. 2, p. 6), incidents which as a matter of law are **likely insufficient**. Then he gave this example, that the plaintiff applied for and was awarded disability retirement. (Hurston depo. P. 5, 1. 1-11) she was not fired. While she was working, her pay was never affected.

The plaintiff based her claims for discrimination upon her **race, gender, disability, retaliations**, and **not retaliatory firing** as Jack McGowan stated. Thus, the plaintiff was not fired, and she never stated that she was fired. Hurston stated that she is on permanent disability **(see exhibit 3-2**, Hurston depo. P. 5, 1. 1-11). Also, in the plaintiff's complaint (Doc. No. 2, No. 9), she stated, "I have been force to work in a different job position other than my own for years, without being paid the higher wage." Hurston will explain what her statement means to her below.

Mr. McGowan has twisted the content of the deposition, (Hurston depo. P. 119, 1.12-18), which reflect his manipulative purpose to shed unfavorable light on the plaintiff. Hurston did not say in her deposition, "While working her pay was never affected." Hurston was responding to Jack's question regarding the August 17, 2000, meeting when Jack asked, "At that time was the question. Was your pay affected at that time?" Hurston replied, "No, My rate of pay

2

stayed the same." (Hurston depo. P. 118, 24-25, P. 119, 1.12-18, **(see exhibits 3-(3-4).** The plaintiff already have to deal with one of the defendant's attorney (Doug E. Duckett) that submitted misleading evident to Helen B Glutz throughout his entire December 19, 2000 letter, when he denied that the defendant did not have any medical records of the plaintiff, when he stated that the plaintiff was require to do a log for only a three-week time span, when he stated that the plaintiff repeatedly disobeyed the instruction of her immediate supervisor, when he submitted false testimony to EEOC that were never substantiated, when he stated that plaintiff request for accommodations was a wish and whim, and that the defendant treated Hurston with kids gloves **(see exhibit 3-(5-9).** Plaintiff have not covered all the misleading evident that Doug E. Duckett submitted, it would take more than twenty pages of memorandum to do so. Now, Jack C. McGowan has also submitted misleading evident for the defendant to this Court, in his May 6, 2004 motion. Will justice be overlooked, because plaintiff is Pro Se?

**A chronology of facts in this case will reveal why defendant should not be entitled to relief in the form of leave to file motion for summary judgment. Chronology is as followed:**

Unlawful intent against the plaintiff, Brenda K. King (Hurston's maiden name) **began** in the form of discrimination of **race, retaliation,** and **gender** in 1990, which had a lasting effect of intentional discriminations in the form of **disability, race** and **retaliation** until 2001. Her confident and her health have been undermined over the years. Evident will prove, out of retaliation, the defendant have for over a ten ½ -year period, have promoted Hurston with the responsibilities and the name, as a Purchasing Assistant 1 and a Procurement Specialist, **without the pay.** When, plaintiff start becoming aware of their unlawful actions, the defendant tried to cover-up their unlawful actions by demoting her, **without the pay.** To understand BCDJFS "willful violations of the act" and the position that the plaintiff is now currently in, you will have to go back to the year 1988. In 1988, King became employed as a full-time, classified civil service employee in the position of Machine Operator 2, #12422 **(see exhibit 3-(10, 18, 20, & 22).** On November 22, 1988, King had passed her probation period **(see exhibit 3-23).** On May 16, 1989, her immediate supervisor Jack K. Dudash evaluated King again. He became ill after her performance evaluation **(see exhibit 3-24).** Mr. Dudash stated in the plaintiff performance evaluation, "Ms. King has performed her job in an excellent manner during this rating period. **Brenda is an extremely confident worker** who has completely reorganized the printing room functions in a more efficient and productive work area". Linda Duff, who then became plaintiff's immediate supervisor, also commented on the May 16, 1989, evaluation stating, "I concur with raters comments re: Ms. King". Linda Duff became plaintiff's immediate supervisor for approximately 12 months, until her transfer to the Middletown Office in July 1990. During that 12 months period, King became a victim of discriminatory intent, which will last for the next 10 ½ years, because of race (African American), gender and retaliation. The retaliation began, because King refused to be use as a token service for BCDJFS to use her statement as a reason to terminate another African-American co-worker, Dianne Cameron **(see exhibit 3-(25-34).**

3

On 10-27-89, Linda Duff requested that the plaintiff go into the director's office, Dianne Rice Logsdon and tell her that Dianne Cameron (An Elderly African-American woman with a disability of the hand, due to all fingers gone and who had been employed as a classified civil service employee in the position of switchboard operator), was abusing the switchboard by not answering incoming business calls, because she was always receiving her own personal calls. The plaintiff did not feel that it was her place to get involved in a matter that she was not fully aware of and that all employees of BCDHS were allowed to receive personal phone call. As a result of retaliation, BCDHS adversely affected plaintiff status as a classified civil-service employee because of race, and gender, with the assistant of the American Federation of State, County, Municipal Employees, Ohio Council 8, Local 3062 union. The plaintiff was a dues-paying member, until 1995. The union did not bargain fairly in the plaintiff's behalf, nor, was she advised at any time of her rights to file a complaint to any appropriate state or federal civil rights enforcement agency. Starting in November 1989, the plaintiff suffered as followed:

1. Public humiliation in front of other co-workers **(see exhibits 3-(35-36)**).

2. Persistent criticism and inaccurate accusations. **Plaintiff was accused of falsifying doctor's medical records (see exhibits 3-(37-43), Union President, Lynn Mitchell's notes.** Linda Duff & Betty Proctor alleged that plaintiff falsified **exhibits 3-(40-41)**.

3. Constantly changing work guidelines. The plaintiff's job description changed (5) five times within the 12 months supervision of Linda Duff **(see exhibits 3-(11-15)**).

4. **On 6-5-90,** Plaintiff received an unfair unsatisfactory performance evaluation **(see exhibit 3-(44-52)**. **"A negative performance evaluation can qualify as an act of retaliation under Title VII." Bostic v. AT&T of the Virgin Islands**. The Bostic Court reasoned, "An unfavorable employee assessment, placed in a personnel file to be reviewed in connection with future decisions concerning pay and promotion, could both prejudice the employee's supervisors and materially diminish his chances for advancement."

