IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BRENDA K. HURSTON | : | CASE NO. C-1-01-313 |
| Plaintiff | : | Judge Weber; Timothy Black, M.J. |
| -vs- | | PLAINTIFF'S BRENDA HURSTON MOTION IN OPPOSITION OF THE |
| BUTLER COUNTY DEPT. OF JOB AND FAMILY SERVICES | : | DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| Defendants | | |

_____ :

COMES NOW Brenda K. Hurston's motion in opposition to the defendant, Butler County Department of Job and Family Services' motion for summary judgment, because there are genuine issues of material facts involving this case. Therefore, the defendant should not be entitled to summary judgment, but be held accountable for their intentional discriminatory employment practices out of *"retaliation"*, in the form of *race, gender and disability* that continued over a period of ten ½ years against the plaintiff. This motion is supported by the depositions of the plaintiff's witnesses, the attached memorandum, and other exhibits attached hereto.

Respectfully submitted,

*Brenda K Hurston*

Brenda K. Hurston, Plaintiff, Pro Se
1812 Grand Avenue
Middletown, OH  45044
(513) 420-9602

1

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In support of plaintiff's response, Brenda K. Hurston offers the following Statement of facts that you can rely on:

## INTRODUCTION

Butler County Department of Human Services, now known as the Butler County Department of Job and Family Services (hereinafter "BCDJFS") have stained their white collar, as with scarlet[1], by their Intentional Discriminatory Employment Practices out of *"retaliation"* in the form of *race, gender and disability* against the plaintiff, Brenda K. Hurston. "BCDJFS" intentional discriminatory employment practices against the plaintiff did not just happen over night; but *continues* to have a long-developed, long-lasting and a devastating snowball effects upon Ms. Hurston's physical and mental well being for over 10 ½ years. As a result, the plaintiff's *"quality of life"* has suffered many years of deprivation and mental anguish that affected her physically, *emotionally* and *financially*. By 2001, however the plaintiff realized that "BCDJFS" have used her as if she was worthless and totally expendable. As they pursued their selfish goals without any regard for her well-being, her life have become cheap in their eyes, and they have treated her as a disposable tool for making money at the cost of her well-being.

The initial team players that formed the building block of retaliation that lasted for over 10 ½ years, consisted of (Douglas E. Duckett (currently legal counsel for the defendant, BCDJFS), Dianne Rice Logsdon (Director of BCDFS in 1990 (retired), who married Commissioner Logsdon in 1990 who is now deceased), Roy Kadle (Assistance Director of BCDJFS in 1990 (retired), Betty Proctor (Head-Personnel officer in 1990-currently on staff under new name title), Linda Duff (Plaintiff's immediate supervisor in 1990 went out on disability), Lynn Mitchell (Union President, who is currently married to Larry Watkins and went out on disability) and (Larry Watkins (Union's Staff Representative). They *all* made the conscience decision to violate policies and procedure in 1990 that had the devastating snowball effects for the second team to follow. The second group of team players, that added to the first

---

[1] The word "scarlet" denotes a bright red color, is a fast, or fixed color. Neither dew, nor rain, nor washing, nor long usage, would remove it.

group of team players, consisted of (Gail Weigel, plaintiff's immediate supervisor, after her transfer to the Middletown's office; later Gail became Assistant Director (retired?), Bruce Jewett (Director in 1998), Heath MacApline (Assistant Director late 1999), Linda Day (Plaintiff's immediate supervisor starting in 1996-7), Roy Dawson (Union President), Bob Bullock (Vice President) and other co-workers that replaced the first team. They too made the conscience decision to violate policies and procedures against the plaintiff, until the plaintiff had no alternative but to apply for disability status in 2001. Recent cases demonstrate how seemingly trivial and unconnected employment actions or events can be strung together later on to form the building blocks of retaliation claim. Ray v. Henderson (9th Cir. July 7, 2000) 2000 Daily Journal D.A.R. 7393.