**The plaintiff filed grievance on 6-9-90** with the union's president Lynn Mitchell. The union failed to take appropriate action in behalf of the plaintiff **(see exhibits 3-53)**. Nor was she advised to seek other means of support pursuant to APM.9114. Complaint/Grievance Policy and Procedures [OAC 5101-9-11] the county agency shall have in effect complaint/grievance procedures that incorporate **"due process."** (5) The complainant shall be advised, within ten days, of the findings regarding the complaint. The complainant shall also be advised of the right to file a complaint to any appropriate state or federal civil rights enforcement agency, if not satisfied with the **internal** decision. The defendant took advantages of the opportunity to mislead the plaintiff, because they knew that she did not understand her rights. King relied heavy on the action of the union, just as a member of a church would rely on their minister, to take appropriate actions that would protect her well being. Instead, the union and the defendant did not advise King of her rights. On 6-19-90, an evaluation hearing took place, **(see Lynn Mitchell's note exhibit 3-(54-56)**. On June 26, 1990, King received a memorandum **(see exhibits 3-(59-62 )**.

4

**In the months of December 1989, and June, 1990**, the plaintiff contacted Ms. Katherine Rump Butler (Mayor of Hamilton, OH at that time), to ask for help and report the complaints of discrimination that she has suffered from November of 1989 to June, 1990. Ms. Butler requested a meeting with Dianne Logsdon during the first week of July. As a result of King's complaints to Ms. Butler, a meeting did occur between Ms. Butler, NAACP President, Dianne Logsdon and her attorney. Following the meeting, Linda Duff went in and came out of Mrs. Logsdon's office and left the building immediately. The plaintiff did not see Linda Duff any more, until she was suddenly transferred to the Middletown Office in 1994. Following that meeting, Roy Kadle (Assistance Director) told the plaintiff that Linda Duff has been transferred to the Middletown's office and that she is to report him, because he will be her immediate supervisor, until further notice. Then **he instructed her to keep a daily log of the work (see exhibits 3-(57-58),** as Ms. Logsdon instructed her to do in the June 26, 1990 memorandum, that she would be doing **(see exhibits 3-(59-62 )** and that she would be reevaluated in 60 days. Roy also told her that Randy Chafin will be her supervisor to, but she is to report to him first. Also, the union president, Lynn Mitchell, stated to King, "Dianne Logsdon is very angry at you and that the union is the only one that has exclusive right to represent you. I am telling you not to request anyone to speak to Dianne about anything again." "The union is the only one that can represent you." **At that time, King became something very detestable to Dianne Logsdon and the union; she was under restraint and would not be able to advance in pay or promotion.** King became very nervous of knowing that Dianne Logsdon was upset with her, but she was happy that she no longer had to deal with Linda Duff. The next day, the plaintiff called and told Ms. Butler, "Linda Duff has been transferred to the Middletown's office and thanked her for speaking to Dianne in her behalf. However, that wasn't the end, but only the beginning.

**Although plaintiff was a classified civil service, BCDHS treated King as an unclassified employee, who could be used at the expense of the company. Pursuant to O.R.C. chapter 124, BCDHS was in violation of this chapter. The plaintiff was hired as an Office Machine Operator 2. Out of retaliation, the defendant BCDHS manipulatively assigned King (3) Primary Job Positions into one. In addition to working the primary duties as a Machine Operator 2, she was forced to work out-of-class and was required to performed the primary duties as a Purchasing Assistant 1, and a Procurement Specialist, <u>without pay</u>, (compare position descriptions (see exhibits 3-(10-16), (63-64), 109 ). Ohio public employees in the classified civil service have specific legal protections regarding unwarranted discipline, termination, layoff, transfer, and other changes in the terms and condition of employment.**

**On 7-6-90** Dianne Logsdon retaliated against the plaintiff by signing a "new" job description. Randy Chafin submitted the "new" job description on 7-9-90 to the plaintiff **(see exhibit 3-15)**. At that time, Hurston was required to performed the primary duties as a Purchasing Assistant 1, formerly held by Charlie Treadway **(see exhibit 3-(63-66)**, in addition to performing the primary duties as a Machine Operator 2 **without pay**. On 7-10-90 and 7-11-90, Charlie Treadway trained the plaintiff to do his job duties. On 7-10-90, King went into Roy Kadle's office while Lynn Mitchell was there. She asked Roy and Lynn, "Do I get paid for the extra work?" Lynn Mitchell replied, "You will be reevaluated in 60 days and that you are facing

5

termination of your job, because of the unsatisfactory evaluation of 6-5-90. You may be able to keep your job, if the revaluation is satisfactory." The plaintiff was morbid with fear and worked even harder to keep her job, because she didn't want to be terminated. King believed that her first priority was to provide for her son. While the forms were being printed, she was logging and processing supplies orders. The plaintiff went home everyday extra tired, but she wanted to keep her job. She felt that working harder was better than being terminated and being on public assistant. Also, she knew from experiences that it was harder for African-Americans to obtain decent jobs in the Butler County area. She had taken several civil service examinations, before she was hired to work for the then known Butler Co. Dept. of Human Services.

The Purchasing Assistant 1 job position was manipulatively forced upon the plaintiff, because the defendant knew that the plaintiff did not understand her rights. The Union's President Lynn Mitchell, who also works for the defendant and has an interest in pleasing BCDHS, did not advise the plaintiff of her rights. Nor did the Staff Representative Larry Watkins, who later married Lynn, advise her of her right. In 1990, the plaintiff was a dues paying member of the union. Also, the Director, Dianne Logsdon or Roy Kadle, the Assistance Director did not advise the plaintiff.

On 9-5-90, Roy Kadle wrote Dianne Logsdon a memo, indicating that the assigned to King have substantially changed. He thinks King current performance level is satisfactory. After the reevaluation on 9-6-90, the plaintiff again requested more pay for more work; the defendant and the union threaten her by telling her that **she would be terminated for insubordination,** if she does not perform the added duties. They alleged that the added duties also, fall in the 5% category of duties requested by the supervisor (which was now a part of the plaintiff's job description **(sees exhibits 3-(67-68).** Also, they told the plaintiff that she was lucky to have a job, due to the performance evaluation that she received in 1990 **(out of retaliation)** that was set in motion by Linda Duff, who was her immediate supervisor for approximately a year.

On 9-6-90, the plaintiff received her grievance form from Lynn Mitchell that indicated that she would not get her annual rise. Lynn also told her that she would not get more money for more work **(see exhibit 3-69).** King cried bitterly on her way home on 9-6-00. She felt so confused and abused, with no one to turn to.

The plaintiff's instinct told her that the union and the defendant's malicious action were wrong. However, she was told that the union is the only one that has exclusive right to represent her. Therefore, she became morbid with fear to contact Ms. Butler again. King felt that she did not have any options and no one to turn to. Because the defendant deceived her through threats, King did not know that the defendant's actions was materially adverse or against the law. She became very depress and felt paralyzed with fear, humiliated, a feeling of worthless and inadequacy, and physically exhausted by the retaliatory behaviors that led up to her working out-of-class. Again, Jobs were hard to obtain, especially for African-Americans in the Butler County area. Because she did not want to be insubordinate and to be terminated from her job, King chose to work by performing the added job duties, instead of being on public assistance. In order to cope and to provide for her family, the plaintiff blinked-out the defendant's and the union's malicious actions out of her mind. She comforts herself with the words: "I am thankful to God

6

that I can pay my bills; Conquer evil with good and you will be blessed; Vengeance is mines, said the Lord." It was many rainy days that King did not find comfort in those words, because it hurt so much when she think about having trusted someone in authority that she had to rely on for her income and they deceived her. She felt that she could not do anything about it. Plaintiff was a Purchasing Assistant 1 from July 9, 1990 until February 27, 2001.