THE RETALIATION BEGIN

The retaliation begins in November of 1989; when Brenda King, now known as Brenda Hurston (hereinafter Ms. Hurston) was requested provide a false-written statement against Diana Cameron[2], by Linda Duff (plaintiff's newly-hired immediate supervisor). The plaintiff refuses to provide a false written statement against Diana Cameron, because she did not feel that it was her place to get involved in a matter that she was not fully aware of, and she believe that Linda Duff's request was discriminatory. She felt that the agency wanted to use her statement as a token service[3] for them to discipline Diana Cameron (see exhibits 3-(25-34). **Out of retaliation**, for refusal to obey a request by her employer, the plaintiff begins to suffer many intentional discriminatory employment practices that were set in motion by the first group of team players of her employer. The plaintiff have listed **some of the main practices that have continues** to have a long-develop, long-lasting and a devastating snowball effects upon her physical and mental well being up to the present time. They are listed as follow:

1. <u>Increase in workload & constantly changing work guidelines</u>. The plaintiff's job description changed (5) five times within the 12 months supervision of Linda Duff (see exhibits 3-(11-15). Plaintiff's job position went from sitting down[4] to standing[5] for the

---

[2] Diana Cameron: African-American Elderly woman, with a disability of the hand, and who had been employed as a classified civil-service employee in the position of switchboard operator.
[3] Token service- an action that gives an appearance, that the company's action against Diana Cameron was not racially motivated.
[4] Relieving on the switchboard, which is a sit-down position.

primary part of her day; she was required to wear heeled dress shoes. The agency's action led the plaintiff to exercise her right to request accommodation to wear comfortable shoes. Then "BCDJFS" retaliated by not permitting her to wear comfortable shoes and charging her with falsification of doctor's statement that was not <u>substantiated.</u>

2. <u>Plaintiff not permitted to wear comfortable after submitting doctor's statement; instead she was accused with falsification which wasn't substantiated</u>-**Feet pain begins**.
Because of the increase workload that had plaintiff standing the majority of the time, plaintiff purchased a pair of shoes to relieve the pain in her foot due to the extra workload and standing in heels all day. Approximately, April 9, 1990, Linda Duff noticed that plaintiff was wearing a new pair of shoes; which was the very first day that Ms. Hurston wore them to work. Plaintiff told Linda that her feet hurt from the constant standing in heeled shoes. Therefore she purchased a new pair of shoes to help her to have less pain in her feet. Linda told plaintiff that she could not wear the shoes, unless she had a doctor's statement. Plaintiff asked, if she could wear the shoes until she could get in and see a doctor, Betty Proctor and Linda Duff denied her request. Betty Proctor said, "The shoes were in violation of the dress-code policy[6]". It was 2 weeks before a doctor could see her. On 4-23-90 the plaintiff finally saw the doctor. After the doctor examined the plaintiff, he signed the BCDHS 161 P sick sheet that certified the use of sick leave described was necessary (see exhibit <u>3-40</u>). He also provided the plaintiff with a letter dated 4-23-90 (see exhibit <u>3-41</u>). The plaintiff immediately gave the sick sheet and letter to Betty Proctor upon arriving to work the next day. Plaintiff also brought her shoes in so she could wear them, as she was in unbearable pain. Although the letter clearly stated, "**Mrs. King's foot type does not allow her to wear dress shoes <u>for any length of time</u>, therefore, please allow her to wear comfortable shoes while working.**" Betty Proctor still would not permit her to wear the shoes that the plaintiff purchased, indicating that she had to provide a statement that explained her medical condition (see exhibits <u>3-38 & 3-41</u>). Plaintiff was not going to be seen again by the doctor for another two weeks. In the meantime, Betty Proctor and Linda Duff conspired to have plaintiff charged with falsification on 4-30-90. On 5-7-90, the plaintiff attended a meeting in Dianne Rice Logsdon's office regarding the falsification charges, which Lynn Mitchell took notes (see exhibit <u>3-37-39</u>). The plaintiff carried in shoes that she purchased. Dianne Rice Logsdon, Betty Proctor, Brenda King, Lynn Mitchell & Larry Watkins were all in attendance. Lynn's notes indicated Dianne apologized for BK's inconvenience during this problem. The union did not take appropriate action on her behalf. They failed to advise her on what to do. All the union did was attend the meeting, make a few comments and take notes. There was no further action taken. No concern regarding her feet condition or solution to the problem. Dianne's apology was not sincere; she blamed the doctor's office for misinformation. The plaintiff showed Dianne the new shoes, Dianne stated, "I don't consider those dress shoes." Plaintiff was extremely upset. As she did not want to show emotions in front of everyone, she walked out of the meeting, due to the unconcern