**Out of retaliation** Starting approximately September of 1992, after the plaintiff had surgery on her left foot and she have received notice that her claim have been allowed from the Workers' Compensation in on 9-14-93, because she had injuries to her pelvic and has back strain, for lifting boxes on 11-6-90, while she was at work. The plaintiff asked the defendant only to pay for her $45.00 doctor bill, but the defendant refused. Instead they requested that Hurston attend a hearing. As a result of the hearing and further examination of the plaintiff, she was awarded approximately $2,000.00. That was a long way from $45.00 **(see exhibit <u>3-70</u>)**.

**On 3-31-94** Hurston was suddenly mandatory assigned to the Middletown's office **(see exhibit <u>3-71</u>)**. There, Hurston was **isolated** at work. She worked out of two buildings, without accommodations that a normal person would need (utility cart). Again, the defendant manipulatively and intently forced the plaintiff to work out-of-class, as a Procurement Specialist in addition to working the primary function as a Machine Operator 2, and a Purchasing Assistant 1. Procurement duties were initially the responsibility of Administration, Randy Chafin **(see exhibit <u>3-(107-120)</u>).** Plaintiff was told by Dianne Logsdon to process a procurement order in 1992 **(see exhibit <u>3-(72-74)</u>).** Then in 1993, Hurston was required to process another procurement packet. In 1995, the procurement duties were totally a requirement of the plaintiff until 2000 **(see exhibit <u>3-(75-106)</u>).** Plaintiff was the only one that was not part of Administration that was processing procurement packet **(see exhibits <u>3-(121-125)</u>)**, although her job position description states, "If item is not included in the supplies catalog, forward request to the administrator who has procurement responsibilities." **See exhibit <u>3-15.</u>** Lynn Mitchell was also aware of this transaction, **(see exhibit 3-72).**

**The new job descriptions had the following effects of law violations due to retaliation:**

**(1)** In 1990, the formerly known, Butler County Department of Human Services discriminated against the plaintiff in 1990 out of retaliation when they promoted King (Hurston's maiden name) by manipulative forced as the Purchasing Assistant 1, without pay, in addition to her assuming the primary responsibilities as Machine Operator 2. **Starting 7-9-90, when King received the "new" job description, her pay was definitely affected tremendously**. She was **never paid** for performing the primary duties as a Purchasing Assistant 1, which she had performed for ten ½ long years. Pursuant to O.R.C., 4112.02,(B),(1),(C),(1),(2), BCDJFS has committed unlawful discriminatory practices against the plaintiff. The new job description reflects improperly reclassify and reassigning the plaintiff job position. The defendant manipulatively and intently forced King to work out-of-class.

Section 10, Article XV, Ohio Constitution requires that promotions in the civil service "*** be made according to merit and fitness, to be ascertained, as far as practicable by competitive examinations."

7

1.  The defendant has violated O.R.C. 124.271, in pertinent part, states, "Any employee in the classified service of the state or any county, city, city health district, general health district, or city school district who is appointed provisionally to fill a vacancy and who remains in provisional statue in the same classification for a period of two years of continuous service, during which period no competitive examination is held, becomes a permanent appointee in the classified service at the conclusion of such two year period."

On of the fundamental purposes of the civil service laws is the protection of civil service employees. See Richley v. Youngstown Civil Service Commission (1984), 9 Ohio St. 3d 15; State, ex rel. Alford, v. Willoughby (1979), 58 Ohio St. 2d 221. R.C. 124.271 was enacted so that the appointing authority could not rely on its own neglect or continuing evasion of the civil service laws to deprive employees of the opportunity to become permanent employees. Richley, supra; Yarosh v. Becane (1980), 63 Ohio St. 2d 5; Alford, supra.

"[I] rregularities in the appointment procedure will not divest a classified government employee of his statutory rights, at least where those irregularities are the result of a mistake or dereliction of duty on the part of the civil service commission."

Alford, supra, at 227-228.

2.  The defendant has violated O.R.C. 124.31, Promotion (A) that states, "Vacancies in position in the classified services shall be filled insofar as practicable by promotions. The director of administrative services shall provide in the director's rules for keeping a record of efficiency for each employee in the classified service and for making promotions in the classified service on the basis of merit to be ascertained as far as practicable by promotion examinations, by conduct and capacity in office, and **by seniority in service**, and shall provide that vacancies shall be filled by promotion in **all** cases where, in the judgment of director, it is for the best interest of the service."

3.  The defendant did not fill the former Purchasing Assistant 1 job position by promotion that was formerly held by Charlie Treadway in 1990, thus his position was never posted. Instead the defendant improperly reclassified the plaintiff's job position on July 9, 1990. Now the plaintiff is responsible for assuming the primary position as a Purchasing assistant 1 and responsible for assuming the primary position as a Machine Operator 2. The plaintiff did not get paid for the additional job position. Instead she was forced to do the work or be threatening with termination for insubordination. For ten ½ years the plaintiff was a Purchasing Assistant 1, without paid. For ten ½ years the defendant saved the salary of the former Charlie Treadway of approximately $240,000.00 - $280,000.00, which the plaintiff should be entitled to, because she had to assume the primary position for those ten ½ years under manipulative false pretends, that was initiated by the defendant. The defendant violated the law again, although they were responsible for the enforcement of the civil service laws.

8

## GENDER

**Equal Pay Act of 1963** - prohibits sex discrimination in payment of wages to women and men performing substantially equal work in the same establishment. (The plaintiff would never volunteer to do extra work without paid, especially under the hostile environment that she was in). The plaintiff did the best that she could do under the circumstance that she was put in by the defendant. The defendant should be held accountable for their malicious actions.

## Equitable Estoppel:

The acts of Butler County Department of Human Services and the consequences thereof fit squarely with the concept of equitable estoppels. The concept of equitable estoppels is that a party is precluded from denying his words, acts or silence that have induced a second party too reasonably and in good faith rely thereon to that party's prejudice. State, ex rel. Cities Services Oil Co. v. Orteca (1980), 63 Ohio St. 2d 295; First Federal Savings & Loan Assn. v. Perry's Landing, Inc. (1983), 11 Ohio App. 3d 135. Hurston believed that she would be terminated for insubordination, based on what the defendant and the union told her through deception. Thus, she worked 2 ½ primary job positions for 10 ½ years, without pay, under one job title.