---

[5] Working in close files, copier machine maintenances, and helping out in mailrooms, which are all stand-up position.
[6] A few days prior, Betty Proctor had told the plaintiff that she could no longer wear her culottes, because her culottes (they look like a skirt in the front) were in violation of the dress code.

shown toward her medical problems. She felt hopeless, as well as, helpless. Later on, Lynn Mitchell handed the plaintiff a copy of her notes. The deprivation from not being able to wear the shoes indeed caused the plaintiff mental anguish. From the first day that plaintiff wore the shoes, and told them that she was in pain from wearing the heeled shoes, until she could actually wear the shoes that provided comfort was approximately a 35-day time span. However, the doctor's of 4-23-90 clearly implied that **"Mrs. King's foot type does not allow her to wear dress shoe for any length of time."** Therefore the plaintiff believes that "BCDJFS" is responsible for the agitation of her foot condition, which was the beginning of a long-develop, long-lasting and a devastating snowball effects upon her physical and mental well being up to the present time. "BCDJFS" increased her workload that required her to stand majority of time wearing heeled shoes. "BCDJFS" did not permit plaintiff to follow doctor's instruction. Although plaintiff was permitted to wear the shoes beginning on May 8, 1990, when Betty Proctor received the letter indicating the medical condition of plaintiff's foot (see exhibit 3-43), **the damages was already done.** The plaintiff did not get any relief from the May 7, 1990 meeting with Dianne Rice Logsdon or the union. Instead, out of retaliation for the plaintiff exercising her right to request accommodation; "BCDJFS" retaliated by giving the plaintiff an unfair performance evaluation on June 5, 1990. By their intentional discriminatory employment practices, out of retaliation, in the form of disability that was display during this time period, it is truly a reason why they "did not tell the truth," when the defendant alleged that they had no medical evidence of plaintiff's disability claim.

3. <u>On 6-5-90, Plaintiff received an unfair unsatisfactory performance evaluation (see exhibits 3-(44-52). Also see: Plaintiff's memorandum in opposition to the defendant's motion for leave to file for summary judgement</u> (Doc. ___, p. 4 & 5),(KATHERINE RUMPH-BUTLER depo., August 26, 2004, p.6,l.3-21; p.7,l.21-25; p.8,l.1-14; p.12,l.12-20; p.38,l. 10-13, and p.39,l7-13).

Because the plaintiff opposed the unfair unsatisfactory performance evaluation and requested that Mrs. Katherine-Rumph Butler speak to Dianne Logsdon regarding her concerns of racial discrimination; Ms. Hurston became something very detestable to Dianne Logsdon and the union. As a result, "BCDJFS" retaliated against the plaintiff by <u>Substantially increasing her workload of two higher classifications, without pay for ten ½ years</u>. Dianne Rice Logsdon assigned a new job position description on 7-6-90. The new job description requires the plaintiff to performed (55%) the primary duties as a Purchasing Assistant 1 (see exhibits 3-(63-66), formerly held by Charlie Treadway in addition to performing the primary duties as a Machine Operator 2., and she was also required to performed the Duty as a Social Program Administrator 1 as a procurement specialist that was previously held by Randy Chafin. Dianne Logsdon told Randy that she was going to send the new job description to Columbus. Randy also confirms that plaintiff requested to wear comfortable shoes. Randy was also told by "BCDJFS" when he had been out on disability, and tried to return to work; his job did not exist[7] (they alleged that the plaintiff's duties no longer existed, however, others were doing her job

---

[7] Exist, defined as 1. To have reality or actual being; to be; 2. To occur or be present; 3. To continue being- Webster's New World Dictionary, Third College Edition, 1988.