Section 703(a) (1) of Title VII of the Civil Rights Act of 1964 provides in relevant part: It shall be an unlawful employment practice for an employer -

"(1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ." 42 U.S.C. 2000e-2(a). [509 U.S. 502, 506]

Under Title VII of the Civil Rights Act, 42 U.S.C. 2000e-2(a), "It shall be an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

**On 2-9-99**, Hurston complained in writing to Linda Day about her conduct and her use of curse words in her presence **(see exhibits 3-(126-127)**.  Hurston felt that Linda Day was trying to force her personal opinions on her. The plaintiff mental anguish continued to increase, as Linda proceeded to call Vicki Perkins and Madeline Burns (both are supervisors), Bitches and Motherfuckers. Plaintiff eyes have languished, because of her afflictions both pass and present. The pressure of having contact with Linda Day, who curses at other supervisors, causes much dismay to Hurston. She felt that Linda Day probably call her out of her name too, when she get upset. Also, every time that Hurston looked at Madeline Burns and Vicki Perkins those curse words would automatically pop up in her mind, without thinking. **The plaintiff told Linda Day, "You keep pressuring me with pettiness, and I feel like an animal trapped in a cage, I am**

9

**tired of feeling bad mentally & physically, let's try to start over**, but let us get to the core of the problem, so we can move on. Let's do what this RESPECT, DIGNITY, and EQUALITY CONTRACT SAYS." After Linda Day received the 2-9-99 letter in writing, she claimed down, until exactly on year later on 2-9-00. If the 2-9-99 letter was not true, Linda Day should have reported this letter to the Director, and the plaintiff should have been terminated for dishonesty. **Instead, Linda Day kept silent about the letter, because of her unprofessional conduct is supposed to be unacceptable (see exhibit <u>2-9</u>).** On 3-7-00, the plaintiff gave the letter to the union president, Bob Bullock and staff representative, Larry Watkins. Linda Day was very angry of the plaintiff's action. Once again, the plaintiff has become something very detestable to the defendant and to the union.

**In 2000**, the currently known, Butler County Department of Job and Family Services discriminated against the plaintiff, out of retaliation when they demoted Hurston by forced as they took away the Purchasing Assistant 1, and Procurement Specialist position, which have became a sit-down position due to technology. Out of retaliation because Hurston submitted a 2-9-99 letter to the union and to Heath MacAlpine, regarding Linda Day's unprofessional conduct on 3-7-00 and again on 5-10-00. Because Hurston appears to recognize discrimination more clearly, by her actions of filing grievances, the defendant removes those duties to keep from paying the plaintiff her ten ½ years due. In the year 2000, when the plaintiff's physical and mental pain increased, due to more malicious behavior that was forced upon her by the defendant, it became evident to the plaintiff that she was being constantly and systematically set-up for failure for exercising her protected activity rights. **Hurston was reliving 1990 allover again.** However, this time, she felt that she was falling, and that she did not have the mental and physical strength to be able to get back up again.

The plaintiff also witnessed the malicious actions against Sadie Williams, a former co-worker who was terminated on August 17, 2000, without notice. On August 17, 2000, at 4:08 p.m., Sadie did not know that she was about to be terminated, when Hurston said, "Goodbye!" Deputy Sherry Compton was at intake door watching Sadie, as Hurston left the building. Only after Hurston was completely gone, that Sadie was told that she is terminated and she was requested to leave the building on the spot, with only her purse. On August 18, 2000, when Hurston reported to work at 7:00 a.m., she witnessed Narka Gray, and June Hom boxing and cleaning out Sadie's desk. Hurston also witnessed Sadie's systematically set-up for failure, with the assistant of Pam Suldovsky. Hurston also witnessed Linda Day and Malissa Gulley copying Sadie William's files and putting them in the bottom left cabinet drawer of Linda Day's desk. Their actions lead Hurston to believe that they were responsible for Sadie's suspension, before she was terminated. Bob Bullock, union's vice president, who sits directly in front of Hurston (approx four feet away), was constantly conspiring with Linda Day, June Hom, Sherry Compton, and Pam Suldovsky. Hurston noticed that because Sadie had several individual involved in carrying out her duties, it was very easy for the defendant to systematically set Sadie up for failure. Sadie had become very depress, because of her affliction that was set in motion by her supervisor, June Hom, with the assistant of Linda Day. Hurston was able to provide witness testimony in behalf of Sadie Williams, at her request **(see exhibit 2-2)** in the year 2000. By their malicious actions against Sadie Williams, Hurston was able to discern that there is a need for action on her part to protect herself, because she was next to suffer at the hand of the defendant.

Hurston made copy of her work, within the guidelines of the agency **(see exhibit 14-1)** as a shield against unfair action by Linda Day and her conspirators. Every time Hurston had questions regarding discrepancy of her work, Linda Day would wait until lunch time and go through the her desk or take away the information so that Hurston would not have information that would verify malicious intent, without this information, she could not prove her case.

For ten ½ years, Hurston did her Purchasing Assistant 1, & Procurement Specialist duties alone, without any involvement of other co-workers, like Malissa Gulley. Hurston did these jobs manually by the typewriter and fax machine, which filled a whole week continuously. Hurston had very little training on computer since 1988 **(see exhibit 17-21)**, because over the years when she requested for computer training, Gail Weigel and Linda Day stated, "You are not qualify for computer training, because you are a 01 instead of 02." Hurston was very surprised when she received a computer in 1998, and computer training in 2000. Then on **5-4-00**, at Linda Day's request, Malissa Gulley became a part of the Office Depot computer training when supply orderings would be done on line **(see exhibits 17-(14-20)**. Linda Day told Hurston that she was going to allow Malissa to copy the Office Depot Orders on a disk and take home for her to review. Plaintiff knew right then that she is being systematically set-up for failure, because plaintiff also witnessed Linda and Malissa copying Sadie William's files and putting them in the bottom left cabinet drawer of Linda Day desk. This made Hurston a prime target to terminate her job position, out of retaliation by the defendant. As of 5-4-00 others became involved in plaintiff's work, which would make Hurston an easy target for systematically set-up for failure. The same day that Sadie was terminated, Linda Day falsely accused plaintiff of being late from her 15 minutes break. The next day, August 18, 2000, Linda Day falsely accused the plaintiff of speaking unprofessional manner, and demeaning to co-worker. On August 18, 2000, the plaintiff asked Linda Day who was making the complaints against her, but Linda Day never told her **(see exhibit 3-(128-129)**). The August's complaints were never substantiated. Hurston found out two years later on June 18, 2002 about the complaints of August 18, 2000 **(see exhibits 3-(130-134)**. Hurston also faxed a "Blow the Whistle" on discrimination to OCRC on 6-21-00 that they received **(see exhibits 17-(1-3),** and on 8-9-00, Hurston faxed Marcia Slotnick regarding fair treatment. Plaintiff received a response from **Joe Silver on** by E-mail **(see exhibits 17-(4-7)**.