duties). The plaintiff had been assigned Randy's duties as a procurement specialist. (See exhibit A), (RANDY CHAFIN depo., August 26, 2004, p.9; p.10,l.1-4; p.11,l.12-19; p.13,l.14-17; p.19,l.11-25; p.20; p.21,l.1-9; p.37,l.8-14; p.58; p.59; & p.60,l.1-6)

I. SUMMARY JUDGMENT SHOULD BE DENIED, AS THERE ARE MATERIAL QUESTIONS OF FACT.

Upon Ms. Hurston filing her suit against "BCDJFS" on 5-21-01, it should have been common knowledge to them, especially an organization of its status; to know that they have the accessibility to request a copy of the plaintiff's closed file from EEOC (Under Title 29-Labor Chapter XIV— Equal Employment Opportunity Commission Part 1610—Availability of Records Subpart A—Production or Disclosure Under 5 U.S.C...Public Law92-261, 42 U.S.C), since it is considered public record. Therefore, the plaintiff thought that the defendant had already obtained a copy of Ms. Hurston's EEOC file, since they already had a copy of the charge. Ms. Hurston has submitted the EEOC's Pre-charge instruction and checklist on 10-17-00, which she had highlighted 5 of the 8 reasons why she believe that she was being discriminated against (see exhibit 100-1). The reason why the question, ("Do you believe that the action taken against you was based on one or more of the above reasons?") was not marked yes is because the plaintiff overlooked the question, because the investigator was in a hurry to finish the interview by 5:00 p.m., closing time. Although the plaintiff and Sadie Williams (see exhibits 100-(6-7) arrived timely for her interview at 3:00 p.m., the investigator was at least 30 minutes late for the intake interview. Also, Ms. Hurston's submitted an affidavit (see exhibit 100-2) to EEOC on 11-6-00, which clearly implies that she believes that she was being retaliated against. There were so many *consecutive incidents* that the plaintiff opposed, she did not know the exact reason for the retaliation. Her statement on the additional pages of her affidavit -"Attachment page-1 (size, 8 ½ x 14 sheet of paper, see exhibit 100-4) and Attachment page-2 (size, 8 ½(see exhibit 100-5) states as followed:

"There have been rumors that we are currently overstaffed, and the agency is getting rid of the old employees. I believe I am being set up for discharge because of my race, Black, and my disabilities. Also, in February 1999, I wrote Linda Day up for using cuss words in my presence. I had told her that this was offensive to me because of my religion Jehovah Witness, but she continued to use them. I do not think she has forgotten that I made this formal complaint, even though it was more than 1 year ago. Ms. Day also gave me an unfair evaluation in June, 2000. *I do not know if this is because of my **race, disabilities, or retaliation** for my reporting her.*"

"* The agency feel that I was responsible for Sadie Williams having knowledge of a file that was on Linda Day desk, June Hom approached Sadie & told her, I looked on Linda's desk & saw Sadie's file. I did not looked on Linda Day desk."*(This statement was handwritten, see exhibit 100-5)

Accordingly to Ms. Hurston's statement, she was led to believe that "BCDJFS" actions against her were due to racial, religious, disability, as well as, retaliation for reporting Linda Day. The affidavit clearly indicates that she believes she was being retaliated against. Her stated reasons for the retaliation clearly imply that the time span was prior to 7-13-00. The plaintiff wrote Linda Day (her immediate supervisor) up in February 1999. 7-13-00 was not the earliest date that discrimination took place against the plaintiff. Therefore the plaintiff may have misunderstood the intake investigator question at EEOC during the time of the interview on October 17, 2000. Also during the interview, the plaintiff asked the intake investigator to mark the box for retaliation; she did not type her charges herself, but the charges were typed in by the intake investigator and the intake officer failed to do so (see exhibits 100-(6-7). Also, Ms. Hurston filed charges with The State of Ohio State Employment Relations Board; her case numbers are 01-ULP-01-0006, 01-ULP-01-0007, 01-ULP-03-0150, and 01-ULP-03-0151. The filing of a discrimination charge with either a state or federal administrative agency is a prerequisite to filing a Title VII discrimination suit in federal court. See Seymore v. Shawver & Sons, Inc., 111 F.3d 794, 799 (10th Cir.), cert. Denied, 118 S. Ct. 342 (1997).