**On 2-9-00**, Hurston dismissed herself from an argument that Linda Day provoked as she signed in for work that day. The plaintiff immediately went to Bob Bullock desk and told him about the incident. Bob went over to Linda's desk and spoke to her privately. Bob came back and told the plaintiff, "Linda said that you were arguing with her." The plaintiff replied, "If I was arguing with Linda, Vicki Perkin (that sits directly in front of Linda) would have heard her." Later that day, Linda told Hurston that her desk would be move to an isolated area, per Karen Conklin request. Hurston immediately sends an E-mail requesting that her desk not to be moved **(see exhibits 17-(8-9)**.

**On 2-25-00 and 3-3-00**, Linda requested a meeting with Hurston. As a result of the meeting, the situation became worse. Bob Bullock, union's vice president was there.

11

**On 3-30-00**, Hurston faxed letter to be put in her file, Regarding: NON-DISCRIMI-NATION, SUPERVISORY INTIMIDATION & DISCIPLINE FOR JUST CAUSE **(see exhibits 17-(10-13)**.

**On 4-25-00**, at 9:00 a.m., Hurston declined from having a requested meeting with Heath MacAlpine. Her reasoning to Heath was, "Bob isn't here to sit in on the meeting." Heath replied, "You are going to have a meeting with me, on way or the other."

**On 5-10-00**, the Hurston attended a meeting with Heath MacAlpine and **Bob Bullock**, regarding the plaintiff's discriminatory complaints against Linda Day. The plaintiff also gave Mr. MacAlpine and Bullock a copy of the 2-9-99 letter that was given to Linda Day on 2-9-99.

**On 6-9-00**, out of retaliation, Hurston received an unfair evaluation **(see exhibit 16-1)**. Hurston had to constantly look over her shoulder. It appears to the plaintiff that BCDJFS was looking for anything to file a complaint against her, to terminate her job position, since August 17, 2000. That was the day that Sadie Williams was terminated without just cause **(see exhibit 16-(2)**. Hurston witnessed Linda Day and Malissa Gulley constantly copying Sadie's files without her consent and knowledge. Sadie was constantly and systematically set up for failure. Plaintiff also provided witness testimony to OCRC, in behalf of Sadie because it was the truth and the right thing to do.

**On 6-16-00**, Hurston requested a meeting with Bruce to discuss her performance evaluation of 6-9-00, and on 6-20-00, Heath MacAlpine responded to Hurston's request **(see exhibit 13-1)**. **On 6-19-00**, Hurston submitted Grievance in writing to Bob Bull, Heath MacAlpine(**see exhibit 13-(2-8)**. The meeting was set up for 6-27-00.

**On 6-27-00**, charging party met with Assistant Director Heath MacAlpine, her Union representative Bob Bullock, and Middletown Office Manager Linda Day to discuss Hurston's unfair performance evaluation, that was given to her on 6-9-00 **(see exhibits 13-9)**. At the meeting, Heath MacAlpine allowed the plaintiff to read her comments that she had prepared in her grievance **(see exhibit 13-(2-8)**. Also at that meeting, according to Doug E. Duckett, December 19, 2000, letter pg 2, para, 1, he stated "On June 27, 2000, charging party met with Assistant Director Heath MacAlpine, her union representative **Bob Bullock**, and Middletown Office Manager Linda Day **to discuss the changes that were occurring in charging party's work load.**" Therefore Bob Bullock was aware of the changes, he was there, but fails to advises and take action on behalf of the plaintiff. Hurston did not have any choice, but to file charges with EEOC on October 17, 2000 **(see exhibit 13-(2-8)**. **On 7-10-00**, Hurston received Heath MacAlpine written response **(see exhibit 3-(5-9)**.

**On 7-13-00**, Malissa who was in the same unit as the plaintiff's was passing out business cards to co-workers, including Hurston's new business cards **(see exhibit 15-1)**.  That was the plaintiff's job, to order and process business cards (procurement).  When the plaintiff saw that her new business cards had on them Machine Operator 2, as her job title, she knew then that she will be set up for failure, because she had already been replaced by several workers.

12

## DEMOTION

Out of retaliation, when Hurston's doctor again requested that her employer provide her with a sitting position for her employment on 6-1-00, that request was not granted **(see exhibit-4-1)**. Instead, on 7-13-00 to 2-27-01, her employer **demoted** Hurston. Her job duties were physically increased with collating on a daily basis, when she was accustomed approximately once or twice a week **(see exhibit 4-2)**. **She was required to keep a daily log of this demotion on 7-13-00 to 2-7-01**, which is approximately 7 months, instead of the 3 weeks time-span that Doug E. Duckett stated in his December 19, 2000, letter to Helen B. Glutz, page 2, para 4, **(see exhibit 7-(1-117 )**. The biggest part of Hurston's purchasing responsibilities (sit-down duties) that she was **qualified and able to do (see exhibits 10-(1-107)**, was **removed** from her and passed on to Jennifer Buker who was hired as a Clerk 2 in the Hamilton's office on 4-10-00 **(see exhibit 8-(1-4 ), & 8-(5-6 ), & 8-(7-72 )**. Jennifer is Caucasian, without a disability. Also, Other Caucasians were processing Office's Depot Orders **(see exhibits 8-(73-91)**. Hurston has been known as a purchaser and a supplier since 1990 **(see exhibits 8-92, & 8-93, 8-94-103 )**. The defendant was now processing the plaintiff to be constantly and systematically set up for failure. **Work was being process in Hurston name without her consent, although it is in violation pursuant to O.R.C. laws (see exhibit 18-(1-13 & 14-1)**. **On 8-7-00**, Hurston discovered that one of her Office Depot order had been tampered with. Hurston decided to ask Office Depot regarding order. Trina Coffman stated, "A female called from BCDJFS to cancel order. Then the order was rekeyed into computer which gave it a new number **(see exhibits 14-(2-16)**. Linda Day refused original order on 8-3-00. When Hurston questioned Linda Day regarding this matter, Linda Day became defensive stating, "I don't know your password." While Hurston was at lunch that day the original order disappeared. Later, Hurston was told that Linda & Malissa were going through her desk, while she was at lunch. Also, **work was being process in the Hamilton's office by Jennifer Buker for the Middletown's office (see exhibits 19-(1-10)**, which was always the responsibility of the plaintiff. Before 6-19-00 the process of Office Depot was a very long process. **On August 8, 2000**, Hurston asked, "Could I have the Office Depot

13

responsibilities back?" Linda Day replied, "I will let Bruce know how important the orders are to you." Hurston never did get her Office Depot duties back. At first, Hurston felt that collating was job security, but it wasn't. Hurston became more depress as she saw others doing her job, and her feet pain worsens. **On 9-22-00** at an all-staff meeting, the defendant shared the "new" Procurement Purchasing Packet information to all staff. The packet also stated, see Jennifer Buker or Brenda Hurston, to the purchasing department **(see exhibits 9-(1-8)**. The plaintiff knew now that Jennifer and other staff have replaced her. The **procurement responsibilities** have been her responsibility since 1992 and her total responsibilities since 1995 **(see exhibits 3-72-125)**.