On 3-30-00, Ms. Hurston communicated by fax to Heath MacAlpine/Betty Proctor, that her belief that their actions against her constituted unlawful discrimination (see exhibits 17-10 to 17-13). However, the plaintiff has a reasonable and good faith belief that the opposed practice violated the anti-discrimination laws. Therefore, Ms. Hurston is protected against retaliation, even if she was mistaken about the unlawfulness of the challenged practices. While at one time it was unclear whether employment practices opposed were required to actually be unlawful in order for a plaintiff to seek the protection of Title VII's Opposition Clause, it is now clear that a plaintiff need only to reasonably believe he or she was opposing unlawful conduct. Hochstadt v. Worcester Foundation for Experimental Biology, 545 F.2d 222 (1st Cir. 1976); Rosser v. Laborers' Intern. Union of North America, Local No. 438, 616 F.2d 221 (5th Cir. 1980).

In Arcadian Phosphates, Inc. v. Arcadian Corp, 884 F.2d 69 (CA 2 N.Y. 1989), the Court found that summary judgment was an appropriate procedure to determine whether a contract

7

exists, where the question of intention is determinable by written agreements and a review of the agreements indicates that it was a binding contract. Summary judgment is appropriate to determine the construction and legal effect of an unambiguous writing, and it is for the Court, not the fact-finder, to make such determination. Summary judgment is properly used for interpreting contracts whose terms are agreed to by all parties and are clear and unambiguous, despite the parties having divergent views on what the agreement provides. Clemons v. Dougherty County, Ga, 684 F.2d 1365 (11th Cir. 1982).

Ms. Hurston's pending case has and will continue to demonstrate that there are material questions of fact in this matter that have been raised by her. This material issue of fact requires the *denial* of the defendant's request for summary judgment. A material or genuine issue of fact is one which, if set forth before the Court and proved, would constitute a legal defense to the claim of the plaintiff. Keehn v. Brady Transfer & Storage Co., 159 F.2d 383 (CA7 Ill. 1947), cert. den., 331 U.S. 844. See also Rogers v. Singletary, 142 F.3d 1252 (11th Cir. 1998).

An issue of fact is not material unless it has legal, probative direction as controlling the issue submitted, and a motion for summary judgment is not a trial of the issues but is utilized for the purpose of determining whether, in fact, there are any genuine issues as to material facts.

While supported allegations in pleadings and briefs do not establish genuine issues of material fact, plaintiff's proofs clearly establish sufficient basis on which to oppose summary judgment. Earley v. Champion Int'l Corp., 907 F.2d 1077 (11th Cir. 1990). Ms. Hurston's contentions in this matter clearly sets forth more than mere *"scintilla"* of evidence in plaintiff's favor and does not simply reassert factually unsupported allegations contained in her pleadings. It specifically sets forth a basis upon which the defendant should have undertaken to act with respect to the agreement in question so as to preclude the injuries sustained by the plaintiff. The facts educed and raised by the plaintiff in this matter are material, in that they should, in accordance with the cases, affect the outcome of a lawsuit under applicable law. The dispute over any material fact has been held to be "genuine" if the evidence is such that a reasonable fact-finder could return a verdict for the non-moving party. Clemons, supra; Kopelowitz v. Home Ins. Co., 977 F. Supp. 1179 (S.D.Fla. 1997).

There is no clear-cut definition for "genuine issues of material fact" in United States v. One Parcel of Real Property with Building, 960 F.2d 200 (CA1 R.I. 1992), the Court found that for the purposes of summary judgment, "genuine" means that evidence about the facts raised are

such that a reasonable jury could resolve the issue in favor of the non-moving party and "material" means that the fact is one which might affect the outcome of the lawsuit under existing governing law. Under this definition, the plaintiff has more than sufficiently met her burden. See also Tipton v Bergrohr GMBH-Siegen, 965 F.2d 994 (CA11 Fla. 1992); Brown Mackie College v. Graham, 981 F.2d 1149 (CA10 Kan. 1992).