**On 10-17-00**, Hurston filed complaint with EEOC **(see exhibit 9-9-10)**.

**On 1-19-01**, Hurston happens to come across a Purchasing Assistant 1 job description, which she thought was her own Machine Operator 2 job description. As she read the description, she felt like a ton of bricks have hit her in the face. Hurston requested a job audit, after finally realizing BCDJFS's motives for her demotion **(see exhibit 3-16)**.

**On 1-29-01**, Betty Proctor came to Middletown for job audit; she only stayed for approximately 3-4 hours. **On 2-22-01**, Hurtson received Heath MacAlpine job audit response. He acknowledged that Hurston completed daily work logs between July of last year and January 2001, which cover a period of six months of logging, instead of the 3-weeks time span that Doug. E. Duckett stated in his December 19, 2000, letter pg. 2, para. 4 **(see exhibits 2-(7-8)**.

Evident reveals that there are basis and proof for the plaintiff's charges. Charging party's job has been closely examined because, to a large degree, Hurston's sit down-duties were removed and given to Jennifer Buker and other staffs, **without just cause**. The plaintiff was demoted, as a result of malicious intentions and unfair labor practices that were set in motion by Heath MacAlpine, Linda Day, and Bob Bullock. Accordingly to Doug E. Duckett, December 19, 2000, letter pg 2, para, 1, he stated "On June 27, 2000, charging party met with Assistant Director Heath MacAlpine, her union representative **Bob Bullock**, and Middletown Office Manager Linda Day **to discuss the changes that were occurring in charging party's work load."** Therefore Bob Bullock was aware of the changes on 6-27-00, because he was there at the meeting. He failed to advises and take action on behalf of the plaintiff. Hurston did not have any choice, but to file charges with EEOC on October 17, 2000 **(see exhibit 9-(9-16)**.

Vicki Perkins who noticed that Hurston was crying, as she was walking to her car at the end of the day, referred plaintiff to Pat Irwin, R.N., M.S.N., C.S.  Hurston first appointment with Pat Irwin was on 11-22-00 **(See exhibits 21-(1-3)**.

To establish a prima facie case of racial discrimination, the plaintiff must establish that she is a member of a protected class, **(Hurston is African-American, Jennifer Buker & the other co-workers are all Caucasians)**, that she was qualified to perform her job, **(see exhibits 10-(1-107)**, also, she had been doing the job for ten years without complaint, that she was subjected to **an adverse employment** action,

14

( Lost of pay for ten ½ years and Daily logs of demotion-see exhibits 7-(1-117), and that she was replaced by a person outside of the protected class, **(Jennifer Buker & all other co-workers)**. Alternatively she may establish the fourth element of the prima facie case of race discrimination by showing a similarly situated member of the unprotected class, **(Dawn Sullivan)** a comparable employee, was treated more favorably than the plaintiff. <u>Mitchell v. Toledo Hospital</u>, 964 F. 2d 577, 582-83 (6th Cir. 1992).

From July 13, 2000 to February 27, 2001, Hurston's physically and mentally endures her pain, until it became so unbearable for her to handle. As Hurston watched other co-workers with no disability received preferential treatment and doing her job duties, she became again, very depressed and humiliated. To constitute an adverse employment action, an act must result in a loss of pay or benefits, <u>a detrimental change in responsibilities, a negative change in terms or condition of employment</u>, or some actual and unfavorable change in job status. "Birone v. Indian River Sch., No 97-3212, 1998 WL 199791, at *4 (6th Cir. April, 1998) (citing Koesis v. Multi-Care Management Inc., 97 F. 3d 876, 885 (6th Cir. 1996); Smart v. Ball State University, 89 F. 3d 437, 440-42 (7th Cir. 1996). This definition is nearly identical to the Supreme Court's definition in of a tangible employment action. As discussed above, it is evident that Hurston suffered a tangible employment action, and by extension, an adverse employment action, when she was demoted by BCDJFS as of 7-13-00. Hurston's credible direct evidences of discrimination have in effect proved that race was a motivating factor in the adverse employment decision against her.

## (Accommodation Issues)

Between the years 1995 - 1996, Linda Day was transferred to the Middletown's Office from Hamilton. She was a caseworker, and then she was promoted to Office manager and Hurston's immediate supervisor. For a while, Linda Day appears to be friendly and fair. In 1996, a mechanical collator was provided to the plaintiff for her printing needs **(see exhibit 4-(2-17)**). But in 1998, when the plaintiff returns from surgery, Linda Day demeanor had changed, and the collator was no longer provided for the plaintiff.

On 2-23-98, Gayle Weigel (Assistant Director) called and informed the plaintiff's doctor that she is more than willing to accommodate the patient to get her back to work ASAP!**(see exhibit 4-18). Also, Hurston had foot surgery on her right foot on 2-23-98.**

On 4-16-98, Dr. Janis faxed requested records to Dr. David Randolph per employer (see exhibit 4-19).

On 4-27-98, the plaintiff returned to work. Dr. Janis placed limitations on the plaintiff as follows: **Previous limitations are now permanent. Patient needs a sitting position for her employment. The plaintiff returned to work in more pain than usual, because of the request that Gail Weigel made on 2-23-98.**

On May 18, 1998, the plaintiff received a report from Dr. Randolph (see exhibit **4-20**) pg. four. She then submitted the letter to Dr. Janis, along with her response (see exhibit **4-(21-22)**). Then

15

Dr. Jarvis made his recommendations. Afterward, Gayle Weigel tells Hurston that it is not necessary to obtain an independent medical examination. At that time, plaintiff could not look in Linda Day or Gayle Weigel face, because she was morbid with fear. Hurston was afraid of what she might actually see. The plaintiff with mixed emotions could not put her trust in the union. The union had failed Hurston, at the time she needed them most. Therefore, she did not know where to go or who to turn to. Hurston prayed to God frequently, but she felt that she had let God down, by being afraid. Therefore, Hurston became ashamed and felt that she did not put her complete trust in God. **Hurston became very quietly depressed, her confidence and heath had been undermined.**