Summary judgment is not to be granted lightly and is not to be a substitute for a trail of disputed issues of fact. Its use is limited to those exceptional circumstances that where there is no genuine issue as to a material fact, the moving party is entitled to judgment as a matter of law. A "genuine" issue is one, which is sustained by substantial evidence. Lipschutz v Gordon Jewelry Corp., 373 F. Supp. 375 (S.D. Tex. 1974). In the matter presently pending before this Court, the issues raised by the expert's report clearly fall within this concept and definition.

In Ms. Hurston's case presently pending before this Court, summary judgment should be denied in order to permit the plaintiff to present its issues to the fact-finder for determination and consideration.

Consideration of summary judgment requires the applications of the standards of Harris v. H & W Contracting Co., 102 F.3d 516, 518 (11th Cir. 1996). The Court must "view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." Stewart v. Happy Herman's Cheshire Bridge Inc., 117 F.3d 1278, 1285 (11th Cir. 1997). Summary judgment is proper only if the pleadings, depositions, and affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56 (c)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed.2d 265 (1986). The defendant, "BCDJFS" has not sustained its burden in this matter.

Because "BCDJFS" failure to comply in accommodating Ms. Hurston in a timely matter in 1998 to 2001, she suffers from increased agitations to her physical and mental conditions; and was compelled into filing for disability in May 21, 2001 (see exhibits 703- (1-2 ). Ms. Hurston filed a complaint basing her claims for discrimination upon race, gender, disability and retaliations. Hurston stated that she is on permanent disability (see exhibit 3-2, Hurston depo. P. 5, 1-11). The defendant's counsel stated in his memorandum, "Plaintiff *went* on permanent disability leave in May of 2001, when advised by her doctor that she would be unable to return to work due to the degenerative joint disease in her feet. (Hurston depo, April 5, 2002, p. 8:

9

September 9, 2003, p. 227, Exh. J)" His statement is misleading. Do not be misled; Ms. Hurston *applied for* disability leave in May of 2001 and her application was *granted* on September 19, 2001 (see exhibits 704-(1-2), & 732-(1-8). At that time, plaintiff was able to perform a sedentary job on a full-time regular basis with no difficulty (see exhibit 732-5).

The Defendant counsel's statements on pages 3-5, 11,12 are all misleading statements, plaintiff denies all statements mentioned and have addressed them together, because the evidence already submitted reveals the truth in this case. The Defendant's Counsel's statement have been presented in such a way that it is totally misleading. Therefore, his statements are malicious because he have left out details, and events, and other steps that lead to the plaintiff's statements. His statements were intended to be misleading to take the focus off the important matter of this case. For example, he stated, plaintiff was able to use the utility cart of Dawn Sullivan. If plaintiff had access to Dawn's utility cart, there would be no reason to purchase another utility cart since the workstations were side by side. As stated, in the witness depositions, Plaintiff was only seen using a chair for means of a utility cart. In respect to the use of the utility cart that was in Dawn Sullivan's possession; the cart was utilized in the Open Files Department to retrieve existing files returned by all IM workers; which resulted in 100% utilization by "open files". This made the utility card unavailable to use by Ms. Hurston in the Purchasing Department.

## CONCLUSION

There are genuine issues of material fact left for trial, defendant should not be entitled to summary judgment and the defendant should admit to their unlawful intention discriminatory employment practices against Ms. Hurston. The laws are there to balance the scales of justice, but also make it possible that future attempts of violation would be eliminated through the (punishments) consequences of favorable judgment in behalf of the plaintiff. Therefore, upon filing this motion, the plaintiff is asking $300,000.00 for compensatory damages, and $1,000,000.00 for punitive damages.

Respectfully Submitted

*Brenda K Hurston*

Brenda K. Hurston, Plaintiff, Pro Se
1812 Grand Avenue, Middletown, OH 45044
(513)-420-9692

## CERTIFICATE OF SERVICE

    I, Brenda K. Hurston, hereby certify that a true and correct copy of Plaintiff's motion in Opposition of the Defendant's motion for summary judgment, has been sent by regular mail to Jack C. McGowan, Attorney for Defendant, Butler County Department of Job and Family Services, 246 High Street, Hamilton, Ohio 45011, this 14th, day of March 2005.

*Brenda K Hurston*
Brenda K. Hurston, Plaintiff, Pro Se