**\*Fear of retaliation from the defendant is another factor why (2) years are between more written requests. Also, Hurston just did not feel good. Going back to work too soon, at the request of Gail Weigel (who claim that she is willing to accommodate Hurston in order to get her to come back to work ASAP!).  Plaintiff was at a loss for words. She felt humiliated, irrelevance, inadequate, exhausted, and paralyzed with fear.  Her heart was pierced with so much unbearable pain, just to think that she work for a company where she have given a 150 percent efforts (both physically and mentally) to BCDHS and suddenly the plaintiff requested for needed accommodations; and the company drastically turned against her. The plaintiff has suffered and continues to suffer many years of mental anguish and increasing physical pain. Butler Co. Dept. of Job and Family Services should be held accountable for their malicious actions of deprivation of equal protection and, thus they have also, violated the Fourteenth Amendment. Plaintiff tried to blink out her pain in order to cope. However, BCDHS did not let her alone. Hurston doctor made other requests in 1998 (see below). Out of retaliation, Plaintiff was reprimanded for leaving her son alone, while going to the other building to pick up forms at the end of the day, which was a common practice.**

## (Accommodation Requests)
### (were made at least (2) two years before action was actually taken),
despite Doug E. Duckett statement on pg. 5, para 2., when he stated, "Her requests for accommodation have been repeatedly granted, despite the fact that they often seem to reflect wish and whim more than need." (Utility Cart was delivered to Middletown, Ofc. on 10-27-00 (see exhibit <u>2-32-33</u>).

### <u>Utility Cart:</u>

a    **On 12-17-97,** Plaintiff typed this Office Depot Order No. 195-SO No. 38413420/001 (see exhibit <u>11-(1-4)</u>, prior to her surgery on 12-18-97. When the plaintiff received a verbal request from Linda Day, "Purchase a utility cart with handles." Hurston said "Linda, Thank you for my cart, I ordered!" Linda replied, "The utility cart is for Dawn, because Hamilton order one for their active files, so I asked Dawn did she want one." Hurston replied, "What about me. I work in two buildings, and Dawn work in one building. Why can't I have a cart?" Linda replied, "I will get back with you." Dawn's old metal cart was put in the basement, because it was hard to roll,

and did not have handles. In 1998, when Hurtson returned back from have surgery, Hurston made another verbal request. Linda never got back with the plaintiff.

b.  **On 8-21-00**, Hurston made a request in writing for **Eldon's utility cart**, No. 948-23 **(see exhibit <u>11-(6-7)</u>)**. Linda gave Hurston, Dawn's old metal cart, without handles and sharp around the edges, which did not roll properly. She made a request in writing to Heath MacAlpine on 9-1-00 **(see exhibits <u>11-(8 ½ -9, 9 ½ )</u>)**. Hurston received no response. On 9-15-00, Plaintiff requested accommodations through her Dr, Robert A. Schriber, MD, **(see exhibit <u>11-(10-14)</u>)**. Plaintiff is aware that it only takes 1-2days for delivery, once the order is processed. 11-9 ½ verifies 11-8 ½.

Dawn Sullivans' statement of **8-21-00** indicates that she did not request a utility cart. Instead, Linda Day asked her would she like to have a cart since Hamilton was buying a cart for their active files **(see exhibit <u>11-15</u>)**. Dawn is a Caucasian female, without a disability who worked in the same unit as the plaintiff, who was also supervised by Linda Day. Accordingly to Dawn's statement, BCDJFS recognized that even a normal person without a disability and who work area is stationed in one building has a need for a new utility cart that would function properly. Dawn's old metal utility cart without handles and sharp around the edges, which did not roll properly, was placed in the basement, until 8-21-00 when plaintiff submitted a written request in writing to Linda Day.

c.  Picture of both utility carts on 8-21-00 **(see exhibits <u>11-5</u>)**. Plastic utility cart that was given to Dawn in December of 1997. Metal utility cart that was given to the plaintiff on 8-21-00. Plaintiff was told by Linda Day not to use the metal utility cart, although nobody was using the plastic one with the handle & it was close to the plaintiff's work station.

2.  **Adjustable Chair: Request was made at least (2) two years before action was actually taken.  (Adjustable chair was delivered on 10-3-00 (see exhibit <u>2-34-35</u>)**

a.  **On 6-2-98**, Plaintiff requested a sitting position in **an adjustable chair** to accommodate printing needs through her doctor, Leonard R. Janis,  D.P.M., Inc. **(see exhibits <u>11-(16-17</u> )**.

b.  **On 8-21-00**, Hurston made a request in writing for an **Adjustable Task Chair**, **(see exhibits <u>11-(6-8)</u>)**. Again, she made a request in writing to Heath MacAlpine on **9-1-00 (see exhibit <u>11-8 ½ </u>)**. On 9-15-00, Dr. Robert A. Schriber requested accommodations in behalf of Hurston **(see exhibits <u>11-(10-14)</u>)**.

3.  **Sit-down position, not to lift, stand, or walk up & down stairs. Requests were made at least (2) two years, and request was <u>not granted</u>.**

a.  **On 3-30-98**, Plaintiff made a request through her Dr. Leonard R. Janis, D.P.M. Inc., that **she needs a sitting position** for her employment. She is not to lift, stand,

17

or walk up & down stairs **(see exhibit 5-1).** That request was never granted. Instead, her employer continued to give her duties that had her constantly standing, carrying, lifting, reaching, walking up & down stairs and walking back & forth between two buildings and to the copier, **which irritated her already know pre-existing feet condition.**

b. **On 4-27-98,** Plaintiff made a request, through her Dr. Leonard R. Janis, D.P.M previous limitations are now permanent. **Patient needs a sitting position for her employment (see exhibit 6-1).**

c. **On 6-2-98,** Plaintiff made a request through her Dr. Leonard R. Janis, D.P.M., **she requires a sitting position** in an adjustable chair to accommodate printing needs. All previous restrictions apply **(see exhibit 11-(16-17).**

e. **On 6-1-00,** Plaintiff made a request through her Dr. Leonard R. Janis, D.P.M., her previous limitations are permanent. **She needs a sitting position for employment (see exhibit 4-1).**

### Discipline Issues

Hurston did not have any miscommunication problem with other co-workers for ten years, why would she start in August of 2000. Just as come to pass to the plaintiff in 1990, when the defendant requested that the plaintiff submitted a false statement against an African-American female **(Diane Cameron–see exhibits 3-(25-34),** with a disability in order to terminate her job position; which the plaintiff refused to do and was retaliated against for the next ten years as the evident have shown. The defendant has surrounded Hurston like waters all day long; they have closed in upon her all at one time, as they submitted false written statements **(see exhibits 3-(128-134)** in the month of August. The plaintiff was never told who made the false allegations about her in August, therefore, the complaints was never substantiated. Hurston became more depress just as she witnessed Sadie Williams had been, just before she was terminated. Plaintiff started experiencing panic attacks.

On 10-12-00, Hurston asked Deputy Sherry Compton, "Are you watching me?" because Deputy Compton has stationed her self all day long behind plaintiff work area on 10-10-00, at Susan Oaks' desk, while Linda Day, Malissa Gulley, June Hom, Cheryl Tincher, and Susan Oaks were out of the building from 10:00 a.m. to 4:00 p.m. Hurston knows that it was a highly unusual position for **Deputy Compton to be in back area all day long,** because her station was at front-desk area **(see exhibit 2-10)** and not at Susan Oaks' desk. Hurston felt that Deputy Compton was monitoring her, just as she witnessed Deputy Compton monitored Sadie Williams. Hurston is the one that should have found this to be really offensive. Sadie Williams was terminated, with the assistant of Deputy Sherry Compton, who is an officer of the law.

On 10-17-00, Hurston filed complaint with EEOC, after she had an **ambushed meeting** with Linda Day and June Hom that was requested without notice by Linda Day **(see exhibit 9-9-10 & 2-(11-13).** Hurston did not take notes, nor did she say she took notes in the building.

18

**On 10-18-00**, Hurston received verbal and written reprimands in **ambushed meeting with Linda Day**, Madeline Burns, and Bob Bullock that was requested without notice by Linda Day (**see exhibit 2-(14-18)**). Linda Day accused plaintiff of approaching Deputy Compton in a disrespectful manner, and requesting that Hurston bring her personal notes **from home**. Hurston had stopped taking notes at work, when she was told that Linda Day and Malissa Gulley were going through her desk in August 2000. Linda Day verified that Hurston wasn't taking notes on 10-17-00 (**see exhibits 2-(11-13)**). Linda Day was grasping at an empty steno pad that Hurston picked up from file cabinet on her way to the conference room. None of the discipline issues regarding the plaintiff were ever substantiated. It is true that the plaintiff discussed the issue with Ms. Compton "Are you watching me" but the plaintiff was not disrespectful and did not accused Ms. Compton (**see exhibit 2-(11-13)**). Hurston denies sayings, "I have a problem with you! The pressure was killing me. I have documented the time and the date of every occurrence you have been in the back office speaking to the workers." Hurston did not make those comments (**see exhibits 2-(19-23)**). After Hurston made requests again for the written statement (**see exhibits 2-(24-25)**, Hurston received Deputy Compton and June Hom written complaints on January 17, 2001, (**see exhibits 2-(26-30)**. **It took 3 months to give Hurston written complaints. On 10-26-00,** Hurston filed grievance regarding reprimands (**see exhibit 2-31**). Bob Bullock failed to take appropriate action in her behalf. Deputy Sherry Compton was a conspirator with Linda Day and June Hom that is the reason for her false written statement.

Butler County Department of Job and Family Services is a public business, their job position is to create or preserve jobs and employment opportunities, to improve the economic welfare of the people of the state, as Article VIII, Section 13 of the Constitution of the State of Ohio and Ohio Revised code section 307.07 promises. Instead, BCDJFS is evil, evil can't be ignored, and it has to be stop. For ten ½ long years, the defendant has acted with vengeance and harshness, until Hurston no longer can't take it. Her physical & mental condition has deteriorated drastically. One of the essential purposes of the civil service laws is the protection for civil-service employees. Also, Let it be known that, it is understood by the plaintiff that the defendant has the right to make business decisions, including selection decision such as those at issue in this case, for good, bad, or no reason at all, as long as, they don't constitute discrimination. The wanton and willful misconduct of the defendant has already been stated above.

Plaintiff has based her claims for discrimination upon race, disability, gender, and retaliation, which as a matter of law are substantially sufficient. Thus this case involves factual issues, which are best tried to a jury. Therefore, the plaintiff request for a jury trail should be granted and the plaintiff requests defendant's demand for motion to file leave to file motion for summary judgment be denied. Plaintiff also brings her claims against the defendant under Chapter 42 of the U.S.C section 1983, Title VII. E.g., Tyler v. Hot Springs School Dist. No. 6, 827 F.2d 1227 (8th Cir. 1987); Hervey v. City of Little Rock, 787 F.2d 1223 (8th Cir. 1986). This guarantees her right to a jury trial. BCDJFS Discrimination tactics have gone underground, under a different channel. You may no longer hear your employer calling you a nigger. Instead

19

discrimination is in your performance evaluation, and change in job description so that the one who is being discriminated against do not understand that he/she is being discriminated against when they read it. In addition, BCDJFS hires attorneys, family, & friends who are willing to unlawfully defame the name of their targets. What is a person to do, if they do not have the money to pay an attorney to fight back? Give up? Never may that happen! Common people like the plaintiff need to be aware that discrimination still exist in many forms, and what remedies are available to them that would help them to be able to explain their situation.

Magistrate Judge Hogan held a settlement hearing on October 17, 2003 and a settlement was not reached. At that time, Magistrate Judge Hogan appointed Mr. Edward Perry to review and represent the plaintiff with her case. Since then, there were no further motions or discovery by either party until, May 4, & 6, 2004, in which Jack McGowan filed the above motion. Unfortunately, On May 13, 2004, Mr. Perry informed Hurston that if a settlement was not reached, on May 18, 2004, at the conclusion of the settlement conference with Magistrate Hogan, that he would not be able to represent plaintiff. On May 18, 2004, a settlement was not reached. Hurston will always appreciate the time and effort that Mr. Perry put in her case, but she have no choice but to strive forward, even if it means that she is in pro se status. On Friday, May 21, 2004, Jack McGowan informed plaintiff that he would get back with her by Tuesday, May 25, 2004, in regard to her settlement demands that were made on May 18, 2004. Jack McGowan did not get back with Hurston and he still has not responded yet as of this date. Therefore, upon filing this memorandum, if this case goes to court the plaintiff is asking, $300,000.00 for compensatory damages, and $1,000,000.00 for punitive damages. If the plaintiff should prevail in her Pro Se case, it is her belief that finally justice is being served for the right reason. Discrimination is against the law, and no one should be above the law. Instead of looking down at the person in pro se status, the plaintiff request that she receive equal protection under the law of the United States of America, and that she do not be deprive of life, liberty, property, or due process of the law.

Respectfully Submitted:

*Brenda K Hurston*

Brenda K. Hurston, Plaintiff, Pro Se
1812 Grand Avenue, Middletown, OH 45044
(513)-420-9692

20